# Tab 1



ONE DISCOVERY PLACE • SILVER SPRING, MD 20910-3354 • 240.662.0000

## AFFILIATION AGREEMENT

AGREEMENT made as of October 3, 2007, by and among Discovery Communications, LLC ("Discovery"), Animal Planet, L.L.C. ("APLLC") and Sky Angel U.S., LLC, a limited liability company organized under the laws of the State of Florida ("Affiliate"), for the distribution and exhibition of the programming services currently known as DISCOVERY CHANNEL, ANIMAL PLANET, DISCOVERY KIDS CHANNEL, DISCOVERY HOME CHANNEL and MILITARY CHANNEL (collectively the "Services", and each, individually, a "Service") on Affiliate's Affiliate Systems.

1. Definitions.

The following terms shall have the respective meanings set forth below.

1.1 Affiliate System. Each cable television system (as defined below) or IP System (as defined below) now or hereafter (a) at least fifty-one percent (51%) owned and managed by Affiliate or (b) managed by Affiliate as general manager pursuant to a formal management agreement which provides, among other things, that Affiliate has the sole authority to make programming decisions for the system and which is specified in Exhibit A attached hereto and made a part hereof (all such systems sometimes collectively referred to herein as "Affiliate Systems"), as said Exhibit A may be amended from time to time hereunder; provided, however, that no cable television system listed in Exhibit A may be included as an Affiliate System under any other Affiliation Agreement for any Service for purposes of the calculation of service penetration of such Service, volume discount or for any other purpose.

1.1.1 A "cable television system" shall mean (as to each authorized service area that is proposed to be served) a person, firm, or entity which operates one or more "cable systems" (as that term is defined in the Communications Act of 1934 as amended and in effect as of the date of commencement of the Term hereof) over public rights-of-way pursuant to one or more franchises, ordinances, permits, or other governmental grants of authority under which such person, firm, or entity has committed to provide wired cable system services (via cable television line, very-high-speed digital subscriber line, video digital subscriber line, asymmetrical digital subscriber line, or hybrid fiber-coaxial line or fiber optic line) to a specified number or portion of the individual single family homes within a specified area within a specified period of time and has committed to pay franchise fees and who otherwise complies with the provisions of this Agreement.

1.1.2 An "IP System" shall mean a multichannel video distribution system which utilizes Internet protocol ("IP") technology to deliver video programming services over a closed and encrypted transmission path over a national fiber-optic network to a central location for subsequent distribution of such video programming services with proprietary-encoding over a high-speed data connection to set-top-boxes that are secured by industry-standard encryption and conditional access technologies and are connected to Subscribers' television sets.

1.1.3 Notwithstanding the foregoing, a person, firm, or entity which provides video programming services via Direct Broadcast Satellite or an open video system or similar method of delivery shall not be considered an Affiliate System hereunder.

           

NETWORKS DISTRIBUTED BY DISCOVERY COMMUNICATIONS, INC.

1.2 DISCOVERY CHANNEL. A daily programming service generally consisting of documentary programs, currently transmitted 24 hours a day, 7 days a week.

1.3 ANIMAL PLANET. A daily program service featuring programming about animals, including fiction and non-fiction programming concerning animals, their environment and habitat, and the people who study them and care for them, currently exhibited 24 hours a day, 7 days a week.

1.4 DISCOVERY KIDS CHANNEL. A daily programming service generally consisting of programming designed specifically for children which includes programs that provide core educational concepts presented in entertaining, innovative and revolutionary ways, currently transmitted 24 hours a day, 7 days a week.

1.5 DISCOVERY HOME CHANNEL. A daily programming service generally consisting of programming examining lifestyle issues including "how-to", gardening, cooking, health and living, food, crafts, antiques, and home repair, currently transmitted 24 hours a day, 7 days a week.

1.6 MILITARY CHANNEL. A daily programming service generally consisting of programming concerning the military, military studies, military history, aviation and space travel, currently transmitted 24 hours a day, 7 days a week.

1.7 Territory. Those portions of the United States, its territories, and possessions in which any Affiliate System is authorized by the appropriate government authority to distribute multichannel video programming services.

1.8 Subscriber. Any person, firm, entity, or dwelling which receives multichannel video programming services from any Affiliate System, including, without limitation, a private home, or a unit of a condominium, apartment, or other multiple-unit dwelling building, or a room of a hotel, motel, hospital, or extended care facility, but excluding any Commercial Establishment which charges an admission fee, cover charge, minimum, or like sum.

1.9 Service Subscriber. Any Subscriber who receives any Service from any Affiliate System.

1.10 Commercial Establishment. A non-residential establishment, including, but not limited to a bar, restaurant, business office, retail store, and sports arena, and excluding a government center, school, or similar educational institution.

1.11 Term. Subject to the provisions of Paragraph 3.1, the term of this Agreement shall commence upon the date hereof, and shall expire on December 31, 2014.

1.12 NETWORK. Discovery and/or APLLC as applicable. With respect to Discovery Channel, Discovery Kids Channel, Discovery Home Channel and Military Channel, all references to "Network" shall be deemed to refer to Discovery. With respect to Animal Planet, all references to "Network" shall be deemed to refer to APLLC.

2. Grant of Rights.

NETWORK hereby grants to Affiliate and Affiliate hereby accepts, subject to the terms and conditions hereof, a non-exclusive license and right to distribute and exhibit the Services to Subscribers of Affiliate Systems within the Territory, for viewing by such Subscribers on television sets on a subscription basis, during the Term and the right, subject to the further provisions of this Agreement, to sell and obtain revenue from certain commercial announcements presented in the course of distributing and exhibiting the Services via television. Affiliate agrees that such grant of rights does not include the

2

right to offer any Service on an "a la carte" basis (i.e., to offer any Service on its own for a separately stated fee) or on a flexible basis whereby a package is created by the Subscriber through individual selections of programming services (i.e., "pick and pay" or other comparable terminology). Affiliate acknowledges and agrees that the rights granted to Affiliate herein are limited to distribution of the Services for viewing by Subscribers on television sets on a subscription basis and not for viewing on personal computers or otherwise via the Internet. The parties acknowledge that NETWORK has previously granted to Comcast Corporation and its affiliate, Comcast Media Center, Inc. ("CMC"), the right to digitize, compress, and make other reasonably related modifications to the signal of Discovery Kids Channel, Discovery Home Channel and Military Channel (for each such Service, the "Alternative Signal", and collectively, as applicable, the "Alternative Signals"). NETWORK and Affiliate agree that Affiliate shall have the right to receive the Alternative Signals created by CMC in conjunction with its Headend In The Sky ("HITS") service, and, in connection therewith, Affiliate agrees that Affiliate shall have no claim against NETWORK relating to the technical quality of any Alternative Signal as transmitted by HITS. NETWORK and Affiliate further agree that CMC shall have NETWORK's permission to electronically authorize Affiliate's receipt of the Alternative Signals via HITS at the headend locations listed on Exhibit A hereto; provided, that NETWORK shall be entitled to instruct CMC to deauthorize the reception of any Alternative Signal(s) by any headends or reception sites in accordance with the terms of its agreement with Comcast Corporation.

3.      License Fees.

3.1      In consideration of the rights herein granted to Affiliate, Affiliate hereby agrees to pay license fees ("License Fees") which shall be payable in accordance with the provisions of Section 4, "Statements and Payments", below. The License Fees shall be the sum of the amounts determined in accordance with Sub-Paragraphs 3.1.1 through 3.1.6 hereof. Affiliate's liability for License Fees with respect to any Affiliate System, and all other obligations under this Agreement, shall commence as of the date of launch of any Service on any such Affiliate System, whether prior to, or after the date of this Agreement.

3.1.1      For each Service Subscriber, Affiliate shall pay the amount determined in accordance with Exhibit B (attached hereto and made a part hereof) per month (the "Monthly Rate"). Affiliate acknowledges and agrees that the rates set forth on Exhibit B are expressly conditioned on, and contingent on compliance with, Affiliate's limited offering as described in Sub-Paragraph 5.1.1 herein.

3.1.2      For purposes of determining the number of Affiliate's Service Subscribers for which payment is due, if Affiliate supplies any Service to Subscribers in any multiple-unit building on a single, bulk-rate billing basis, the number of Service Subscribers for the building shall be computed on an equivalent Subscriber basis by dividing the Affiliate System's gross billings for such multiple-unit building for the month by the monthly rate generally being charged individual Subscribers for the level of multichannel video service (including buy-through tiers) on which such Service is carried by such Affiliate System; provided, however, that if Affiliate is unable to complete the calculation set forth above in this Sub-Paragraph 3.1.2 for any multiple-unit building because there exists for such building no applicable "monthly rate generally being charged individual Subscribers for the level of multichannel video service (including buy-through tiers) on which such Service is carried by such Affiliate System", then the number of Affiliate's Service Subscribers for such multiple-unit building shall be seventy percent (70%) of the number of units in such multiple-unit building.

3.1.3      For purposes of determining the number of Affiliate's Service Subscribers for which payment is due, if Affiliate distributes any Service to hotels, motels, and/or hospitals on a non-bulk-rate billing basis, the number of Service Subscribers to such Service shall be seventy percent (70%) of the number of rooms in each premises. If Affiliate distributes any Service to reformatories and/or prisons

3

on a non-bulk-rate billing basis, the number of Service Subscribers to such Service shall be the number of television outlets in each premises.

    3.1.4    Except as set forth in Sub-Paragraphs 3.1.2 and 3.1.3, if Affiliate distributes any Service to units of condominiums, apartments, other multiple-unit dwelling buildings, or rooms of extended care facilities or other premises which receive multichannel video programming services from any Affiliate System, then each such unit/room shall be counted as one (1) Service Subscriber to such Service.

    3.1.5    If Affiliate supplies any Service to Commercial Establishments, each Commercial Establishment shall be counted as one (1) Service Subscriber to such Service.

    3.1.6    With respect to any Affiliate System which does not scramble, trap, or use off-premises converters for the retransmission of any Service's signal, for the purpose of determining License Fees payable hereunder, all of Affiliate's Subscribers in each such Affiliate System which offers such Service shall be deemed to be Service Subscribers to such Service.

4.    <u>Statements and Payments.</u>

    4.1    Within thirty (30) days following the end of each and every calendar month during the Term hereof, Affiliate shall deliver to NETWORK to the attention of the Accounts Receivable Department a statement showing the computation of the License Fees in accordance with <u>Exhibit B</u> (even where no License Fees are due pursuant to Exhibit B) and containing true and accurate information for the preceding calendar month as to (i) a complete list of all Affiliate Systems which are carrying any Service, (ii) the total number of Subscribers for Affiliate, (iii) for each Service, the total number of Affiliate's Service Subscribers, (iv) the total number of Subscribers in each Affiliate System and (v) for each Service, the total number of Service Subscribers in each Affiliate System, together with payment of such License Fees. Each such statement shall be true and correct and certified as such by a duly authorized agent or officer of Affiliate. The License Fees shall be paid to NETWORK whether or not Affiliate actually receives payment from Affiliate's Subscribers. To assist Affiliate in the computation of License Fees, NETWORK may, at its election, provide Affiliate with a coupon book for each year of the Term which will contain monthly coupons which Affiliate can use to report the information required pursuant to this Paragraph 4.1.

    4.2    Any License Fees, or portion thereof, not paid to NETWORK within thirty (30) days after the end of the calendar month for which such payment is due shall accrue interest at the rate of one and one-half percent (1-1/2%) per month, compounded monthly, or the maximum lawful rate, whichever is less, from the due date until payment is received by NETWORK.

    4.3    Affiliate shall keep true and accurate books and records relating to this Agreement in accordance with generally accepted accounting principles consistently applied. During the Term hereof and for one year thereafter, at NETWORK's expense, NETWORK or its designated representatives may, at Affiliate's offices and at reasonable times within regular business hours and from time to time, inspect and make extracts and copies of any such books and records in order to determine the accuracy of any or all of Affiliate's statements rendered pursuant hereto. In the event that any audit undertaken by NETWORK in accordance with its rights hereunder discloses a discrepancy of five percent (5%) or more with respect to the amount of the License Fees set forth on any of Affiliate's statements (i) Affiliate shall reimburse NETWORK for all costs incurred by NETWORK in connection with such audit and (ii) in addition to any other rights NETWORK may have hereunder, NETWORK shall have the right to immediately terminate this Agreement.

4

5.    Carriage, New Launches, and After Acquired Systems.

5.1    Affiliate agrees to exhibit and distribute all of the Services throughout the Term on each and every Affiliate System listed on Exhibit A, which list of Affiliate Systems shall include (and be supplemented to include) each and every cable television system owned and/or managed by Affiliate as set forth in Paragraph 1.1 hereof which offers video programming services at any time during the Term. With respect to each such Affiliate System, Affiliate shall notify NETWORK when changing the channel upon which any Service is carried, or when changing the package or tier in which any Service is included. Affiliate shall not remove any Service from any Affiliate System in which it is distributed during the Term hereof. Throughout the Term of this Agreement, each Service must be carried by each Affiliate System in a package or multiple packages of programming services such that no other programming service offered in such Affiliate System is received by a greater number of such Affiliate System's Subscribers (excluding any programming service carried only on a "religious tier," defined as a level of service which includes only broadcast signals, a preview guide, PEG channels and religious networks, and which does not include any other satellite delivered services) than is each Service.

5.1.1    Affiliate acknowledges and agrees that, during the Term, it shall not distribute any ad-supported, satellite-delivered programming services to Subscribers other than ad-supported, satellite-delivered programming services that are comprised of programming at least 97% of which is rated (or if not rated, would have been rated) equal to or less restrictedly than TV-14 under the National Cable Television Association TV Parental Guidelines, and the Services.

5.1.2    Affiliate expressly acknowledges that the carriage requirements contained in the entirety of this Paragraph 5.1 are material obligations under this Agreement.

5.2    At least thirty (30) days prior to launching any Service in any cable television system in which Affiliate has an ownership and/or management interest as described in the definition of "Affiliate System" set forth in Paragraph 1.1 of this Agreement (including for these purposes any such system built by Affiliate), Affiliate shall notify NETWORK in writing of such launch. In the event that Affiliate launches any Service in any such system which is not listed on Exhibit A (as it may be amended from time to time hereunder), each such notification to NETWORK by Affiliate of a new launch shall be deemed to amend Exhibit A to incorporate each such system. Notwithstanding any other provision of this Agreement, all of the terms and conditions of this Agreement shall apply to each such newly launched Affiliate System, whether or not Affiliate provides NETWORK with the requisite notice.

5.3    With respect to each cable television system in which Affiliate acquires an ownership interest and/or enters into a management agreement as described in the definition of "Affiliate System" set forth in Paragraph 1.1 of this Agreement (including for these purposes any such system built by Affiliate) subsequent to the date hereof, Affiliate shall within thirty (30) days of such acquisition and/or management change notify NETWORK in writing of such acquisition and/or management change, and if any Service is carried on such acquired or newly managed system, then Affiliate shall continue carrying such Service on such system during the Term in accordance with the provisions of this Agreement. Each notification to NETWORK by Affiliate of such an acquisition and/or management change shall be deemed to amend Exhibit A to incorporate each such acquired or newly managed system. Notwithstanding any other provision of this Agreement, all of the terms and conditions of this Agreement shall apply to each such built, acquired, or newly managed system, whether or not Affiliate provides NETWORK with the requisite notice.

6.    Delivery of the Services by NETWORK.

6.1    The selection, scheduling, substitution, and withdrawal of any program or portion thereof contained on each Service shall at all times remain within the sole and absolute discretion and control of

5

NETWORK. NETWORK shall use reasonable efforts to transmit high quality signal(s) for each Service from a domestic communications satellite and shall keep Affiliate apprised of both the satellite and transponder NETWORK is using for such transmission. Any and all costs of whatever kind or nature incurred with respect to the pick-up from the satellite (or, with respect to receipt by Affiliate of the Alternative Signals via HITS, any and all costs of whatever kind or nature incurred with respect to the pick-up of the Alternative Signal via HITS) and the retransmission of each Service, whether encoded or not, throughout Affiliate Systems shall be borne by and shall be the sole responsibility of Affiliate. Affiliate may not receive the signal of any Service from a third party (e.g., CMC) unless (a) NETWORK and such third party have agreed in writing to such receipt by Affiliate, and (b) NETWORK and Affiliate have agreed in writing to such receipt by Affiliate. (With respect to receipt of the Alternative Signals via HITS, this Agreement shall satisfy item (b) of the preceding sentence.) Nothing herein shall be construed as precluding NETWORK from distributing an eastern feed and a western feed of a Service. In the event that NETWORK distributes both an eastern and a western feed of a Service, Affiliate Systems in the Eastern and Central Time Zones shall distribute the eastern feed of such Service, Affiliate Systems in the Pacific Time Zone shall distribute the western feed of such Service, and Affiliate Systems in the Mountain Time Zone may, at Affiliate's election and in its sole discretion, distribute either the eastern or western feed of such Service.

6.2    NETWORK reserves all rights in and to all signal distribution capacity within the bandwidth of each Service (the "Signal Distribution Rights") as received at each Affiliate System, including, without limitation, the vertical blanking interval digital data stream and audio subcarriers.

7.    Distribution of the Services by Affiliate.

7.1    Affiliate shall distribute each Service in its entirety, without delay, interruption, alteration, addition, deletion, or editing of any portion thereof and in a manner which will permit highest quality reception by Service Subscribers of each Service's audio and visual materials. Affiliate shall maintain suitable facilities for the pick-up and retransmission of the Service signal(s) throughout Affiliate Systems and shall comply with all applicable local, state, and federal laws, rules, regulations, licensing requirements, and franchises. Affiliate represents and warrants that each satellite-delivered, advertiser-supported programming service, including each Service, that it distributes to Subscribers shall be distributed in digital rather than analog format. Affiliate acknowledges and agrees that throughout the Term, each of the programming services provided by Affiliate to Subscribers of its Affiliate Systems shall be delivered in the same manner, and using the same technology, as the Services. If any programmer that provides one or more programming services to Affiliate for distribution during the Term ceases to provide a programming service to Affiliate (other than based on expiration of the applicable contract for such service), Affiliate shall immediately notify NETWORK of such cessation and the reason therefore, and NETWORK shall be entitled to terminate this Agreement. Affiliate shall encrypt each of the Service signals or use a substantially similar method of security to secure each of the Service signals from Affiliate's point of receipt of the Service signals through the points of reception by the Service Subscribers.

7.1.1    Affiliate agrees that, other than (i) electronic program guides and other interactive services that appear on screen regardless of what channel the Subscriber is tuned to, and (ii) Information "crawls" that Affiliate Systems from time to time utilize to communicate information (e.g., regarding inclement weather, service interruptions or changes, or inviting subscriber feedback) to Subscribers (but not to include commercial advertising or promotion for other programming or services offered by the Affiliate System), it will not superimpose any audio or visual elements over a Service signal as viewed by a Service Subscriber, nor will it allow, unless controlled by the Subscriber through the Subscriber's own equipment, any audio or visual elements to appear on the screen of a Service Subscriber's receiver simultaneously with a Service signal (i.e., through use of a split screen or reduction of the size of the picture of any Service). For greater clarity, except for electronic program guides, information "crawls" or

6

audio or visual elements controlled by the Subscriber through the Subscriber's own equipment referenced in this Paragraph 7.1.1, Affiliate shall distribute each Service such that at all times such Service is displayed 24 hours a day, 7 days a week on the full length and width of the video screen.

7.2    Affiliate shall take all necessary precautions with respect to Affiliate Systems to ensure that the Services are received only by parties who are Service Subscribers.

7.3    Upon request from NETWORK, Affiliate shall conduct an audit designed to reveal unauthorized or illegal recipients of the Services, and it will promptly provide NETWORK with the results of such audit.

7.4    Affiliate shall not, and shall not authorize others to, receive, reproduce, retransmit, record, copy, duplicate, transmit, or exhibit by any means, whether now known or hereafter devised, any part of any Service except as specifically authorized by NETWORK in writing. Affiliate shall take all reasonable precautions to prevent unlawful reception, recording, copying, reproduction, retransmission, or duplication of the Services. If Affiliate becomes aware that any unauthorized third party is receiving, transmitting, or exhibiting any part of any Service, Affiliate shall notify NETWORK in writing of the name and address of such third party. It is specifically acknowledged and agreed that this Paragraph 7.4 shall not be deemed to apply to the videotaping of any Service by private individuals for in-home television viewing only.

7.5    During the Term of this Agreement, with respect to each Affiliate System listed in Exhibit A (as amended from time to time), Affiliate covenants that it shall promptly notify NETWORK in writing of any reduction below fifty-one percent (51%) in Affiliate's ownership of any such system, and/or any change in management of such system sufficient to disqualify such system as an "Affiliate System" hereunder. Upon receipt of such notice, NETWORK may, at its option, advise Affiliate and such system in writing that, effective as of the date of such change, the distribution of the Services in such system is no longer subject to this Agreement and shall cease immediately. If NETWORK so advises Affiliate with respect to such system the license granted hereunder to distribute the Services to such system shall terminate immediately. The provisions of this Paragraph 7.5 shall be in addition to any other right or remedy which NETWORK may have.

7.6    Affiliate acknowledges that the names and marks "DISCOVERY CHANNEL," "ANIMAL PLANET," "DISCOVERY KIDS CHANNEL," "DISCOVERY HOME CHANNEL," "MILITARY CHANNEL," and any other NETWORK trademarks and any logos and variations incorporating the same, and titles of programs contained in any Service are the exclusive property of NETWORK and that Affiliate has not and will not acquire any proprietary rights thereto by reason of the Agreement. Affiliate shall have no rights to use such names, marks, logos, variations, or titles except at the times and in a manner expressly approved by NETWORK. Affiliate shall not publish or disseminate any material which violates any restrictions imposed by NETWORK or NETWORK's program suppliers and disclosed to Affiliate by NETWORK.

7.7    Provided that Affiliate is otherwise in compliance with this Agreement, then, in the event Affiliate ceases to provide video programming services through an Affiliate System, effective the later of written notice to NETWORK from Affiliate or the date that such Affiliate System ceases to provide video programming services: (1) such Affiliate System shall be removed from this Agreement, but (2) if, during the Term, Affiliate recommences providing video programming services to the areas served by such Affiliate System, Affiliate shall immediately launch each Service on such Affiliate System and shall, at NETWORK's election, continue to be bound by this Agreement.

8.    Format.

NETWORK will supply each Service in a format which makes provision for (a) with respect to

7

Discovery Channel, two (2) minutes of commercial positions in each hour, and (b) with respect to Animal Planet, Discovery Kids Channel, Discovery Home Channel and Military Channel, three (3) minutes of commercial positions in each hour, and Affiliate shall have the right to insert advertising messages per hour on such Services in such commercial positions, reserving NETWORK's right to preempt such commercial positions. Affiliate shall have the right to use, to exploit, and to derive revenues for its own account from the sale of such commercial positions as designated by NETWORK for such use and exploitation, provided that (a) all local advertising to be sold by Affiliate for exhibition on any Service shall comply with all applicable laws and regulations, (b) Affiliate shall bear sole responsibility and liability for all aspects of the production and content of local advertising exhibited on a Service, (c) Affiliate shall not arrange sponsorship of any program on the Service, (d) Affiliate shall ensure that all local advertising material is not obscene, pornographic, libelous or defamatory of any entity or persons or of such natures as to incite people to violence, (e) Affiliate shall not allow local advertising to contain advertising of pornographic products or services, and (f) Affiliate shall not insert any material or information contained in or embedded in or around any portion of a local advertising message, such as interactive elements. Such commercial positions may not be used, however, during any time block which NETWORK has scheduled educational programming for use in schools. Currently, this educational programming is aired on Discovery Channel between 9:00 a.m. and 10:00 a.m. EST Monday through Friday. NETWORK reserves the right to change such schedule and/or add additional commercial-free programming to its schedule at any time during the Term. If NETWORK exhibits a commercial-free block of programming on any Service whereby NETWORK does not utilize its commercial positions during such commercial-free block, then Affiliate shall not be entitled during such commercial-free block on such Service to utilize Affiliate's commercial positions as described above. Except as specifically provided pursuant to this Paragraph 8, Affiliate shall not sell or use, or authorize others to sell or use, any portion of any Service for sponsorship, advertising, or promotion of any products, goods, or services.

9. Marketing and Promotion.

9.1    Affiliate shall use its best efforts to promote the Services to the Subscribers of each Affiliate System with the aim of maximizing the number of Service Subscribers. NETWORK shall provide Affiliate with promotional and marketing advice and shall make available to Affiliate, at Affiliate's expense, such sales and promotional materials as NETWORK and Affiliate mutually consider appropriate. Affiliate shall pay all costs associated with delivery of all sales and promotional materials to Affiliate. Affiliate's payments pursuant to this Paragraph 9.1 shall be made within thirty (30) days of receipt of NETWORK's invoice for same. Affiliate shall not delete or alter, or authorize the deletion or alteration of, any copyright or trademark notice, logo, credit, or any other notice included in any materials delivered pursuant to this Paragraph 9.1.

9.2    At NETWORK's request, Affiliate will provide NETWORK with all available data regarding the marketing and promotion of the Services by Affiliate and Affiliate Systems (including without limitation, penetration figures for the most widely distributed cable services). Affiliate will also provide such other assistance to NETWORK that NETWORK may reasonably request, at NETWORK's cost, regarding any marketing test, survey, poll, or other research that NETWORK may undertake in connection with the Services. NETWORK shall treat as confidential the names and addresses of Subscribers which NETWORK receives from Affiliate and shall not utilize any such names or addresses except in connection with such research.

10. Representations and Warranties; Indemnification.

10.1    NETWORK and Affiliate each represents and warrants that it has the authority to enter into this Agreement and to perform all of its obligations hereunder. Affiliate represents and warrants that its Affiliate Systems are operating and shall continue to operate throughout the Term in accordance with all applicable local, state, and federal laws, rules, regulations, licensing requirements, and franchises

8

issued by the relevant local regulatory authority, federal government, or other governing body of the Territory in which Affiliate Systems distribute the Services.

10.2    NETWORK represents and warrants that the material contained in the Services and in promotional material supplied to Affiliate hereunder will not violate any copyright, trademark, right of privacy or publicity, or literary or dramatic right of any person. Affiliate represents and warrants that material contained in commercial announcements supplied by Affiliate and in promotional material developed by Affiliate will not violate any copyright, trademark, right of privacy or publicity, or literary or dramatic right of any person.

10.3    Affiliate shall indemnify NETWORK for any alteration, deletion or material added by Affiliate to any Service, including, without limitation, the addition of a commercial announcement supplied by Affiliate, which alteration, deletion or addition gives rise to losses, liabilities, claims, costs, damages, and expense including, without limitation, reasonable counsel fees and court costs under this Paragraph 10.3 (collectively, "Costs"). Affiliate shall indemnify NETWORK for any Costs arising from Affiliate's distribution of the Services that causes NETWORK to violate any of its programming rights contracts. Affiliate shall indemnify NETWORK for any Costs arising from failure or inadequacy of Affiliate's Service signal security measures.  Notwithstanding the foregoing, to the extent that, at any time during the Term, NETWORK's music performance license fees are in any way determined by or based on the revenues of Affiliate, NETWORK and Affiliate agree to negotiate in good faith an arrangement by which such license fees may be shared by NETWORK and Affiliate.

10.    Affiliate each shall indemnify and forever hold harmless NETWWORK, and NETWORK's affiliates, officers, directors, employees, agents, shareholders, and partners from and against any and all claims, losses or damage, costs, and expenses (including reasonable counsel fees) arising out of any breach of any representation or warranty hereunder made by it; provided that in any case in which indemnification is sought, NETWORK shall (i) promptly notify Affiliate and (ii) afford the Affiliate the opportunity of defending such claim and controlling the litigation, settlement, or other disposition of such claim and (iii) NETWORK shall fully cooperate in connection with such defense, settlement, or other disposition and shall have the right, but not the obligation, to join in and be represented by its own counsel, at NETWORK's own cost and expense.

11.    Force Majeure.

NETWORK shall not be liable to Affiliate for failure to supply any Service or any part thereof by reason of any act of God, act of terrorism, war, labor dispute, non-delivery by program suppliers or others, breakdown of facilities, legal enactment, governmental order or regulation, or any other cause beyond its control.

12.    Default and Termination.

12.1    Due and timely performance by Affiliate is of the essence hereof.  If Affiliate defaults in the (a) making of any payments hereunder or (b) performance of any of its material obligations hereunder, including its obligations to maintain the security of a Service signal which failure to maintain the security of a signal results in a theft of such Service in an amount equal to or greater than ten percent (10%) of Affiliate's then current base of Subscribers to that Service, and such default shall not be cured within five (5) days after written notice thereof to Affiliate, or if Affiliate becomes insolvent, or if a petition under any bankruptcy act shall be filed by or against Affiliate (which petition, if filed against Affiliate, shall not have been dismissed within thirty (30) days thereafter), or if Affiliate executes an assignment for the benefit of creditors, or if a receiver is appointed for the assets of Affiliate, or if Affiliate takes advantage of any insolvency or any other like statute (any of the above acts are hereinafter called "Event of Default"), then NETWORK may, in addition to any and all other rights which NETWORK may have against Affiliate,

9

terminate this Agreement by giving written notice to Affiliate at any time after the occurrence of an Event of Default. Affiliate shall, nevertheless, remain liable for all moneys due or to become due to NETWORK pursuant hereto, and shall be liable for all costs and expenses of collection, including reasonable collection agency fees, attorneys' fees, and court fees incurred by NETWORK in exercising its rights hereunder. Notwithstanding anything to the contrary herein, in the event NETWORK determines that the Service signal integrity or the Service signal security measures or distribution methodology used by or on behalf of Affiliate are not satisfactory, NETWORK shall have the right to terminate this Agreement.

12.2    If, at any time during the Term, Affiliate is not carrying Discovery Channel pursuant to a valid, written affiliation agreement or otherwise discontinues carriage of any programming service distributed by Discovery, APLLC, or any subsidiary or partner of Discovery, then NETWORK, in its sole discretion, upon ten (10) days prior written notice to Affiliate, may terminate this Agreement with respect to any or all of its Services. Affiliate shall, nevertheless, remain liable for all moneys due or to become due to NETWORK pursuant hereto, and shall be liable for all costs and expenses of collection, including reasonable collection agency fees, attorneys' fees, and court fees incurred by NETWORK in exercising its rights hereunder.

13.    Miscellaneous.

13.1    All rights not specifically granted to Affiliate hereunder in and to any Service and any Service's content are reserved to NETWORK for NETWORK's sole and exclusive use, disposition, and exploitation and are exercisable by NETWORK at any time in any location and by any means whatsoever.

13.2    All notices, statements and other communications given hereunder shall be made in writing by facsimile transmission, personal delivery, or by mailing the same by certified mail, return receipt requested, or by express delivery in a postpaid wrapper, addressed to the other as aforesaid, and such notice shall be effective the date of such facsimile transmission or personal delivery, the next day if by next-day express delivery, the date two (2) days after such mailing if by two-day delivery, or the date five (5) days after such mailing. Except as otherwise specified herein, all notices sent to Discovery and/or APLLC hereunder shall be directed to the attention of the Senior Executive Vice President, General Counsel, with a copy to William F. Goodwyn, President, Domestic Distribution and Enterprises. Except as otherwise specified herein, all notices sent to Affiliate hereunder shall be directed to the attention of Affiliate's signatory hereof.

13.3    Neither this Agreement nor any rights hereunder may be assigned by Affiliate without the prior written consent of NETWORK, including but not limited to an assignment by operation of law, such as would result from the merger or acquisition of Affiliate; provided, however, that Affiliate may assign its rights and obligations hereunder to a majority-owned subsidiary of Affiliate without NETWORK's consent. Any assignment permitted hereunder shall not relieve the assignor of any obligations hereunder that have accrued prior to the date of such assignment. Any purported assignment without the requisite NETWORK consent shall be null and void and not enforceable against NETWORK. Any assignment without the requisite NETWORK consent attempted by Affiliate notwithstanding the foregoing shall be deemed a material breach of this Agreement.

13.4    Any waiver by either party of any breach or any term or condition hereof shall be effective only if in writing and such writing shall not be deemed to be a waiver of any subsequent or other breach, term, or condition of this Agreement.

13.5    With respect to the subject matter of this Agreement, this Agreement and the Exhibits hereto (i) set forth the entire agreement between the parties hereto and any parties who have in the past or who are now representing either of the parties hereto; (ii) supersede all prior understandings and communications between the parties, oral or written; and (iii) constitute the entire agreement between the

10

parties. No amendment, supplement, modification, or waiver of any provision of this Agreement, nor consent to any departure by Affiliate therefrom, nor any novation or restatement of this Agreement shall be effective unless the same shall be in writing and signed by Affiliate and NETWORK.

13.6     Affiliate and its employees and agents have maintained and will maintain, in confidence, the terms and conditions of this Agreement, as well as all data, summaries, reports, or information of all kinds, whether oral or written, acquired, devised, or developed in any manner by or from NETWORK personnel or NETWORK files, and have not and will not reveal the same to any persons not employed by NETWORK, except: (i) at the written direction of NETWORK; (ii) to the extent necessary to comply with law or a valid order of a court of competent jurisdiction, in which event Affiliate shall so notify NETWORK as promptly as practicable (and, if possible, prior to making any disclosure) and in all cases shall seek confidential treatment of such information; (iii) as part of its normal reporting or review procedure to its parent company, auditors, and its attorneys, provided such parent company, auditors, and attorneys agree to be bound by the provisions of this Paragraph 13.6; and (iv) in order to enforce its rights pursuant to this Agreement.

13.7     Nothing contained herein shall be deemed to create a relationship of joint venture, associates, principal and agent, or partnership between the parties hereto, and neither party shall hold itself out to the contrary. Each party is acting as principal hereunder.

13.8     This Agreement and the rights and obligations of the parties hereunder shall be governed by and construed in accordance with the laws of the State of Maryland applicable to contracts entered into and fully performed therein without regard to its conflict of laws principles. The parties to this Agreement consent and agree to be subject to the jurisdiction of any court of record in the State of Maryland for the adjudication or resolution of any matter or right in connection with this Agreement and agree that venue in such jurisdiction is proper.

13.9     The invalidity or unenforceability of any provision of this Agreement shall in no way affect the validity or enforceability of any other provision of this Agreement, and in the event that any portion of this Agreement is determined to be invalid, void, voidable, unlawful, or for any reason unenforceable, the remaining portions of this Agreement shall remain in full force and effect; provided, however, that both parties shall negotiate in good faith with respect to an equitable modification of the portion of this Agreement, or application thereof, held to be invalid or unenforceable and the provisions logically related thereto.

[Signature page follows.]

11

Case 8:13-cv-00031-DKC   Document 5-2   Filed 01/03/13   Page 13 of 14

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first set forth above.

SKY ANGEL U.S., LLC

By: _____

Name: Thomas G. Scott

Title: PRESIDENT / COO

Date: 10/05/07

DISCOVERY COMMUNICATIONS, LLC
(with respect to Discovery Channel, Discovery Kids Channel, Discovery Home Channel and Military Channel only)

By: _____

Name: Eric Phillips
EVP Domestic Distribution

Title: _____

Date: 10-16-07

ANIMAL PLANET, L.L.C.
By its representative:
Discovery Communications, LLC
(with respect to Animal Planet only)

By: _____

Name: Eric Phillips
EVP Domestic Distribution

Title: _____

Date: 10-16-07

12

## EXHIBIT A to Affiliation Agreement
with

_____
(Name of Affiliate)

_____
Name of Affiliate System (by Headend)

_____
Address          City          County          State          Zip

_____
Phone                                    # Homes Passed

_____
# Affiliate System Subscribers

_____
# of Discovery Channel Subscribers          # of Discovery Kids Channel Subscribers

_____
# of Animal Planet Subscribers          # of Discovery Home Channel Subscribers

_____
# of Military Channel Subscribers

_____
Launch Date(s)                    Channel Assignments

_____
Individual Contact                Geographic Area Served

(Please copy this page as necessary to list
all headends carrying the Services.)

Affiliate certifies that the information contained herein is true and correct.

SKY ANGEL U.S., LLC

By:     _____
Name:   _____
Title:  _____
Date:   _____

13