**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**Southern Division**

| | |
|---|---|
| **SKY ANGEL U.S., LLC,** | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| **v.** | ) **Civil Action No. 8:13-cv-00031-DKC** |
| | ) |
| **DISCOVERY COMMUNICATIONS, LLC, et al.,** | ) |
| | ) |
| *Defendants*. | ) |
| | ) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DISCOVERY'S
MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................................1

STATEMENT OF UNDISPUTED MATERIAL FACTS .....................................................5

    A.    The Agreement..........................................................................................................5

    B.    Sky Angel's IPTV System And The Parties' 2007 Negotiations .............................7

    C.    Discovery Included Provisions In The Agreement Barring Sky Angel From Distributing The Services Via The Internet And Affording Discovery A Termination Right ...................................................................................................11

    D.    Despite The Contractual Language And Its Assurances To Discovery During The Negotiations, Sky Angel Distributed The Services Via The Internet ......................13

    E.    Sky Angel's July 2009 Agreement With C-SPAN Prohibited Use Of Public Internet ...................................................................................................................15

    F.    Other Programmers, Including C-SPAN, Terminate Sky Angel Because Of Its Distribution Methodology, But Sky Angel Fails To Inform Discovery ...................16

    G.    Discovery Learns About Sky Angel's Internet Distribution, Which Was Contrary To The Agreement And Discovery's Long-Standing Internet Policy ......................18

    H.    Discovery Terminates The Agreement Pursuant To Section 12.1 ...........................22

LEGAL STANDARD .........................................................................................................23

LEGAL ARGUMENT ........................................................................................................24

I.    DISCOVERY IS ENTITLED TO SUMMARY JUDGMENT .................................24

    A.    The Agreement Is Plain And Unambiguous In Discovery's Favor .......................24

    B.    Discovery Appropriately Exercised Its Unambiguous Termination Right ...............28

        1.    Discovery Appropriately Exercised Its Termination Right Under An Objective Standard .................................................................................28

        2.    Even If The Subjective Standard Is Applied, The Undisputed Record Establishes Discovery's Honest Dissatisfaction With Sky Angel's Distribution Methodology ...........................................................................30

    C.    Summary Judgment Should Also Be Granted To Discovery Because Discovery Could And Would Have Terminated The Agreement If Sky Angel, As Required, Had Informed Discovery Of Other Programmers' Terminations ............................34

i

II.    SUMMARY JUDGMENT MUST BE DENIED TO SKY ANGEL ............................................35

    A.    Sky Angel Cannot Obtain Summary Judgment Under The Objective Standard ..............36

        1.    Disputed Facts Regarding Pre-Contract Negotiations ...........................................37

        2.    Disputed Facts Regarding Discovery's Internet Distribution Policy....................42

        3.    Disputed Facts Regarding the Basis For Discovery's Termination......................43

        4.    Disputed Facts Regarding Sky Angel's Compliance With The Agreement..........44

    B.    Sky Angel's Motion Must Also Be Denied Under The Subjective Standard...................47

    C.    Sky Angel's Motion Must Also Be Denied For Its Admitted Breach of § 7.1 ................50

CONCLUSION.....................................................................................................................................50

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aiken v. Policy Mgmt. Sys. Corp.*,
    13 F.3d 138 (4th Cir. 1993) ............................................................................23

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)........................................................................................23

*Andrews Bartlett & Assocs., Inc. v. Am. Soc. of Health-Sys. Pharm., Inc.*,
    129 F.3d 116 (4th Cir. 1997) ..........................................................................26

*Ard Dr. Pepper Bottling v. Dr. Pepper Co.*,
    202 F.2d 372 (5th Cir. 1953) ..........................................................................35

*Blondell v. Littlepage*,
    991 A.2d 80 (Md. 2010) ..................................................................................49

*Bollino v. Baltimore & Ohio R. Co.*,
    856 F.2d 186 (4th Cir. 1988) ..........................................................................35

*Bond v. Messerman*,
    873 A.2d 417 (Md. App. 2005).......................................................................33

*Capitol Radiology v. Sandy Spring Bank*,
    No. DKC 09-1262, 2010 WL 610785 (D. Md. Feb. 17, 2010),
    *aff'd*, 439 F. App'x. 222 (4th Cir. 2011)........................................................30

*Clancy v. King*,
    954 A.2d 1092 (Md. 2008) ...............................................................28, 30, 33, 47

*Faltings v. IBM Corp.*,
    854 F.2d 1316 (4th Cir. 1988) ........................................................................25

*Ferris v. Polansky*,
    59 A.2d 749 (Md. 1948) .............................................................................30, 47

*First Nat'l Realty Corp. v. Warren-Ehret Co., Inc.*,
    233 A.2d 811 (Md. 1967) .........................................................................28, 29, 30, 47

*Frederick Rd. Ltd. P'ship v. Brown & Sturm*,
    756 A.2d 963 (Md. 2000) ................................................................................36

*Gresham v. Lumbermen's Mut. Cas. Co.*,
   404 F.3d 253 (4th Cir. 2005) ...................................................................................23

*Lancaster Laundry v. Fallston Gen. Hosp., Inc.*,
   Civ. A. No. HAR-90-1737, 1991 WL 26935 (D. Md. Feb. 25, 1991).................................26

*Mellen v. Bunting*,
   327 F.3d 355 (4th Cir. 2003) ...................................................................................23

*Mona v. Mona Elec. Grp, Inc.*,
   934 A.2d 450 (Md. App. 2007)..................................................................................34

*People for Ethical Treatment of Animals v. Doughney*,
   263 F.3d 359 (4th Cir. 2001) ...................................................................................34

*Questar Builders, Inc. v. CB Flooring, LLC*,
   978 A.2d 651 (Md. 2009) ............................................................................. *passim*

*Rite Aid Corp. v. Hagley*,
   824 A.2d 107 (Md. 2003) .........................................................................................30

*Sky Angel U.S., LLC v. Nat'l Cable Satellite Corp.*,
   12-1834 (RC), 2014 WL 1266776 (D.D.C. Mar. 28, 2014) .............................................17

*Sky Angel U.S., LLC v. National Cable Satellite Corp.*,
   947 F. Supp. 2d 88 (D.D.C. 2013)......................................................................16, 34

*St. Paul at Chase Corp. v. Mfrs. Life Ins. Co.*,
   278 A.2d 12 (Md. 1971) .....................................................................................26, 33

*Sullins v. Allstate Ins. Co.*,
   667 A.2d 617 (Md. 1995) .........................................................................................26

*Sy-Lene of Wash., Inc. v. Starwood Urban Retail II, LLC*,
   829 A.2d 540 (Md. 2003) .................................................................................24, 27

*Thompson v. Potomac Elec. Power Co.*,
   312 F.3d 645 (4th Cir. 2002) ...................................................................................23

*Towson Univ. v. Conte*,
   862 A.2d 941 (Md. 2004) .........................................................................................30

*Volos, Ltd. v. Sotera*,
   286 A.2d 101 (Md. 1972) .........................................................................................30

*Wash. Metro. Area Transit Auth. v. Potomac Inv. Props., Inc.*,
    476 F.3d 231 (4th Cir. 2007) ..........................................................................................23, 24

*World-Wide Rights Ltd. v. Combe Inc.*,
    955 F.2d 242 (4th Cir. 1992) ...................................................................................................24

**Statutues**

Fed. R. Civ. P. 56(a) .....................................................................................................................23, 35

**Other Authorities**

23 Williston on Contracts § 63:22 (4th ed.)...............................................................................35

Defendants Discovery Communications, LLC and Animal Planet, LLC (together, "Discovery") respectfully submit this Memorandum in support of their Motion for Summary Judgment on all claims brought by Plaintiff Sky Angel U.S., LLC ("Sky Angel"), and in opposition to Sky Angel's Motion for Partial Summary Judgment.

## INTRODUCTION

Sky Angel brings this case seeking redress under a contract it knew it could not fulfill at the time it entered the contract, hoping it could ignore express contractual language barring it from distributing Discovery's programming over the Internet and a specifically-negotiated termination provision that Discovery exercised in good-faith.  In October 2007, Sky Angel and Discovery entered into an affiliation agreement (the "Agreement") that granted Sky Angel a limited right to distribute five of Discovery's video programming networks (the "Services") to television sets in subscribers' homes, and prohibited Sky Angel from distributing the Services "via the Internet." During the parties' negotiations, Sky Angel's President and General Counsel, Tom Scott, told Discovery that Sky Angel's new "IPTV" service (as yet unlaunched) would <u>not</u> be using the public Internet to distribute the Services.  Discovery had significant concerns about the distribution methodology Sky Angel would be using to distribute the Services to its subscribers given that neither Sky Angel nor its third-party technology vendor, NeuLion, would answer Discovery's basic questions about the methodology and given that Mr. Scott made promises it was unclear he could deliver on.

Discovery included a clear and unambiguous prohibition on distribution "via the Internet" in the Agreement's Grant of Rights provision – the most material of any provision in an affiliation agreement – in which the parties define the rights being granted to the distributor.  Remarkably, Sky Angel essentially ignores this foundational provision in its own summary judgment motion and does not

dispute that its now-conceded use of the Internet violates its terms.  Discovery also specifically bargained for an unambiguous right to terminate the Agreement at any time if it became dissatisfied with Sky Angel's "distribution methodology."  It is undisputed that Sky Angel knew about these provisions, even was unhappy with them, but went ahead with the deal anyway.  Upon learning conclusively in 2009 that Sky Angel's distribution system in fact utilized the Internet to distribute the Services in contravention of the Agreement, Discovery invoked its termination right.

Discovery is entitled to summary judgment because its decision to terminate the Agreement in response to Sky Angel's undisputed and unauthorized use of the Internet was entirely justified under the plain contract terms.  *See* Argument, § I.  Discovery's termination decision was objectively reasonable because Sky Angel's distribution methodology violated the Agreement's Grant of Rights provision, which unambiguously prohibited Sky Angel from utilizing the Internet to distribute the Services.  In turn, the Agreement's unambiguous termination provision authorized Discovery to terminate the Agreement upon a determination that Sky Angel's "distribution methodology" was not satisfactory. Discovery is thus entitled to summary judgment under the plain language of the Agreement.  *See* Argument, § I (A).

Even if the Court inquires into Discovery's subjective good faith in terminating the Agreement, the undisputed facts confirm Discovery's honest dissatisfaction with Sky Angel's distribution methodology.  Fundamentally, Discovery's dissatisfaction was reflected by the Agreement itself, which barred Sky Angel from distributing Discovery's Services "via the Internet."  In refusing to grant Internet distribution rights to Sky Angel in 2007, Discovery acted consistently with its long-standing business practice and internal policy – in place at the time of the Agreement and for years thereafter – not to

2

allow distribution of its 24/7 linear Services[1] over the Internet.  Discovery would not have granted Internet distribution rights to Sky Angel for the linear Services because Discovery did not then and does not now have the rights to distribute some of the programs appearing on the Services over the Internet. Discovery does not grant rights it does not have.  Discovery was also aware of most-favored nations clauses in its agreements with certain other distributors that could have been implicated had Discovery actually granted unprecedented rights to Sky Angel to distribute any of its linear Services over the Internet—which Discovery had not then provided to any of its at least one thousand distributors. Because Discovery never provided Sky Angel the right to distribute its networks over the Internet in the first place, when it found out Sky Angel was doing just that, its resulting dissatisfaction was entirely honest.  *See* Argument, § I (B).

Discovery also is entitled to summary judgment on the independent basis that, as discovery has revealed, Sky Angel failed to inform Discovery – as required by the Agreement – that at least two other programmers terminated their agreements with Sky Angel during the contract term.  Notably, one of these programmers, C-SPAN, terminated its agreement with Sky Angel due to the same concerns about Sky Angel's use of the public Internet that just a few months later spurred Discovery's termination. Sky Angel's failure to notify Discovery about the other programmers' terminations was a clear breach of § 7.1 of the Agreement, which unambiguously required Sky Angel to "immediately notify" Discovery in the event that "any programmer . . . ceases to provide a programming service" to Sky Angel, and

---

[1] A "linear network" or "linear channel" constitutes a "full and continuous 24-hour, 7-day year-round feed of the programming appearing on the particular network at set times and on a defined and predetermined set schedule from week to week."  *See* accompanying Declaration of William F. Goodwyn, dated August 11, 2014 ("Goodwyn Decl.") ¶ 7.  "This means that the individual discrete programs appearing on the network appear in a linear fashion one after the other."  *Id.*  "In the simplest form [linear network] refers to the live channel that would appear when the customer turns on its television set." *Id.* ¶ 15.

expressly provided that in such event, Discovery "shall be entitled to terminate this Agreement." Sky Angel's material breach in failing to notify Discovery as required, deprived Discovery of a separate and independent contractual termination right. As a result, the Agreement should be deemed terminated as of the time of Sky Angel's breach. *See* Argument, § I (C).

If the Court does not rule that Discovery is entitled to judgment as a matter of law, Sky Angel's own motion for summary judgment must also be denied, as it rests on a fundamental mischaracterization of the parties' rights and obligations under the Agreement, relies upon heavily-disputed facts, and requires the Court to make numerous credibility determinations. Given that Sky Angel did not have the right to distribute the Services over the Internet, there is at least an issue of fact as to whether it was objectively reasonable for Discovery to terminate Sky Angel in light of Sky Angel's conceded use of the Internet in its distribution. Moreover, Sky Angel's motion is replete with (i) fact disputes about the details of the parties' pre-contract negotiations and Discovery's purported understanding of Sky Angel's distribution methodology, (ii) distortions of Discovery's alleged "history" of granting "Internet rights" to other distributors, (iii) speculation about Discovery's "business considerations" for terminating the Agreement, and (iv) extraneous filler concerning Sky Angel's purported compliance with the Agreement. Accordingly, to the extent that Sky Angel's motion for summary judgment is founded upon its assertion that Discovery's termination was not objectively reasonable, myriad factual disputes exist precluding summary judgment in its favor. *See* Argument, § II (A).

To the extent that Sky Angel's motion is founded upon its assertion that Discovery's termination was not in subjective good faith, its motion for summary judgment is even less meritorious. Sky Angel does not come close to showing that there is no genuine disputed issue of material fact as to Discovery's

good faith in terminating the Agreement.  Each of Sky Angel's contentions rest on highly-disputed facts and invite credibility determinations.  *See* Argument, § II (B).

Additionally, Sky Angel's material breach of § 7.1 of the Agreement by failing to notify Discovery of <u>other</u> programmers' terminations and the reasons for those terminations likewise bars any judgment in Sky Angel's favor.  *See* Argument § II (C).

## STATEMENT OF UNDISPUTED MATERIAL FACTS

**A.     The Agreement**

1.     In October 2007, Sky Angel and Discovery entered an Agreement that granted a limited and non-exclusive right to Sky Angel to distribute five of Discovery's linear networks (the "Services") to subscribers' television sets on a subscription basis through December 31, 2014.  *See* Ex. 1.[2]

2.     Section 2 of the Agreement – entitled "Grant of Rights" – defines exactly which rights were licensed to Sky Angel under the Agreement, and provides in relevant part (emphasis added):

> [Discovery] hereby grants to [Sky Angel] and [Sky Angel] hereby accepts, subject to the terms and conditions hereof, a non-exclusive license and right to distribute and exhibit the Services to Subscribers of Affiliate Systems within the Territory, for viewing by such Subscribers on television sets on a subscription basis . . . . [Sky Angel] acknowledges and agrees that the rights granted to [Sky Angel] herein are limited to distribution of the Services for viewing by Subscribers on television sets on a subscription basis <u>and not for viewing on personal computers or otherwise via the Internet</u>."

3.     Nowhere does the Agreement affirmatively grant to Sky Angel the right to distribute the Services "via the Internet."  On the contrary, the Agreement's Grant of Rights section expressly precludes that method of distribution.  *Id.*

---

[2] The Services licensed to Sky Angel in the Agreement were the linear programming networks Discovery Channel, Animal Planet, Discovery Kids, Discovery Home, and Military Channel.  *Id.* §§ 1.2-1.6, 2.

5

4.    The Agreement further provides that "[a]ll rights not specifically granted to [Sky Angel] hereinunder in and to any Service . . . are reserved to [Discovery] for [Discovery's] sole and exclusive use, disposition, and exploitation . . . ." *Id.* § 13.1.

5.    The Agreement also provides that "[Sky Angel] shall indemnify [Discovery] for any Costs arising from [Sky Angel's] distribution of the Services that causes [Discovery] to violate any of its programming contracts." *Id.* § 10.3.

6.    Among Discovery's other termination rights, § 12.1 of the Agreement states in relevant part (emphasis added):

> Notwithstanding anything to the contrary herein, in the event [Discovery] determines that the Service signal integrity or the Service signal security measures or distribution methodology used by or on behalf of [Sky Angel] are not satisfactory, [Discovery] shall have the right to terminate this Agreement.[3]

7.    § 7.1 of the Agreement provides an additional termination right to Discovery:

> If any programmer that provides one or more programming services to [Sky Angel] for distribution during the Term ceases to provide a programming service to [Sky Angel] (other than based on expiration of the applicable contract for such service), [Sky Angel] shall immediately notify [Discovery] of such cessation and the reason therefore, and [Discovery] shall be entitled to terminate this Agreement.

8.    The Agreement contains an "integration" clause, § 13.5, which states that "this Agreement . . . set[s] forth the entire agreement between the parties" and "supersede[s] all prior understandings and communications between the parties, oral or written."

---

[3] Section 12.1 provides for certain other termination rights to Discovery based on an "Event of Default" by Sky Angel. In those circumstances, Discovery was obligated to provide Sky Angel with written notice and the opportunity to cure the default within five days. *Id.* By contrast, the concluding sentence of Section 12.1 applicable here does not require either written notice or a cure period. *Id.*

**B.**    **Sky Angel's IPTV System And The Parties' 2007 Negotiations**

9.    In early 2007, Sky Angel – a small, now-defunct distributor of faith and family television programming – began to transition its video programming distribution service from a satellite-based system to a technology called "Internet protocol ('IP') technology," or "IPTV," following the failure of a satellite.  *See* Ex. 2 (Scott Dep. at 239:6-241:2).

10.    According to Sky Angel's CEO Rob Johnson, Sky Angel's transition from satellite to IPTV distribution carried "inherent risk because it was a new technology that nobody really had heard of."  Ex. 3 (R. Johnson Dep. at 127:22-128:13).  Sky Angel took this risk because it was prohibitively expensive to replace its failed satellite.  *Id.* at 125:12-126:7; Ex. 2 (Scott Dep. at 239:18-240:22).

11.    Prior to 2007, Sky Angel had no experience with IPTV technology.  Ex. 2 (Scott Dep. at 22:21-23:10; 104:16-18).

12.    Throughout the summer and fall of 2007, Sky Angel reached out to Discovery and other programmers in order to obtain as many programming channels as possible for its new service.  *See* Ex. 4 (K. Johnson Dep. at 202:11-19).

13.    Sky Angel's primary negotiator with Discovery, Kathy Johnson, admitted that she had only "incomplete" knowledge of how Sky Angel's distribution system was to work, such that she could not answer even "basic" questions Discovery posed.  *Id.* at 151:2-11.

14.    Ms. Johnson informed her superiors, Messrs. Johnson and Scott, during the parties' negotiations in July 2007 that Discovery's questions "are very basic – I just didn't want to say something wrong because I still am unclear how it works.  Again, it would be nice to have a presentation for the managers . . . . We look stupid when our counterparts at the networks start asking questions and we can't answer them."  Ex. 5 (SA-0001383).

7

15.    In a follow-up email to her superiors on July 30, 2007, Ms. Johnson stated that "I just don't have a handle yet on the technology enough yet to speak intelligently on it.  I think it would be good . . . to have some kind of brief education on how all this works."  Ex. 6 (SA-001818-1819).

16.    Sky Angel's new system utilized technology supplied by NeuLion, a third-party vendor. *See* Ex. 7 (LaRue Dep. at 89:23-91:9).

17.    Sky Angel's Vice-President of Engineering, Raymond LaRue, admitted that Sky Angel first learned about IPTV in 2007, and that he never received a detailed tutorial from NeuLion as to how its system was to work.  *See id.* at 57:9-58:6; 61:3-62:8 ("They shared very little as far as the details of their technology.").

18.    Ms. Johnson's lack of knowledge about the technology led to misstatements to Discovery about the nature of Sky Angel's system.  For example, Ms. Johnson admitted that she told Discovery that Sky Angel was "a closed feed similar to Verizon," a telecommunications distributor that does not utilize the public Internet.  *See* Ex. 4 (K. Johnson Dep. at 105:17-22) ("Q.  Did you ever tell Mr. Yavello [at Discovery] that the Sky Angel technology will be a closed feed similar to Verizon?  A.  Yes, I do recall that."); Ex. 8 (DIS-001437-1444) ("Kathy indicated that the technology will be a closed feed similar to Verizon.").

19.    Discovery's negotiator, Elisa Freeman, confirmed that Ms. Johnson told her that Sky Angel's system was "a closed feed, private," meaning that "it would be on a private transmission path outside of the public Internet . . . as is Verizon."  Ex. 9 (Freeman Dep. at 126:5-127:16).

20.    Mr. Scott – who took over the negotiations for Sky Angel once the parties began discussing the contract language – testified that he did not know what Internet protocol technology was.  Ex. 2 (Scott Dep. at 152:20-22) ("Q.  Do you know what Internet protocol technology is?  A.  No.").

21.    Despite Mr. Scott's admitted ignorance of the technology, during the negotiations, Sky Angel's CEO Rob Johnson asked Mr. Scott to speak with Sky Angel's head engineer, Mr. LaRue, "to make sure [Mr. LaRue] doesn't say anything wrong" about the technology. *See* Ex. 5 (SA-0001383).

22.    Discovery's Ms. Freeman told Mr. Scott during the parties' negotiations that Discovery "could not allow distribution over the public Internet." Ex. 9 (Freeman Dep. at 25:9-18).

23.    Mr. Scott told Discovery during the negotiations that Sky Angel would not be utilizing the World Wide Web as part of its distribution methodology. *See* Ex. 2 (Scott Dep. at 84:13-17, 85:8-17) ("Q.  Did you tell my clients, Discovery Communications and Animal Planet, that Sky Angel would not distribute Discovery Channel and Animal Planet over the World Wide Web?  A. Yes . . . . Q.  And that would have been in 2007 before the contract was signed, correct?  A. Yes."); *see also id.* at 73:9-15 (stating that "the World Wide Web is the public Internet."); Ex. 9 (Freeman Dep. at 26:18-27:9; 34:9-15) (testifying that Mr. Scott and Ms. Johnson told Discovery during the 2007 negotiations that Sky Angel would not be using the public Internet).

24.    Discovery attempted to obtain information about the technology from both Sky Angel and NeuLion, including by sending a nine-page, detailed questionnaire to Mr. LaRue, and executing a non-disclosure agreement ("NDA") with NeuLion. *See* Ex. 10 (DIS-001453-1470).  Sky Angel refused to respond with written answers to Discovery's questionnaire.  Ex. 11 (Myers Dep. at 50:11-22) ("Sky Angel was not willing or unable to provide a technical questionnaire response."); *see* Ex. 7 (LaRue Dep. at 209:25-210:10; 211:3-15).  Although requested in the questionnaire, Sky Angel did not provide a block diagram to Discovery.  Ex. 7 (LaRue Dep. 119:15-120:7) ("[Discovery requested a detailed block diagram and we weren't willing to give them a detailed block diagram. . . . Didn't give them a less than detailed one, no, sir."); *see also id.* at 211:32-213:14.

25.    Discovery engineer Charles Myers, who conducted the technical due diligence of Sky Angel for Discovery, testified that with the exception of one question on Discovery's questionnaire, which Sky Angel's engineer answered orally, Sky Angel simply referred Discovery to NeuLion.  Ex. 11 (Myers Dep. at 73:3-13; 92:18-94:4; 156:7-158:19) ("[Mr. LaRue] said that he really wasn't well-versed in it and I really would get the best answer from the NeuLion folks  . . . . Q.  Did Mr. LaRue indicate anything about use of the public Internet during this conversation?  A.  He did not.  He referred me to the NeuLion group.").

26.    Mr. Myers had a "single conversation" by telephone with NeuLion, in which he "learned very little" because NeuLion was "not willing to give us very much information."  *Id.* at 15:5-16:15; 26:19-10.  During that conversation, NeuLion simply told Mr. Myers that its system could use "either the Internet" or "private fiber," and that it was "very flexible."  *Id.* at 94:15-95:1.  NeuLion was "unwilling to give . . . specific details."  *Id.* at 26:19-27:10.

27.    Discovery wanted to have a meeting to better understand the technology that NeuLion and Sky Angel would be using, but NeuLion "went radio silent on [Discovery]."  *Id.* at 29:5-17 ("They didn't return any phone calls.  They didn't return any e-mails.  We just didn't hear from them at all."); 19:4-5; 19:14-21; 26:19-27:10; 169:6-170:2); Ex. 9 (Freeman Dep. at 413:5-9).

28.    Mr. Myers received an email and a newspaper article while conducting his due diligence that suggested that NeuLion had the general ability to transmit content over the Internet, but these materials did not inform Mr. Myers' opinion of Sky Angel's distribution methods because they did not "speak[] specifically to the Sky Angel agreement, and conversations with the NeuLion group indicated it could be done over the Internet or over a private fiber connectivity."  Ex. 11 (Myers Dep. at 107:3-10);

10

*id.* at 94:15-95:1.  As Mr. Myers explained, "I recall [NeuLion] telling me that they could do it on both public Internet and on private networks."  *Id.* at 208:7-20.

C.    **Discovery Included Provisions In The Agreement Barring Sky Angel From Distributing The Services Via The Internet And Affording Discovery A Termination Right**

29.    From the outset of the negotiations, the Agreement's Grant of Rights section limited Sky Angel's programming rights to "distribution of the Services for viewing by Subscribers on television sets . . . and not for viewing on personal computers or otherwise via the Internet."  *See* Ex. 1 § 2.

30.    Because Sky Angel never adequately explained to Discovery the precise method that Sky Angel would use to distribute the Services, Discovery also specifically bargained for the right to terminate the Agreement if, among other things, Sky Angel's "distribution methodology" was not satisfactory to Discovery at any time during the contractual term.  *See* Ex. 9 (Freeman Dep. at 203:22-204:22 ("I was concerned enough . . . that I didn't know what that NeuLion box did to add language to 12.1 which gave us a broad termination right in the event we were dissatisfied or we felt as if we didn't have rights that we needed . . . we were willing to enter into the agreement only with that protection in 12.1 . . . ."); 38:9-39:13; 189:18-190:19).

31.    On October 1, 2007 (a few days before the Agreement was finalized), Discovery provided Sky Angel with a redline draft of the Agreement that inserted additional termination language at the end of § 12.1, *see* Ex. 12 (DIS-000420-424 and DIS-002847-2862), specifically:

> Notwithstanding anything to the contrary herein, in the event [Discovery] determines that the Service signal integrity or the Service signal security measures or distribution methodology used by or on behalf of [Sky Angel] are not satisfactory, [Discovery] shall have the right to terminate this Agreement.

11

As Discovery's former in-house counsel and draftsperson Stephen Kaminski testified, this was not standard, boilerplate language typically included in Discovery's licensing agreements. *See* Ex. 13 (Kaminski Dep. at 282:6-16); *see also* Ex. 2 (Scott Dep. at 195:14-18) (agreeing that the concluding sentence of § 12.1 added "an additional termination right for Discovery").

32.     Sky Angel agreed to the termination language. *See* Ex. 9 (Freeman Dep. at 18:21-19:21, 38:9-39:13, 189:18-190:19); Ex. 2 (Scott Dep. at 193:16-22; 194:16-195:18).

33.     Discovery also included a provision stating that Sky Angel would indemnify Discovery "for any Costs arising from [Sky Angel's] distribution of the Services that causes [Discovery] to violate any of its programming contracts." Ex. 1 § 10.3.

34.     As Discovery's draftsperson explained, "I think we had a lack of full understanding, which is why I built in termination based on distribution methodology, a carve-out from Internet in the grant of rights and full indemnification if any programming rights were violated." Ex. 13 (Kaminski Dep. at 210:14-19); *id.* at 114:13-16, 115:2-10, 211:17-212:1; *see* Ex. 14 (Goodwyn Dep. at 86:4-15).

35.     The parties also negotiated a definition of "IP System" that did not reference the Internet. Specifically, Section 1.1.2 of the Agreement defines "IP System" as follows (emphasis added):

> An 'IP System' shall mean a multichannel video distribution system which utilizes Internet protocol ("IP") technology to deliver video programming services over a closed and encrypted transmission path over a national fiber-optic network to a central location for subsequent distribution of such video programming services with proprietary encoding over a <u>high-speed data connection</u> to set-top-boxes that are secured by industry standard encryption and conditional access technologies and are connected to Subscribers' television sets.

36.     An IPTV system, while it may involve a "high-speed data connection," does not require the use of the Internet to distribute video programming. *See* Ex. 7 (LaRue Dep. at 48:9-12 ("Q. Okay.

12

Internet protocol, would you agree with me, does not mean that it has to be distributed over the Internet?
A. That's correct."); 50:17-18); Ex. 11 (Myers Dep. at 109:21-110:6).

      37.      Discovery knew at the time of the negotiations, based on prior experience with other distributors, that IPTV technology <u>did not require</u> the use of the public Internet.  *See* Ex. 11 (Myers Dep. at 7:20-8:6) ("My understanding of an IPTV system is it is a closed platform that is delivered over private fiberoptic circuits to a consumer's home."); Ex. 13 (Kaminski Dep. at 278:4:13) ("IPTV technology is different than transmission via the Internet."); Ex. 9 (Freeman Dep. at 249:12-17); Goodwyn Decl. ¶ 10.

### D.      Despite The Contractual Language And Its Assurances To Discovery During The Negotiations, Sky Angel Distributed The Services Via The Internet

      38.      Although Mr. Scott assured Discovery during the parties' negotiations that Sky Angel was not going to be using the World Wide Web, *see supra* ¶ 23, and even though the Agreement expressly precluded Internet distribution, *see supra* ¶ 2, Sky Angel's internal documents from 2007 confirmed that the Services would be distributed via the public Internet.  In an internal e-mail dated May 25, 2007, Sky Angel's Glenn Christopher forwarded an article to Ms. Johnson and other Sky Angel executives, and stated that "[a]t times this article refers to IPTV as a 'closed, managed system', which we are not.  <u>We are going over the public Internet</u> and our service is closed (meaning subscription based or needing authorization) but <u>we do not deliver our services over lines or bandwidth we manage or control, such as AT&T and [Verizon] FiOS</u>."  Ex. 15 (SA-002680-2682 at 2680) (emphasis added).  These internal Sky Angel documents were not shared with Discovery.

      39.      Sky Angel's marketing materials from 2007 asserted that its system was going to be "[p]owered by the Internet," Ex. 16 (SA-0003742-3745 at 3744), and touted the "new technology" as

"easy to use, portable, and only requires an Internet connection and the IPTV set top box," *see e.g.*, Ex. 17 (SA-0003293-3301 at 3296). Sky Angel's July 2007 marketing similarly stated that Sky Angel's subscribers could use the system in various locations – including "on vacation, your summer home, etc." – so long as they had "access to the internet." Ex. 18 (SA-0003784-3793 at 3787). Sky Angel did not tell Discovery that its system would be "portable" and available anywhere there was Internet access. Ex. 19 (Sky Angel's Responses to Discovery's First Set of Interrogatories at Interrogatory No. 3). These materials were not shared with Discovery.

40.    Sky Angel now openly concedes that its IPTV service used the public Internet as part of its distribution of video programming services. Sky Angel's Motion for Partial Summary Judgment ("Mot.") at ¶ 34, 32.

41.    Mr. Scott admitted at his deposition that Sky Angel uses the Internet. Ex. 2 (Scott Dep. at 162:15-163:17) ("It uses the Internet. It goes from here to here and it uses the Internet . . . . Q. It travels across the Internet, you said. Whose internet? A. The world's Internet.").

42.    During discovery, Sky Angel's 30(b)(6) corporate representative with respect to distribution methodology testified that Sky Angel first processed and encrypted content received from programmers such as Discovery, and transmitted it to NeuLion "by private fiber, cross-country fiber circuits." Ex. 7 (LaRue Dep. at 62:9-63:15, 154:4-20). NeuLion then distributed that content over the public Internet to the end users (i.e., to Sky Angel's subscribers). *Id.* at 88:7-12. Mr. LaRue admitted that "[w]e can't control the portion from NeuLion to the set-top box" of the subscriber, *id.* at 73:21-74:20, as each Sky Angel subscriber has its "own service to the Internet" through a contract with a separate Internet provider, *id.* at 67:18-68:5.

43.     Several other Sky Angel witnesses confirmed that the second step in Sky Angel's two-step distribution process utilized the public Internet.  *Id.* at 88:7-12 ("Q.  So the public Internet is involved?  A.  Yes."); Ex. 20 (Alexander Dep. at 145:3-146:5) (testifying that Sky Angel's IPTV system used "[t]he Internet that Al Gore invented"); Ex. 21 (Jones Dep. at 66:5-14) ("When a Sky Angel subscriber viewed content on the Sky Angel platform, NeuLion sent the content to the customer through the Internet."); Ex. 22 (Collins Dep. at 99:4-14) ("The Internet was used, yes.").

44.     Rather than a fixed offering limited to a subscriber's home, Sky Angel's use of the public Internet enabled its subscribers to use their set top boxes to view video programming such as Discovery's Services anywhere there was an Internet connection.  *See* Ex. 23 (SA-0004111-4119 at 4113); Ex. 24 (SA-0003781-3783 at 3782) ("Completely portable.  Available anywhere in the U.S. where a TV and high-speed Internet is available—just bring your receiver with you."); Ex. 21 (Jones Dep. at 107:25-108:4) ("Q.  And was it also capable of being connected to a television set other than the one in the customer's home?  A.  Yes.").  As Mr. LaRue testified, it "[d]idn't matter where [the set top box] was," as long as there was Internet and a television.  Ex. 7 (LaRue Dep. at 130:23-25).

45.     Discovery never agreed to license Sky Angel rights to distribute the Service via the Internet or on a portable basis (i.e., anywhere the subscriber had an Internet connection).  Ex. 9 (Freeman Dep. at 7:13-19) ("In the contract between Discovery and Sky Angel, there's no grant of rights . . . for it to be portable."); Ex. 13 (Kaminski Dep. at 294:13-21) ("Discovery did not provide an affirmative grant of rights to distribute via the Internet in a multilocation manner.").

**E.     Sky Angel's July 2009 Agreement With C-SPAN Prohibited Use Of Public Internet**

46.     Sky Angel also entered into an affiliation agreement with C-SPAN, dated as of May 28, 2009 (the "C-SPAN Agreement").  *See* Ex. 25 (C-SPAN Agreement).

15

47.    Section 1(a) of the Sky Angel/C-SPAN Agreement states as follows:

[C-SPAN] hereby grants to [Sky Angel] the non-exclusive right, and [Sky Angel] hereby accepts said right . . . to exhibit, distribute and authorize the reception of the Services to end users . . . by means of an internet-protocol based stream <u>which shall be secure and capable of being accessed only in a manner which would not allow any form of subsequent distribution other than as set forth herein, including without limitation, distribution over the public Internet</u>.

*Id.* at 1 (emphasis added); *see* Ex. 2 (Scott Dep. at 383:2-4) ("Q.  You put into the C-SPAN agreement that you would not use the public Internet, correct?  A.  Yes.").

**F.    Other Programmers, Including C-SPAN, Terminate Sky Angel Because Of Its Distribution Methodology, But Sky Angel Fails To Inform Discovery**

48.    During the term of the Agreement, at least two other programmers – C-SPAN and Visual Arts – ceased to provide their programming services to Sky Angel by terminating their agreements with Sky Angel.  *See, e.g.*, *id.* at 66:9-11 ("Q.  Are you aware that C-SPAN terminated Sky Angel's service? A. Yes."); Ex. 3 (R. Johnson Dep. at 204:20-205:5).

49.    C-SPAN specifically attributed its termination to concerns about Sky Angel's distribution methodology, as its contract with Sky Angel prohibited "distribution over the public Internet" (just as the Agreement in this case prohibited distribution "via the Internet").  *See* Ex. 25 (C-SPAN Agreement at 1); Ex. 26 (*Sky Angel U.S., LLC v. National Cable Satellite Corp.*, 947 F. Supp. 2d 88, 95 (D.D.C. 2013) ["*C-SPAN I*"] (quoting 7/13/09 email from C-SPAN to Sky Angel, which "expresses C–SPAN's belief that the 'IPTV [A]greement does not allow for the type of delivery' implemented by Sky Angel")).

50.    Sky Angel's CEO Robert Johnson admitted that Sky Angel never notified Discovery that these programmers ceased to provide their programming services to Sky Angel or the "reason therefore," either "immediately" or otherwise.  *See* Ex. 3 (R. Johnson Dep. at 204:11-19).

16

51.     If Sky Angel had done so, Discovery would have been "entitled to terminate [the] Agreement" pursuant to § 7.1.  *See* Ex. 1 § 7.1 ("If any programmer that provides one or more programming services to [Sky Angel] for distribution during the Term ceases to provide a programming service to [Sky Angel] (other than based on expiration of the applicable contract for such service), [Sky Angel] shall immediately notify [Discovery] of such cessation and the reason therefore, and [Discovery] shall be entitled to terminate this Agreement.").

52.     Sky Angel also sued C-SPAN, but both its Complaint and Amended Complaint have been dismissed.  *See* Ex. 27 (*Sky Angel U.S., LLC v. Nat'l Cable Satellite Corp.*, 12-1834 (RC), 2014 WL 1266776 (D.D.C. Mar. 28, 2014) ["*C-SPAN II*"]).

53.     Sky Angel's Executive Vice President of Programming, Brian Collins, testified that several other programmers – including PBS Sprout, NBC Sports, INSP, GMC (now UP), and ASPiRE – either terminated or chose not to renew agreements with Sky Angel because they lacked the Internet distribution rights necessary for distribution on Sky Angel's service.  *See* Ex. 22 (Collins Dep. at 79:4-10, 81:7-17; 84:12-18; 86:4-21; 90:19-91:16); *see also* Ex. 2 (Scott Dep. at 93:5-19; 94:25-95:23).

54.     Other programmers – including Disney's Buena Vista Television ("Buena Vista"), The Food Network, The Golf Channel, HGTV and several others – refused to enter agreements with Sky Angel because they tested NeuLion's set-top boxes and found that they did not provide "industry standard" encryption.  *See* Ex. 28 (Neulion_0000044-45); Ex. 3 (R. Johnson Dep. at 219:11-221:8).

55.     In contrast to the lack of information provided to Discovery during the 2007 negotiations, Sky Angel provided written responses to technology questionnaires submitted by other programmers, such as Buena Vista, and provided a block diagram indicating that Sky Angel was distributing video programming "from the NeuLion servers to the customer via the Internet."  Ex. 7 (LaRue Dep. at 118:7-

17

120:19); *see id.* at 107:6-14, 209:12-24; Ex. 29 (SA-0018258-18283 at 18282) ("Deliver through open

internet").  Buena Vista was one of the several programmers cited above that did not subsequently sign

an agreement with Sky Angel.  Ex. 7 (LaRue Dep. at 118:11-13).

G. **Discovery Learns About Sky Angel's Internet Distribution, Which Was Contrary To The Agreement And Discovery's Long-Standing Internet Policy**

56.     In November 2009, Discovery learned that Sky Angel's distribution system utilized the

Internet after receiving a letter from one of its distributors, DISH Network, LLC (the "DISH Letter").

*See* Ex. 30 (Cross Dep. at 216:5-10).

57.     Following receipt of the DISH Letter, Discovery undertook a review of Sky Angel's

distribution methodology and became aware that Sky Angel was promoting its service as an Internet-

based, transportable service that could be used in multiple locations.  *See* Ex. 14 (Goodwyn Dep. at

176:5-177:1); Ex. 31 (DIS-001108-1111 at 1110-11); Ex. 13 (Kaminski Dep. at 41:13-20).  Specifically,

Discovery's David Broughton sent an email to Ms. Freeman quoting from Sky Angel's website, which

stated that Sky Angel "uses your high-speed Internet service to deliver over 70 faith and family

channels . . . ." Ex. 32 (DIS-001166-1168 at 1166) (emphasis added).  William Goodwyn, who was in

charge of the domestic distribution of all programming networks for Discovery in 2009, testified that he

reviewed this email, which showed that Sky Angel "was not in compliance with the [A]greement."  Ex.

14 (Goodwyn Dep. at 184:15-20).

58.     Discovery determined that Sky Angel's use of the Internet was contrary to the

Agreement, as Sky Angel "did not have the grant of rights to allow them to use the Internet to carry the

service, deliver the service."  *Id.* at 196:13-197:7; *see also id.* at 182:9-18 ("I made the determination

that [Sky Angel was] delivering the signal in a manner that was not agreed to in the contract"); *id.* at 249:12-16; Ex. 33 (Phillips Dep. at 322:18-323:9); Ex. 9 (Freeman Dep. at 308:7-14).

59.    Sky Angel's use of the Internet to distribute the Services was contrary to long-standing Discovery policy against the distribution of Discovery's linear networks via the Internet, and presented substantial legal and business risks with respect to Discovery's licensors and distributors if Discovery permitted Sky Angel to continue distributing the Services in a manner inconsistent with the Agreement. *See* Ex. 14 (Goodwyn Dep. at 169:3-22; 170:17-171:4; 173:2-174:8; 182:9-18; 184:15-20).

60.    In 2007 and for years thereafter, Discovery never granted any of its at least one thousand distributors the right to distribute Discovery's full, linear programming networks over the Internet. *See id.* at 33:20-34:21; 277:14-278:6; Ex. 13 (Kaminski Dep. at 24:15-20) ("I was instructed when I began and it was understood -- I understood the entire time I was there not to ever allow linear networks to be distributed over the public Internet."); Ex. 9 (Freeman Dep. at 398:12-399:19); Goodwyn Decl. ¶ 21 ("Until the end of 2013, as both a policy and business practice, Discovery had never before entered into any agreements with any distributor through which any of Discovery's linear programming networks were permitted to be distributed to subscribers in the United States over the Internet.").

61.    A "linear network" or "linear channel" refers to a daily programming service, such as the five Discovery Services licensed to Sky Angel, that are exhibited 24 hours a day, 7 days a week. *See* Ex. 1 §§ 1.2-1.6; Ex. 33 (Phillips Dep. at 10:15-11:3); Goodwyn Decl. ¶ 7.

62.    Discovery's policy not to allow distribution of its 24/7 linear networks over the Internet stemmed from a number of concerns, including the level of security, the quality of the signal, the portability of the signal, the ability to provide both East Coast and West Coast feeds, and the ability to measure the ratings of the audience watching the programming. *See* Ex. 14 (Goodwyn Dep. at 36:5-

19

38:20; 39:6-41:3); Goodwyn Decl. ¶ 13 (detailing concerns as to signal quality and security).  Discovery stressed to Sky Angel during the 2007 negotiations that it was concerned about "the signal quality and the security of the system."  Ex. 6 (SA-00001818-1819).

63.    Discovery also did not allow distribution of its 24/7 linear networks over the Internet because some of its agreements with third-parties from which it licenses certain programs do not allow Discovery to exhibit certain licensed programming over the Internet.  *See* Ex. 30 (Cross Dep. at 19:9-20:12); Goodwyn Decl. ¶ 12.  For example, Discovery entered a licensing agreement, dated as of April 15, 2008, which states in relevant part that Discovery "agrees that it will not distribute the Programs over the world wide web/Internet."  Ex. 34 (April, 15, 2008 Licensing Agreement § 3); Ex. 30 (Cross Dep. at 227:22-228:10, 232:10-233:19); *see also* Ex. 35 (March 15, 2005 Licensing Agreement § D).  Because Discovery did not have the licensing rights to allow such programs to be viewed over the Internet, it could not grant those rights to any of its distributors, including Sky Angel.  *See* Ex. 30 (Cross Dep. at 15:17-22); Goodwyn Decl. ¶ 12.

64.    Finally, Discovery would not license its linear programming networks for distribution over the Internet because certain of Discovery's distributors, such as DISH, have most-favored-nations ("MFN") provisions in their agreements with Discovery.  Following its determination that Sky Angel was utilizing the Internet, Discovery was concerned that if it allowed Sky Angel to continue distributing its Services over the Internet when no such rights were granted under the Agreement, other distributors would claim they were entitled under their MFN provisions to distribute the Services utilizing the same distribution technology as Sky Angel.  *See* Ex. 30 (Cross Dep. at 31:9-15; 31:22-32:11; 41:5-42:2; 281:17-282:4); Goodwyn Decl. ¶ 14; Ex. 36 (Jan. 1, 2007 Discovery/DISH Agreement §§ 3(h), 12(b)).

20

65.    Discovery had never allowed a distributor to distribute its 24/7 linear networks over the public Internet until 2013 when its agreement with a cable distributor provided a limited and additional right (often called "TV Everywhere") that would allow subscribers to that cable distributor's underlying cable system to access certain of Discovery's linear networks on devices that may be connected to the Internet on an authenticated basis using an authorization code.  This additional right, made by way of an express grant of rights separate from the rights granted to traditional distribution of Discovery's linear networks, is subject to separate terms and conditions.  *See* Goodwyn Decl. ¶ 22; Ex. 14 (Goodwyn Dep. at 33:20-34:21; 278:15-20).  Even then, however, if Discovery does not have Internet rights to a particular program, "[t]hat program . . . would not appear on the TV Everywhere service that utilizes the Internet but would appear only on the underlying cable service that does not utilize the Internet." Goodwyn Decl. ¶ 23.

66.    Discovery has allowed certain discrete <u>programs</u> – for example, half-hour or one-hour television shows – to be distributed on a video-on-demand ("VOD") basis over the Internet.  VOD concerns non-linear programming, and Discovery closely controls and restricts which episodes of which programs it permits for use on VOD, such as to episodes only from prior seasons.  *See* Ex. 14 (Goodwyn Dep. at 48:21-49:17); Goodwyn Decl. ¶¶ 15-16.

67.    Discovery has also allowed certain short-form clips of its programs to be available on websites such as MSN, Comcast, Netflix, Amazon, or YouTube.  Ex. 14 (Goodwyn Dep. at 297:18-298:4); Goodwyn Decl. ¶ 18.  Additionally, Discovery had entered into an agreement with FloTV to distribute certain episodes of discrete programs on mobile devices.  *See* Goodwyn Decl. ¶ 19.  That company, however, did not use the Internet to distribute the particular clips or programs to its subscribers.  *Id.*

21

68.     These more limited forms of non-linear programming are very different than the online distribution of entire 24-7 linear networks, such as the Discovery Services that Discovery came to learn Sky Angel was distributing over the Internet.  Goodwyn Decl. ¶ 15.  They are also different than the concept of 24-7 "TV Everywhere," as Sky Angel's industry expert acknowledged.  *See* Ex. 37 (Furchtgott-Roth Dep. at 168:12-20).

**H.     Discovery Terminates The Agreement Pursuant To Section 12.1**

69.     Having learned that Sky Angel allowed its subscribers to access the Services anywhere there was an Internet connection, Discovery's Mr. Kaminski and Ms. Freeman asked Sky Angel in a telephone call in December 2009 if there was another way for Sky Angel to distribute the Services.  Sky Angel's answer was no.  *See* Ex. 13 (Kaminski Dep. at 70:5-13; 73:12-74:5).

70.     Discovery then sent a letter to Sky Angel, dated January 22, 2010, stating that:

> We have determined that the distribution methodology used by and on behalf of Affiliate is not satisfactory.  Accordingly, pursuant to Section 12.1 of the Agreement, we hereby elect to terminate the Agreement.  In order to provide for an orderly transition process, including notification to your subscribers, we will provide you with a three (3) month transition period; accordingly, the Agreement will terminate effective on April 22, 2010.  Ex. 38 (DIS-001160).

71.     Discovery had no obligation under the Agreement to provide a termination notice to Sky Angel, or to grant Sky Angel a three-month transition period.  *See* Ex. 1 § 12.1.

72.     Discovery reiterated in a letter dated March 19, 2010 that it made its termination decision under Section 12.1 of the Agreement because Sky Angel's "distribution methodology" was "not satisfactory."  Ex. 39 (DIS-000846).

73.     Five days later, Sky Angel filed a Program Access Complaint and Emergency Petition for Temporary Standstill with the Federal Communications Commission ("FCC").  Ex. 40 (FCC Order dated April 21, 2010 at 2).  The FCC denied Sky Angel's request for a temporary standstill, ruling that

22

Sky Angel "has not carried its burden of demonstrating that it is likely to succeed in showing on the merits that it is an MVPD entitled to seek relief under the program access rules." *Id.* at 4, 6.

74.    On April 22, 2010, at the direction of its CEO Rob Johnson, Sky Angel deleted all references to its system's portability from its website.  *See* Ex. 41 (SA-0003749-50 at 3749) ("I have made a quick survey of the information on our website that talks about the box being portable and per Rob [Johnson's] direction we're removing it."); Ex. 3 (R. Johnson Dep. at 339:15-19).

75.    On January 14, 2014, Sky Angel suspended its distribution business as it has "endured years of losses."  Ex. 42 (SA-0017688); Ex. 3 (R. Johnson Dep. at 72:16-75:3) (admitting that Sky Angel's IPTV distribution business lost money every year since its inception in 2008); Ex. 43 (Skelton Dep. at 171:25-172:22) (same).

## LEGAL STANDARD

Summary judgment should be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  On a summary judgment motion, the Court makes the "threshold inquiry of determining whether there is the need for a trial"—that is, whether disputes over material facts are "genuine" such that "they may reasonably be resolved in favor of either party" by a finder of fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  "[T]he movant initially bears the burden of demonstrating the absence of a genuine issue of material fact," after which "the burden shifts to the non-moving party to produce facts sufficient to create a triable issue of fact."  *Aiken v. Policy Mgmt. Sys. Corp.*, 13 F.3d 138, 141 (4th Cir. 1993).  "Conclusory or speculative allegations do not suffice, nor does a mere scintilla of evidence in support of [the nonmoving party's] case."  *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002) (citation omitted).

23

When, as here, "cross-motions for summary judgment are submitted to a district court, each motion must be considered individually, and the facts relevant to each must be viewed in the light most favorable to the non-movant."  *Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003).  In contract interpretation cases governed by Maryland law such as this one, "summary judgment is appropriate when the contract in question is unambiguous."  *Wash. Metro. Area Transit Auth. v. Potomac Inv. Props., Inc.*, 476 F.3d 231, 235 (4th Cir. 2007).  Indeed, it is well-settled that "[t]he interpretation of a contract, including the determination of whether a contract is ambiguous, is a question of law." *Gresham v. Lumbermen's Mut. Cas. Co.*, 404 F.3d 253, 260 (4th Cir. 2005).  Under Maryland law, "the purpose of contract interpretation is to determine and effectuate the intent of the parties, and the primary source for identifying this intent is the language of the contract itself."  *Wash. Metro. Area Transit Auth.*, 476 F.3d at 235.  Extrinsic evidence in the form of parol evidence, such as pre-contract negotiations, is irrelevant unless the language of the contract is ambiguous.  *Sy-Lene of Wash., Inc. v. Starwood Urban Retail II, LLC*, 829 A.2d 540, 544 (Md. 2003).  "If a court properly determines that the contract is unambiguous on the dispositive issue," it should not resort to extrinsic evidence but rather should "properly interpret the contract as a matter of law and grant summary judgment."  *World-Wide Rights Ltd. v. Combe Inc.*, 955 F.2d 242, 245 (4th Cir. 1992).

## LEGAL ARGUMENT

## I.     DISCOVERY IS ENTITLED TO SUMMARY JUDGMENT

### A.     The Agreement Is Plain And Unambiguous In Discovery's Favor

Summary judgment should be granted to Discovery based on the Agreement's clear and unambiguous language.  The Agreement afforded Sky Angel only <u>limited</u> rights to distribute the Services, as precisely delineated in the Grant of Rights provision—"the fundamental provision of any

affiliate agreement." Ex. 13 (Kaminski Dep. at 277:2-10). Specifically, the Grant of Rights provision unambiguously stated that "the rights granted to [Sky Angel] herein <u>are limited to distribution of the</u> <u>Services for viewing by Subscribers on television sets on a subscription basis and not for viewing on</u> <u>personal computers or otherwise via the Internet</u>." Ex. 1 § 2 (emphasis added). The Grant of Rights provision thus both addresses and limits the methods of "<u>distribution</u>" granted to Sky Angel. Sky Angel concedes that, in direct violation of this provision, it "used the Internet as part of its means of distribution." Mot. at 36.

The Agreement's termination clause, set forth in the concluding sentence of § 12.1, is likewise unambiguous on its face:

> Notwithstanding anything to the contrary herein, in the event [Discovery] determines that the Service signal integrity or the Service signal security measures or distribution methodology used by or on behalf of [Sky Angel] are not satisfactory, [Discovery] shall have the right to terminate this Agreement.

Ex. 1 § 12.1. Construed according to its plain meaning, this provision entitled Discovery to end the Agreement at any time based solely on a determination that it was not satisfied with, <u>inter alia</u>, Sky Angel's "distribution methodology."

<u>First</u>, the phrase "[n]otwithstanding anything to the contrary herein" makes plain that this particular termination clause is unencumbered by any other condition that may exist elsewhere in either § 12.1 or the Agreement. *See Faltings v. IBM Corp.*, 854 F.2d 1316, at *4 (4th Cir. 1988) (Table) (holding that a termination clause beginning "[n]otwithstanding any other provision of this Agreement" specifically stated that "it stands alone" and "unambiguously conferred an unrestricted right to terminate upon three months' notice"). Under the Agreement, Discovery needed only to "determine[] that the . . . distribution methodology used by or on behalf of" Sky Angel was "not satisfactory." Ex. 1 § 12.1.

Second, the Agreement's Grant of Rights set forth certain requirements and limitations

concerning Sky Angel's distribution methodology. *Id.* § 2. That provision expressly defined which

distribution rights were licensed to Sky Angel and at the same time prohibited "distribution" of the

Services "via the Internet."[4] *Id.* Moreover, because Discovery did not grant Sky Angel any rights to

distribute the Services via the Internet, those rights were specifically reserved to Discovery under the

Agreement's reservation of rights provision. *Id.* § 13.1.

Third, the word "satisfactory," under Maryland law, must be given its "ordinary signification,"

*Sullins v. Allstate Ins. Co.*, 667 A.2d 617, 619 (Md. 1995), i.e., meeting the requirements, expectations,

or needs of Discovery, and/or leaving Discovery free of doubt or uncertainty. *See St. Paul at Chase*

*Corp. v. Mfrs. Life Ins. Co.*, 278 A.2d 12, 29 (Md. 1971) (applying Webster's New International

Dictionary's definition of "satisfactory," "giving or producing satisfaction . . . of a kind to meet all

requirements or expectations . . . relieving the mind from doubt or uncertainty"). Accordingly, under §

12.1 of the Agreement, Discovery needed to determine that Sky Angel's use of the Internet either did

not meet Discovery's expectations for Sky Angel's distribution methodology, or that it left Discovery

with "doubt or uncertainty" about Sky Angel's fulfillment of the Agreement's terms. Because

Discovery has shown that it appropriately exercised its express termination right under these standards,

*see* § I (B) infra, it is entitled to summary judgment. *See Lancaster Laundry v. Fallston Gen. Hosp.,*

*Inc.*, Civ. A. No. HAR-90-1737, 1991 WL 26935, at *1-2 (D. Md. Feb. 25, 1991) (granting summary

---

[4] Although Sky Angel claims in support of its own summary judgment motion that its performance satisfied certain aspects of the Agreement, Mot. at 23-26, Discovery is entitled to summary judgment because it is undisputed that, regardless of Sky Angel's performance with respect to some of its obligations, its "distribution methodology" was contrary to the Agreement's Grant of Rights provision. Nor can Sky Angel claim that § 1.1.2 of the Agreement allowed Internet distribution, since that section defined Sky Angel's "IP System" without reference to the Internet as a method of distribution. Ex. 1 § 1.1.2 (referring instead to a "high speed data connection"). Neither "IPTV" nor "high-speed data connection" is synonymous with the Internet. *See* Ex. 9 (Freeman Dep. at 252:3-7); Ex. 13 (Kaminski Dep. at 269:9-14).

judgment where unambiguous "early termination provision" "expressly [provided] either party the right to walk away from the agreement after meeting certain conditions . . . even if the contract is still in effect"); *see also Andrews Bartlett & Assocs., Inc. v. Am. Soc. of Health-Sys. Pharm., Inc.*, 129 F.3d 116 at *1 (4th Cir. 1997) (Table) (affirming summary judgment where "the termination clause unambiguously granted [defendant] the right to end the contract if it was dissatisfied with [plaintiff's] performance and . . . there was sufficient uncontroverted evidence of that dissatisfaction").

Notwithstanding these unambiguous contractual provisions, Sky Angel sometimes argues that it was actually <u>permitted</u> to use the Internet, relying on extra-contractual evidence that Discovery allegedly "knew" Sky Angel was using the Internet.  Mot. at 36.  For example, Sky Angel points to an email it forwarded to Discovery's Mr. Myers that contained an embedded reference to NeuLion's purported use of the Internet. *Id.*; Sky Angel Ex. A-23.  Even if this email could be considered to show that Discovery "knew" Sky Angel was using the Internet – and it cannot, given (1) NeuLion's statements that it could use either the Internet or private fiber and (2) Sky Angel's inability or unwillingness to cooperate with Mr. Myers' due diligence inquiries – any such reliance is foreclosed by the parol evidence rule.  *See Sy-Lene of Wash.*, 829 A.2d at 544 (holding that a court does not go beyond the four corners of the contract to explain the contract's meaning unless the court first "finds the contract to be ambiguous").  Similarly, Sky Angel cannot rely on other pieces of parol evidence (a newspaper article about NeuLion's set-top boxes or a newsletter excerpt about IPTV generally, Mot. at 9), to contradict the plain terms of the Agreement.  Even if this stray extrinsic evidence could be considered in these circumstances – and it cannot – Mr. Myers explained that these isolated references to the Internet did not inform his opinion of Sky Angel's distribution methods because they did not "speak[] specifically to the Sky Angel agreement, and conversations with the NeuLion group indicated it could be done over the Internet or

27

over a private fiber connectivity." Ex. 11 (Myers Dep. at 107:3-10); *see also id.* at 198:22-199:7

(newspaper article merely "confirmed . . . that <u>one</u> of the potential cases <u>could be</u> over the Internet")

(emphasis added). Moreover, the Agreement's integration clause expressly provides that the Agreement

"set[s] forth the entire agreement between the parties" and "supersede[s] all prior understandings and

communications between the parties, oral or written." Ex. 1 § 13.5.

> **B.      Discovery Appropriately Exercised Its Unambiguous Termination Right**

The undisputed facts establish that Discovery properly exercised its termination right based on

its dissatisfaction with Sky Angel's distribution methodology. Despite the Agreement's express

proscription on Internet distribution, Sky Angel nonetheless distributed its video programming to

subscribers via the Internet. Discovery's Statement of Undisputed Material Facts ("SUMF") ¶¶ 40-45.

Indeed, Sky Angel's own summary judgment brief acknowledges that Sky Angel, through NeuLion,

delivered programming "over the Internet." Mot. ¶ 34. Because Sky Angel's conceded use of the

Internet was precluded by the Agreement's plain language, Discovery's determination that it was

dissatisfied with Sky Angel's distribution methodology under § 12.1 fell squarely within its contractual

rights and, thus, was objectively reasonable because it was based upon the unambiguous contractual

criteria outlined in the Agreement's Grant of Rights provision.

> **1.      Discovery Appropriately Exercised Its Termination Right Under An
> Objective Standard**

In determining whether a party's exercise of discretion in terminating a contract for

dissatisfaction constitutes a breach of contract, Maryland courts apply either an objective or subjective

standard. *Questar Builders, Inc. v. CB Flooring, LLC*, 978 A.2d 651, 670, 675 (Md. 2009) (implying

"an obligation to act in good faith and deal fairly in exercising discretion under a contract). If "objective

criteria" are available by which to judge the party's satisfaction, then the applicable test is "whether the [party], as a reasonable man, should have been satisfied," as measured by those objective criteria. *First Nat'l Realty Corp. v. Warren-Ehret Co., Inc.*, 233 A.2d 811, 814-15 (Md. 1967). In contrast, "in matters essentially affecting personal taste, the [promisor's] opinion as to satisfaction control[s] in the absence of fraud or bad faith." *Clancy v. King*, 954 A.2d 1092, 1108 (Md. 2008) (internal quotation marks and citation omitted). In essence, the objective test asks "whether the [party exercising discretion] ought to have been satisfied," while the subjective test asks "whether [it] <u>was</u> satisfied." *First Nat'l Realty Corp.*, 233 A.2d at 815 (emphasis added).

The objective standard "requires a party exercising discretion to do so in accordance with the 'reasonable expectations' of the other party." *Questar*, 978 A.2d at 675. Reasonable expectations, however, do <u>not</u> refer to the other party's subjective understanding or feelings in entering a contract, and they are not assessed in a vacuum. *See id*. Rather, "[w]hat constitutes a 'reasonable expectation' . . . <u>depends on the language of the contract</u>." *Id.* at 675-66 (emphasis added); Dkt. No. 37 at 14 ("reasonable expectations" are "established by the language of the contract itself"). The objective test is appropriate in this case because "objective criteria" for reasonableness appear on the face of the contract. *First Nat'l Realty Corp.*, 233 A.2d at 815. As set forth herein, the Agreement contains objective criteria governing a satisfactory distribution methodology in its Grant of Rights provision, and also provided a mechanism for Discovery to terminate the Agreement if it determined that it was dissatisfied with the "distribution methodology used by or on behalf of [Sky Angel]." Ex. 1 § 12.1. Accordingly, the objective standard should apply.

Discovery's determination of dissatisfaction with Sky Angel's distribution methodology did not constitute a breach of contract because it was objectively reasonable under the criteria provided by the

Agreement's unambiguous terms.  The undisputed record shows that in November 2009, Discovery was notified by another distributor that Sky Angel was using the public Internet to distribute Discovery's content.  *See* SUMF ¶ 56.  Discovery determined that Sky Angel utilized the Internet and enabled its subscribers to view the Services anywhere with an Internet connection, *id.* ¶¶ 57-58, 69, which violated the criteria imposed by the Grant of Rights prohibiting distribution "via the Internet," Ex. 1 § 2. Discovery determined that Sky Angel's distribution methodology contravened the requirements and expectations as reflected in the core term of the parties' Agreement, and terminated the Agreement pursuant to § 12.1.  SUMF ¶¶ 58-59, 69-72.  Because that decision was objectively reasonable under the Agreement, summary judgment should be granted to Discovery.

### 2.    Even If The Subjective Standard Is Applied, The Undisputed Record Establishes Discovery's Honest Dissatisfaction With Sky Angel's Distribution Methodology

Even if the Court decides to apply the alternative subjective test for good faith, summary judgment should still be granted to Discovery.  The subjective standard looks to the terminating party's "actual personal satisfaction" instead of the reasonable person's satisfaction.  *First Nat'l Realty Corp.*, 233 A.2d at 815.  Under the subjective standard, "unreasonable dissatisfaction is permitted so long as it is honest."  Dkt. No. 37 at 14. *See Ferris v. Polansky*, 59 A.2d 749, 752 (Md. 1948).  The subjective standard requires <u>only</u> that a party's dissatisfaction must be "real and not pretended, capricious, mercenary, or the result of a dishonest design."  *Id.*; *accord Volos, Ltd. v. Sotera*, 286 A.2d 101, 110 (Md. 1972).  In short, a party cannot simply "feign[] dissatisfaction" to avoid its contractual obligations. *Towson Univ. v. Conte*, 862 A.2d 941, 950 (Md. 2004); *Ferris*, 59 A.2d at 752; *see* Mot. at 28.

Although subjective good faith "ordinarily is a question of fact" because it looks to a party's actual motive or intent, *Clancy*, 954 A.2d at 1106 n.24, 1109-1110, such cases still may be resolved on

summary judgment if there are no disputes as to the material facts of the case.  *See Capitol Radiology v. Sandy Spring Bank*, No. DKC 09-1262, 2010 WL 610785, at *6-7 (D. Md. Feb. 17, 2010) (granting summary judgment in breach of contract case where "events [were] sufficient to support Defendant's good faith belief" that it properly declared plaintiff in default), *aff'd*, 439 F. App'x. 222, 226 (4th Cir. 2011); *see also Rite Aid Corp. v. Hagley*, 824 A.2d 107, 119, 121 (Md. 2003) (affirming in relevant part summary judgment in favor of defendant in case involving allegations that defendant failed to act in good faith).  Thus, where subjective good faith is a determinative issue, courts still grant summary judgment if the "facts, whether considered singly or collectively," "do not give rise to any reasonable inference" that the defendant's beliefs were "not honestly" held.  *Rite Aid Corp.*, 824 A.2d at 120.

Here, summary judgment should be granted to Discovery because the facts establishing its honest dissatisfaction with Sky Angel's distribution methodology are undisputed.  The Grant of Rights provision specifically precluded Sky Angel from using the Internet.  Discovery determined in 2009 that Sky Angel was in fact using the public Internet based upon Sky Angel's own representation that its service "uses your high-speed Internet service to deliver over 70 faith and family channels . . . ."  Ex. 32 (DIS-001166-1168) (emphasis added).  At the time of contracting and for several years thereafter, Discovery had a policy not to grant any distributor the right to distribute its 24/7 linear networks over the public Internet.  SUMF ¶¶ 60-61; Goodwyn Decl. ¶ 21.  This policy stemmed from a number of concerns on Discovery's part, including its own licensing rights, as some of the programs exhibited on Discovery's linear networks were not cleared for distribution over the Internet, SUMF ¶ 63, the level of security, the quality of the signal, the portability of the signal, the ability to provide both East Coast and West Coast feeds, and the ability to measure the ratings of the audience watching the programming, id. ¶ 62; Goodwyn Decl.¶ 13.  And, Discovery knew in 2007 that its agreements with certain of its

31

distributors, such as DISH, had MFN provisions, and that if Discovery allowed Sky Angel to distribute the Services over the Internet, those other distributors would claim they were entitled under their MFN provisions to distribute the Services in the same fashion.  SUMF ¶ 64.

During the 2007 negotiations, Sky Angel's negotiators assured Discovery that Sky Angel did <u>not</u> use the public Internet in its distribution methodology.  *Id.* ¶¶ 18-19, 23.  For example, Sky Angel's President, Mr. Scott, admitted that he told Discovery that "Sky Angel would not distribute Discovery Channel and Animal Planet over the World Wide Web[.]"  *Id.* ¶ 23.  Ms. Johnson, Sky Angel's other negotiator, similarly advised Discovery that Sky Angel used "a closed feed similar to Verizon"—which does not use the public Internet.  *Id.* ¶¶ 18-19.  Discovery's negotiator, Ms. Freeman, confirmed that on several occasions, Mr. Scott and Ms. Johnson told Discovery that Sky Angel would not be using the public Internet.  *Id.* ¶ 23.  Moreover, Discovery had no reason to "know" that Sky Angel was using the Internet because IPTV technology does not require the use of the Internet and Discovery had contracts with other distributors that used IPTV technology, but did not use the Internet in their distribution.  *Id.* ¶¶ 36-37.  Sky Angel also entered into an agreement with C-SPAN that barred "distribution over the public Internet," *id.* ¶¶ 46-47, which corroborates Sky Angel's practice of assuring programmers that its distribution methodology did not utilize the public Internet.  And, despite Discovery's requests, neither Sky Angel nor NeuLion provided written questionnaire answers or diagrams detailing how precisely their system was to work, which would have made clear that the Internet was utilized.  *Id.* ¶¶ 24-25, 55.

Having been provided with assurances but no details, and because it was unclear exactly how Sky Angel was delivering its signal, Discovery included specific terms in the Agreement to ensure that Sky Angel complied with Discovery's policy against distributing linear programming networks over the Internet.  To that end, the Agreement (i) excluded Internet distribution from the Grant of Rights, (ii)

reserved to Discovery all rights not granted to Sky Angel, (iii) afforded Discovery a unilateral

termination right premised solely on its dissatisfaction with the distribution methodology, and (iv)

indemnified Discovery if Sky Angel's distribution violated Discovery's other programming rights (e.g.,

its agreements with some content providers that barred Internet distribution). *Id.* ¶¶ 2-7, 30-36. Despite

these provisions and Sky Angel's assurances during the negotiations, it is now undisputed that Sky

Angel's distribution system utilized the Internet. *Id.* ¶¶ 38-43.

Based on the above undisputed facts, Discovery had every reason to believe – as the Agreement

confirms – that it never granted Sky Angel the right to distribute its Services over the Internet. As

noted, Sky Angel executives had assured Discovery that its distribution methodology did not use the

public Internet and Discovery specifically prohibited the use of the Internet to distribute its linear

networks in accordance with its long-standing policy and consistent with its licensing arrangements with

third-party content providers. It is undisputed that as soon as Discovery was alerted to Sky Angel's

prohibited use of the Internet, Discovery determined that Sky Angel's distribution methodology was not

satisfactory under the Agreement. Given that Discovery never granted Sky Angel rights to an Internet-

based distribution methodology, its resulting dissatisfaction was "an honest belief" without any "design

to defraud or to seek an unconscionable advantage." *Bond v. Messerman*, 873 A.2d 417, 432 (Md. App.

2005) (citing Black's Law Dictionary 623 (5th ed. 1979)); *Clancy*, 954 A.2d at 1108 (where the contract

granted a party discretion based on its satisfaction, that party's "opinion as to satisfaction controlled in

the absence of fraud or bad faith") (emphasis omitted). Certainly, there was nothing "capricious or

arbitrary" about that determination such that it could be said to "vitiate[]" Discovery's good faith. *St.*

*Paul at Chase Corp.*, 278 A.2d at 31. Summary judgment should thus be granted to Discovery under the

subjective standard, to the extent the subjective standard is deemed applicable.

**C.      Summary Judgment Should Also Be Granted To Discovery Because Discovery Could And Would Have Terminated The Agreement If Sky Angel, As Required, Had Informed Discovery Of Other Programmers' Terminations**

Summary judgment should also be granted to Discovery because Sky Angel indisputably violated the unambiguous terms of § 7.1 of the Agreement by failing to inform Discovery that the programmers C-SPAN and Visual Arts terminated their agreements with Sky Angel during the Agreement's term.  *See* SUMF ¶¶ 48-51.  Under § 7.1 of the Agreement, "[i]f any programmer . . . ceases to provide a programming service" to Sky Angel for any reason other than the expiration of its contract, Sky Angel "shall immediately notify [Discovery] of such cessation and the reason therefore, and [Discovery] shall be entitled to terminate this Agreement."  Ex. 1 § 7.1.  Although Sky Angel repeatedly claims in support of its own summary judgment motion that it performed "all of its express, material contractual obligations," including as to § 7.1, Mot. at 23, it notably fails to include a <u>single reference</u> to this obligation of § 7.1 at <u>any point</u> in its brief.  *See id.* at 23, 5, 30, 33.

Sky Angel omits this provision because it is in breach, and the breach, expressly tied to a right of termination, is by definition material.  It was only late in the discovery process in this case that Sky Angel admitted that Visual Arts terminated its agreement in October 2008, and that C-SPAN did the same in July 2009.  *See* Ex. 3 (R. Johnson Dep. at 204:20-205:5).  Both of these terminations occurred during the term of the Agreement between Discovery and Sky Angel, and prior to Discovery's termination in April 2010.  Moreover, C-SPAN predicated its termination on Sky Angel's use of the public Internet - the same concern that caused Discovery to terminate the Agreement months later.  *See* Ex. 26 (*C-SPAN I*, 947 F. Supp. 2d at 95).  Even though the C-SPAN Agreement, like the Agreement here, barred the use of the Internet, *see* Ex. 2 (Scott Dep. at 383:2-4), Sky Angel elected to enter into these agreements despite its distribution methodology violating both agreements.

34

It is undisputed that Sky Angel violated § 7.1 of the Agreement by failing to inform Discovery about these programmers' terminations and the "reason therefore." *See* Ex. 3 (R. Johnson Dep. at 204:11-19). Discovery first learned through discovery in this case that Sky Angel failed to comply with its notification obligation under § 7.1. Sky Angel is subject to the doctrine of unclean hands because it failed to inform Discovery of these facts. *Mona v. Mona Elec. Grp, Inc.*, 934 A.2d 450, 474 (Md. App. 2007) (holding that unclean hands applies to "protect the courts from having to endorse or reward inequitable conduct" so long as the misconduct is "directly related to the subject of the suit"). Moreover, when a party learns of an additional claim or defense in the course of discovery, a court can conform the pleadings to the evidence adduced during discovery. *See People for Ethical Treatment of Animals v. Doughney*, 263 F.3d 359, 367-68 (4th Cir. 2001); *Bollino v. Baltimore & Ohio R. Co.*, 856 F.2d 186, at *3 n.1 (4th Cir. 1988) (Table). Had Sky Angel complied with § 7.1 and immediately notified Discovery in July 2009 that C-SPAN terminated its agreement based on Sky Angel's use of the public Internet, Discovery would have been expressly entitled to terminate the Agreement in July 2009. Ultimately, when Discovery learned about Sky Angel's use of the Internet a few months later, it did just that, relying on the termination right contained in § 12.1 of the Agreement. Sky Angel materially breached the Agreement by failing to comply with § 7.1's requirements at any time and deprived Discovery of a separate and independent termination right afforded to Discovery. Accordingly, Discovery is entitled to summary judgment on this ground alone, and the Agreement should be deemed to have been terminated as of the date of Sky Angel's breach of § 7.1, as a matter of law.

## II.      SUMMARY JUDGMENT MUST BE DENIED TO SKY ANGEL

### A.     Sky Angel Cannot Obtain Summary Judgment Under The Objective Standard

In support of its own motion for partial summary judgment, Sky Angel makes the bald claim that judgment should be immediately entered in its favor because Discovery's termination of the Agreement was "objectively unreasonable." Mot. at 32; *see id.* at 23-26; 28-33. On its summary judgment motion, Sky Angel bears the initial burden of showing that "there is no genuine dispute as to any material fact" that Discovery's termination of the Agreement constituted a breach of contract. Fed. R. Civ. P. 56(a). Moreover, "since there is a presumption that all parties act in good faith," Sky Angel also bears the "burden of proving a breach of the covenant of good faith and fair dealing," which applies to termination provisions that are predicated on a party's satisfaction. 23 Williston on Contracts § 63:22 (4th ed.); *Ard Dr. Pepper Bottling v. Dr. Pepper Co.*, 202 F.2d 372, 376 (5th Cir. 1953) ("[Plaintiff], having alleged that the contract was wrongfully terminated, had the burden of so proving."). Far from meeting its burden on its motion, Sky Angel wholly ignores the central provision of the Agreement and raises a host of disputed issues of fact.

Sky Angel's motion fails under the objective standard because its use of the Internet was contrary to the most material term in the Agreement, the Grant of Rights. At a bare minimum, if Discovery is not granted summary judgment, a disputed issue exists as to whether Discovery's decision to terminate the Agreement was made "in accordance with the reasonable expectations of [Sky Angel]," given that the Agreement itself never conferred rights to Sky Angel to distribute the linear Services via the Internet. Dkt. No. 37 at 14; *see Questar*, 978 A.2d at 675-676 (objective standard looks to "language of the contract"). If the Court finds the Agreement ambiguous, Sky Angel's motion also must be denied because it raises numerous disputed fact issues as to whether Discovery's termination was "commercially reasonable under the circumstances." *Id.* at 676.

36

### 1.    Disputed Facts Regarding Pre-Contract Negotiations

Sky Angel, for example, raises several hotly disputed factual issues and invites credibility determinations as to the parties' pre-contract understanding of the technology, Mot. at 36-37, which is fatal on its motion for summary judgment, *see Frederick Rd. Ltd. P'ship v. Brown & Sturm*, 756 A.2d 963, 972 (Md. 2000) ("Evidentiary matters, credibility issues, and material facts which are in dispute cannot properly be disposed of by summary judgment."). Here, there is a plethora of evidence directly contradicting Sky Angel's claim that Discovery based its termination on information that it supposedly "knew" in 2007. Mot. at 1, 36-37.

At the time of the negotiations, Sky Angel's IPTV service had not yet launched, and its negotiators could not answer basic questions posed by Discovery about the technology because Sky Angel had no prior experience with it. Ex. 2 (Scott Dep. at 22:21-23:10; 104:16-18); Ex. 4 (K. Johnson Dep. at 132:23-133:7; 134:21-135:7). As Sky Angel's negotiator, Ms. Johnson, admitted at the time to her superiors, "I just don't have a handle yet on the technology enough yet to speak intelligently on it." Ex. 6 (SA-0001818-1819).

While Sky Angel correctly notes that Mr. Myers "sought information" from Sky Angel and NeuLion regarding Sky Angel's distribution methods, Mot. at 8-10, it fails to acknowledge that Sky Angel and NeuLion stone-walled Mr. Myers' efforts. Sky Angel engineer Mr. LaRue "wasn't well-versed" in the technology and "referred [Mr. Myers] to the NeuLion group." Ex. 11 (Myers Dep. at 156:7-158:16); *id.* at 73:3-13, 92:18-93:17. In Mr. Myers' single conversation with NeuLion, he "learned very little" because NeuLion was "not willing to give us very much information." *Id.* at 15:5-16:15, 26:19-27:10. Mr. Myers did learn in that conversation that NeuLion's system could use "either the Internet" or "private fiber," and that it was "very flexible." *Id.* at 94:15-95:1. However, NeuLion

37

was "unwilling to give . . . specific details," *id.* at 26:19-27:10, and it then went "radio silent" on Discovery. *Id.* at 29:5-17; *see id.* at 19:4-5; 19:14-21; 169:6-170:2.

Sky Angel next asserts that "Mr. Myers forwarded to Sky Angel a written questionnaire regarding the nature of Sky Angel's system," Mot. at 8, but then omits Mr. Myers' testimony that "Sky Angel was not willing or unable to provide a technical questionnaire response." Ex. 11 (Myers Dep. at 50:11-17); *see also* Ex. 7 (LaRue Dep. at 119:15-120:7 ("we weren't willing to give them a detailed block diagram"); 209:25-210:10; 211:3-15). By contrast, Sky Angel did provide written information (and a block diagram) to several other programmers, such as Buena Vista, who thereafter declined to sign with Sky Angel. *See* SUMF ¶ 55.

Mr. Myers testified that he had a concern that Sky Angel's distribution methodology <u>might</u> use the Internet; he did not and could not know such information for certain, as Sky Angel contends, given that Sky Angel and NeuLion stymied his due diligence efforts, as detailed above. Sky Angel raises further fact issues fatal to its motion by pointing to an email and newspaper articles forwarded to Mr. Myers noting that NeuLion had the <u>general</u> ability to transmit content over the Internet. Mot. at 9, 36.[5] Here, too, Sky Angel omits the critical evidence that NeuLion had told Mr. Myers that it also transmitted content <u>without</u> using the public Internet, including by private fiber. Ex. 11 (Myers Dep. at 94:15-95:1). Mr. Myers thus had no reason to conclude that Sky Angel was using the Internet. *Id.* at 107:3-10; 208:7-20. Moreover, these few materials did not inform Mr. Myers's opinion of Sky Angel's distribution methods because they did not "speak[] specifically to the Sky Angel agreement, and conversations with

---

[5] One article, from the Wall Street Journal, references a deal between NeuLion and Dominion Video Satellite Inc. ("Dominion"), and Sky Angel notes that Mr. Kaminski knew that Dominion was a predecessor company to Sky Angel. Mot. at 9 n.7. However, Sky Angel omits Mr. Kaminski's testimony that he did not recall ever reading the article, and that, in any event, he "was relying on the technology diligence that Charlie Myers was doing," and "wouldn't rely on a Wall Street Journal article by a reporter." *See* Ex. 13 (Kaminski Dep. at 183:8-17; 190:10-18).

the NeuLion group indicated it could be done over the Internet or over a private fiber connectivity." *Id.* at 107:3-10; *see id.* at 198:22-199:7 (newspaper article merely "confirmed . . . that one of the potential use cases could be over the Internet") (emphasis added).

Additionally, although Sky Angel's motion conspicuously omits any reference to communications between either Mr. Scott or Ms. Johnson and Discovery prior to the Agreement, Mr. Scott told Discovery during pre-contract negotiations that Sky Angel would not be utilizing the World Wide Web as part of its distribution methodology (which he admitted was the public Internet). *See* Ex. 2 (Scott Dep. at 84:13-17, 85:8-17); *see also id.* at 73:9-15 (stating that "the World Wide Web is the public Internet"). And, Ms. Johnson admitted that she told Discovery that Sky Angel used "a closed feed similar to Verizon," which does not use the public Internet. *See* Ex. 4 (K. Johnson Dep. at 105:17-22); Ex. 8 (DIS-001437-1444 at 1437). Ms. Freeman confirmed these conversations at her deposition. *See* Ex. 9 (Freeman Dep. at 26:18-27:9) ("Q. Is it your testimony that you asked Sky Angel if they were using the Internet? A. Yes. Q. And what was the response you received from Sky Angel? A. No. Q. Who told you that? A. Kathy Johnson and Tom Scott."); *id.* at 34:9-15. The information provided by Sky Angel's negotiators, it turned out, was not true, which raises obvious questions concerning the credibility of Sky Angel's witnesses.[6]

Indeed, the deposition testimony of Mr. Scott, Sky Angel's key negotiator and draftsperson, on a variety of issues was hopelessly contradictory. For example, Mr. Scott claimed not to know what IPTV

---

[6] The discovery record showed Sky Angel's representations to be contrary to Sky Angel's own internal understanding of how the technology was to work, as reflected in contemporaneous internal emails and marketing materials—none of which Sky Angel shared with Discovery. *See* Ex. 15 (SA-0002680-2682 at 2680) ("We are going over the public Internet . . . we do not deliver our services over lines or bandwidth we manage or control, such as AT&T and [Verizon] FiOS"); Ex. 16 (SA-0003742-3745 at 3744) ("Powered by the Internet, our new IPTV television service will give you more channels, more choices and more control.").

technology is, or whether such technology can be used on the Internet.  Ex. 2 (Scott Dep. at 152:20-153:7); *see also id.* at 346:10-347:18 (changing testimony on questioning from Sky Angel's counsel).  Mr. Scott also claimed that he "told [Discovery] exactly how" Sky Angel's system worked, *id.* at 87:15-88:6, but later testified that he told Discovery in a telephone conference in September 2007 that Sky Angel "use[d] the Internet in a private way."  *Id.* at 185:2-6; *see also id.* at 381:15-19 ("Q.  You didn't tell [Discovery] that it went over the public Internet? A.  I did not tell them that.").  Additionally, Mr. Scott testified that Sky Angel managed and controlled the transmission path from NeuLion to the subscriber, which contradicted the testimony of Sky Angel's 30(b)(6) representative, who admitted that Sky Angel <u>does not</u> manage or control the lines or path of delivery to the subscriber.  *Compare* Ex. 2 (Scott Dep. at 160:3-15; 185:2-186:16) *with* Ex. 7 (LaRue Dep. at 68:2-5).[7]

Sky Angel's agreement with C-SPAN poses another credibility issue for Sky Angel and Mr. Scott.  At his deposition in this case, Mr. Scott claimed not to know the meaning of the term "public Internet," Ex. 2 (Scott Dep. 70:5-10), but then admitted that the Sky Angel/C-SPAN Agreement – which he read and signed – barred "distribution over the public Internet," *id.* at 71:14-16; 72:12-18, 80:18-82:18; 383:2-13.  Sky Angel admits that it also informed Discovery prior to the execution of the Agreement that its distribution did not use the public Internet, SUMF ¶¶ 18-19, 23, which, as both C-SPAN and Discovery later learned, is patently false, *id.* ¶¶ 38-44, 49.[8]

---

[7] Discovery thus genuinely disputes the facts asserted in Sky Angel's Statement of Material Facts Not in Dispute ("Sky Angel's SOMF") ¶ 34.

[8] Mr. Scott further testified that even though he told Discovery that Sky Angel would not be using the public Internet, Ex. 2 (Scott Dep. at 73:9-15; 84:13-17; 85:8-17), he was not willing to include the term "public Internet" in the Agreement – and, instead, used the term "Internet" – because he "saw the confusion C-SPAN had" in terminating Sky Angel and "didn't want the same confusion to flow over into Discovery," *id.* at 383:2-10.  However, Sky Angel entered into the C-SPAN Agreement nearly two years <u>after</u> the Agreement with Discovery, and, when confronted with that fact, Mr. Scott admitted that his testimony "was mistaken."  *Id.* at 383:11-18.

Sky Angel's motion also ignores the testimony of Ms. Freeman, who explained that she was "concerned enough . . . that I didn't know what that NeuLion box did to add language to [Section] 12.1 which gave us a broad termination right in the event we were dissatisfied or we felt as if we didn't have rights that we needed." *See* Ex. 9 (Freeman Dep. at 203:22-204:22). Ms. Freeman testified that she specifically negotiated this "broad termination right" following Mr. Myers' inconclusive diligence efforts to address Discovery's concerns about Sky Angel's distribution methodology and thereby protect Discovery's rights. *See id.* at 18:21-19:21; 24:18-25:8; 38:9-39:13; 189:18-190:19; Ex. 13 (Kaminski Dep. at 211:17-212:1; 282:6-16) (noting that additional termination provision was "not standard language") . Sky Angel agreed to it. *See* Ex. 2 (Scott Dep. at 193:16-22; 194:16-195:18). In yet another example of a disputed issue of fact in Sky Angel's motion, Ms. Freeman testified that she had two telephone conversations with Mr. Scott, both before and after sending him the draft agreement that added the termination provision and, in the second phone call, she explained that Discovery "could not allow distribution over the public Internet[,]" the termination provision was "incredibly important" to Discovery, and Discovery "couldn't move forward without . . . [Sky Angel's] sign-off on 12.1." *See* Ex. 9 (Freeman Dep. at 25:9-18; 287:12-18; 288:19-289:7; 289:20-290:19; 298:16-299:4). Mr. Scott denied having such a conversation. *See* Ex. 2 (Scott Dep. at 192:15-193:15; 193:23-194:4). At a minimum, Discovery's version must be accepted as true for purposes of Sky Angel's Motion.

That Discovery expressed its concerns to Sky Angel during the negotiations, and then undertook specific efforts to draft the Agreement so as to preclude Internet rights, further underscores that Discovery's concerns in terminating the Agreement were not "*post hoc* justification[s]," as Sky Angel

claims. Mot. at 36.  At a minimum, they show that Discovery's termination of the Agreement was not

objectively unreasonable under the totality of the circumstances.[9]

### 2.     Disputed Facts Regarding Discovery's Internet Distribution Policy

Sky Angel's motion also blatantly distorts the discovery record in claiming that it is purportedly

undisputed that Discovery has "long permitted its programming to be distributed through the Internet."

Mot. at 41-43.  Quite the contrary:  Discovery knew that it did not grant Sky Angel Internet distribution

rights precisely <u>because</u> at the time the Agreement was signed – and for several years thereafter –

Discovery had <u>never</u> granted rights to distribute its linear Services over the Internet to any of its at least

one thousand distributors.[10]  Goodwyn Decl. ¶ 21.  While Sky Angel references Discovery's agreements

with services such as "Netflix, Amazon, and YouTube," those arrangements concerned the streaming

merely of certain "<u>non-linear programs</u>" (<u>i.e.</u>, not the 24/7 linear Services licensed to Sky Angel, but

rather certain <u>programs</u> that appear on the Services).  *See* Mot. at 42, 42 n.19.  Sky Angel also points in

vain to a video-on-demand agreement Discovery signed with Comcast in 2009, which did not involve

linear programming.  *Id.*  These more limited forms of programming are very different from – and do

---

[9] Sky Angel makes the speculative leap that "Discovery knew Sky Angel was using the Internet in 2007" because Discovery characterized the Agreement as an "experiment" to the FCC.  Mot. at 36.  As Mr. Kaminski testified in this case, the term "experiment" did not mean that "[Discovery] was knowingly allowing a linear network to be distributed via the public Internet," and that if Discovery had known that, "[w]e would not have done that deal."  Ex. 13 (Kaminski Dep. at 207:17-208:2); *see also* Ex. 30 (Cross Dep. at 254:17-256:9) (explaining that "the <u>technology as represented by Sky Angel was an experiment</u>, which was the notion of a private data stream traveling over wires that Sky Angel described as its closed system, was distinguishable from the Internet. . . . and what turned out to be is that it was not true.") (emphasis added).  Discovery thus genuinely disputes the facts asserted in Sky Angel's SOMF ¶ 62.

[10] Sky Angel attempts to minimize this policy by claiming it was "Mr. Goodwyn's own unwritten policy."  Mot. at 41. This is not so, as the facts show that Discovery's executives were well-aware that Discovery never licensed its linear networks over the Internet for the host of reasons identified by Mr. Goodwyn.  *See, e.g.*, Ex. 14 (Goodwyn Dep. at 36:5-38:20; 39:6-41:3); *see also* Ex. 13 (Kaminski Dep. at 24:15-20) ("I was instructed when I began and . . . I understood the entire time I was there not to ever allow linear networks to be distributed over the public Internet."); Ex. 9 (Freeman Dep. at 398:12-399:19).  It was thus not "Mr. Goodwyn's . . . policy," Mot. at 41, but rather Discovery's long-established and consistent business practice.

not implicate the same concerns surrounding – the online distribution of an entire linear network such as the Discovery Services.  *See* Goodwyn Decl. ¶¶ 15-20.

Nor can Sky Angel find any support at all from Discovery's agreement with one of its distributors in **<u>2013</u>** – six years after the Agreement was entered and three years after it was terminated – which marked the first time Discovery <u>ever</u> granted a distributor the ancillary right to allow its subscribers to access Discovery's linear networks on devices that may be connected to the Internet for a separate fee, above and beyond traditional cable distribution of the underlying networks.  Mot. at 42-43; *see* SUMF ¶ 65.  Clearly, a third-party agreement that Discovery reached in 2013 with a major distributor could not and did not inform its decisions in either 2007 (when it entered the Agreement) or 2010 (when it terminated the Agreement) and, in fact, shows that when Discovery grants such rights, it does so expressly and subject to separate terms and conditions.  *See* Goodwyn Decl. ¶ 22; Mot. at 39 n.17.  Even then, Discovery takes pains to remove any programs as to which it does not have Internet-distribution licensing rights.  *See* Goodwyn Decl. ¶ 23.  Given that Discovery signed its first such agreement just one year ago, Sky Angel's claim that Discovery has a "history" of "allowing both linear and non-linear programming to be distributed using the Internet" is simply false.  *Compare* Mot. at 43 *with* Ex. 14 (Goodwyn Dep. at 278:15-20); Goodwyn Decl. ¶ 21-22.

### 3. Disputed Facts Regarding the Basis For Discovery's Termination

Sky Angel deceptively argues that Discovery's termination was unreasonable as a matter of law because Discovery purportedly ended the Agreement solely to "preserve its more lucrative business relationships" with other distributors.  Mot. at 37-38.  Discovery terminated its Agreement with Sky Angel under the terms of the contract itself (and not for "[e]xtra-[c]ontractual [r]easons," Mot. at 33) and has pointed to its contracts with third-party licensors and distributors to explain why it would never have

43

granted Sky Angel Internet distribution rights <u>in the first place</u>.[11]  Indeed, Discovery could not have

granted Internet rights to Sky Angel because Discovery itself lacked the ability to grant such rights, as

some of the licensed programs on the Services could not be distributed over the public Internet.  SUMF

¶ 63.  And, it makes no sense that Discovery would have offered Sky Angel (a small, niche distributor)

unprecedented rights to distribute the linear Services over the Internet given that Discovery's MFN

clauses with other distributors (<u>e.g.</u>, DISH) could have required Discovery to provide them the same

rights supposedly offered to Sky Angel.  <u>Id.</u> ¶ 64; Goodwyn Decl. ¶ 14.  In fact, Ms. Freeman testified

that she told Mr. Scott about Discovery's concern about its MFN clauses prior to executing the

Agreement.  Ex. 9 (Freeman Dep. at 37:2-14).  In light of these risks, Discovery never would have

granted, and in fact did not grant, Sky Angel the right to distribute the complete, linear Services over the

Internet.  *Questar*, 978 A.2d at 676 (party entitled to terminate agreement if "continuing with the

[agreement] would subject it potentially to a meaningful financial loss").  There is, at the very least, a

disputed issue of material fact in this regard requiring the denial of Sky Angel's motion.

### 4.    Disputed Facts Regarding Sky Angel's Compliance With The Agreement

Sky Angel also claims entitlement to summary judgment because it purportedly met "all

applicable objective criteria" under the Agreement.  Mot. at 33; *id.* at 23-26; 32-33.  Sky Angel

contends, for example, that it distributed all of the Discovery programming, did not remove the

Discovery programming, carried the Discovery programming in a package such that no other

programming service was received by a greater number of Sky Angel subscribers, and never assigned

the Agreement without Discovery's consent.  *Id.* (citing Agreement at ¶¶ 1.1.2, 5.1-5.2, 7.1).  These

---

[11] The materials cited by Sky Angel in connection with its SOMF ¶ 49 do not support the facts alleged.  Discovery reserves the right to dispute all of Sky Angel's purported facts at any trial of this matter.

contractual arguments are <u>non sequiturs</u> and are attempts by Sky Angel to sidestep the real issue here – Discovery's dissatisfaction with Sky Angel's use of the Internet in violation of an express contractual prohibition.

The Agreement's Grant of Rights section not only did not grant Sky Angel the right to utilize the Internet as an acceptable distribution method, it expressly barred Sky Angel from distributing the Services "via the Internet." Ex. 1 § 2. Because Sky Angel has no answer for the Grant of Rights provision – it does not claim that it is ambiguous, let alone unambiguous in its favor – <u>it simply ignores it</u>. Yet, by ignoring the most important objective criterion governing its distribution – *i.e.,* whether Discovery actually granted Sky Angel the right to distribute the Services over the Internet – Sky Angel demonstrates that it cannot prevail under the objective reasonableness inquiry. *Questar*, 978 A.2d at 675-76 ("What constitutes a 'reasonable expectation,' . . . depends on the language of the contract."). That other aspects of Sky Angel's performance may not have been the source of Discovery's dissatisfaction shows nothing other than Sky Angel's desire to change the subject. At a minimum, Sky Angel's use of the Internet raises issues of fact regarding its compliance with the Agreement's Grant of Rights provision, and whether Discovery's resulting termination decision was reasonable under the circumstances.[12]

Sky Angel mistakenly contends that a satisfactory "distribution methodology" for purposes of § 12.1 must appear solely in "Sections 1.1.2 and 7 of the Agreement." Mot. at 30; *id.* at 32-33. Nothing in the Agreement, however, supports a conclusion that either section provides an exclusive or determinative yardstick by which Discovery's termination decision should be measured. The

---

[12] Discovery thus genuinely disputes the facts asserted in Sky Angel's SOMF ¶ 35.

Agreement, for example, does not in any way restrict or tie Discovery's termination right to Sky Angel's fulfillment of these two sections.  *See* Ex. 1 § 12.1.  Section 12.1 imposes <u>no</u> restriction on the factors that Discovery could consider in making its determination and certainly the Grant of Rights section would have to be considered.  *See* Ex. 14 (Goodwyn Dep. at 182:9-18; 196:13-197:7; 249:12-16); Ex. 9 (Freeman Dep. at 252:21-253:15; 308:7-14).

Section 7, for example, does not define "distribution methodology" or delineate what constitutes a "satisfactory" distribution methodology.  *See* Ex. 1 § 7.1.  It simply imposes a number of non-exhaustive requirements for Sky Angel's distribution of the Services but does not change (or even speak to) the Agreement's proscription on Internet distribution.  *See* Ex. 13 (Kaminski Dep. at 289:11-292:8) (explaining that § 7.1 "doesn't fully lay out all the rights and obligations," and that "there are numerous other sections that talk about distribution," including "the grant of rights" section).  Nor can Sky Angel claim with any effect that Discovery's termination was unreasonable because Sky Angel's system purportedly met the definition of "IP System" set forth in § 1.1.2, since that section never references the Internet as a distribution method, but instead refers to "a high-speed data connection."

Moreover, it is <u>not</u> undisputed that Sky Angel fulfilled all its obligations even under the contract provisions it cherry-picks.  For example, although Sky Angel claims that "[t]he encryption utilized to protect Discovery's programming signals during transmission was industry-standard," Mot. at 32; *id.* at 12, as required by § 1.1.2, discovery revealed that various programmers refused to enter agreements with Sky Angel because they found that NeuLion's set-top boxes did not provide "industry standard" encryption.  *See* Ex. 28 (Neulion_0000044-45); Ex. 3 (R. Johnson Dep. at 219:11-221:8).[13]  Although

---

[13] Discovery thus genuinely disputes the facts asserted in Sky Angel's Motion ¶ 36(e).

Sky Angel provided written, detailed answers to these other programmers' technology questionnaires, *see* Ex. 7 (LaRue Dep. at 209:12-24), it refused to respond in writing to Discovery's questionnaire, *see* Ex. 44 (SA-0000718-722).  Had Sky Angel provided Discovery with responsive information, rather than a "verbal[] . . . simplistic overview," Ex. 11 (Myers Dep. at 156:3-15), Discovery would have learned about Sky Angel's use of the Internet, *id.* at 153:17-154:15, and not entered the Agreement.[14]  In sum, given that there is at least a disputed issue of material fact as to whether Sky Angel's distribution methodology exceeded the scope of rights granted to it under the Agreement, its contention that it met some of its other contractual obligations certainly does not lead to summary judgment in its favor under the objective standard of contract interpretation.[15]

### B.    Sky Angel's Motion Must Also Be Denied Under The Subjective Standard

Sky Angel also makes the remarkable assertion that it should be entitled to summary judgment because there is purportedly not even an issue of fact that Discovery entirely lacked any honest good faith in terminating the Agreement.  Mot. at 33-44 (claiming that "not a scintilla of evidence" exists that Discovery was dissatisfied with "any aspect of Sky Angel's distribution methodology") (emphasis Sky Angel's).  The record overwhelmingly supports Discovery's honest dissatisfaction with Sky Angel's use of the Internet and its distribution methodology, *see supra* § I(B)(2).  *A fortiori*, Sky Angel's motion must be denied because Sky Angel cannot show that the undisputed record refutes that Discovery's satisfaction was "real and not pretended, capricious . . . or the result of dishonest design."  Mot. at 34;

---

[14] Similarly, Sky Angel's assertion that its system provided "the highest quality reception by subscribers" under § 7.1, *see* Mot. ¶ 36(b), is belied and genuinely disputed by record evidence from its own witnesses that its system was prone to buffering and other signal-related problems.  *See, e.g.*, Ex. 2 (Scott Dep. at 213:9-15 ("It buffers."); 252:16-253:2).

[15] It is also irrelevant that Discovery never exercised its "audit" right under § 7.3 of the Agreement.  *See* Mot. at 1, ¶¶ 15, 39.  That narrow audit right had nothing to do with Sky Angel's distribution methodology but was instead "designed to reveal unauthorized or illegal recipients of the Services," and was to be conducted by Sky Angel, not Discovery.  Ex. 1 § 7.3.

*see also* Dkt. No. 37 at 14 ("[U]nreasonable dissatisfaction is permitted so long as it is honest.").  This is

an exceptionally high bar for Sky Angel to hurdle, given that "under the subjective standard of honest

satisfaction, the 'opinion [of the person to be satisfied] control[s] in the absence of fraud <u>or bad faith.</u>'"

Dkt. No. 37 at 14 (citing *Clancy*, 405 Md. at 568) (emphasis in original).[16]

      Like its objective standard argument, Sky Angel's subjective standard argument is replete with

disputed issues and credibility determinations.  For example, Sky Angel's contention that Discovery

terminated the Agreement without first making a "good-faith assessment of Sky Angel's distribution

methodology[,]" Mot. at 34-35, simply ignores the plethora of evidence to the contrary.  Following its

receipt of the DISH Letter, Discovery undertook a review of Sky Angel's distribution methodology and

became aware for the first time that Sky Angel was promoting its service as an Internet-based, portable

service, usable by its subscribers in any location with an Internet connection.  *See* SUMF ¶¶ 56-58.

Discovery determined that such a distribution methodology was plainly contrary to the Agreement's

Grant of Rights provision, and was thus unsatisfactory.[17]  Indeed, <u>none</u> of Discovery's at least one

thousand other distributors utilized the Internet to distribute the Discovery Services.  *See* Goodwyn

Decl. ¶ 10.  As Sky Angel admits in a footnote, Discovery's Mr. Goodwyn testified that he personally

made the decision to terminate the Agreement based on his conclusion that Sky Angel was "delivering

the signal in a manner that was <u>not agreed to in the contract</u>[,]" and Discovery executive Eric Phillips

---

[16] While purporting to request summary judgment under the subjective standard, Sky Angel neglects to mention that subjective good faith is typically a question of fact for the jury.  *See Clancy*, 954 A.2d at 1106 n.24, 1109-10 ("[g]ood faith ordinarily is a question of fact").  The cases on which Sky Angel relies involved trials on the issue of good faith.  Mot. at 34 (citing, e.g., *First Nat'l Realty Corp.*, 233 A.2d at 815; *Ferris*, 59 A.2d at 752).  Although Discovery has demonstrated why it is entitled to summary judgment even under the subjective standard, *see supra* § II (B), Sky Angel has not.

[17] The Agreement never granted Sky Angel the right to offer its set-top box on a portable basis anywhere its subscribers had access to an Internet connection.  *See* Ex. 1 § 2; *see also* Ex. 9 (Freeman Dep. at 7:13-19).  Despite this lack of a grant of rights for portability, Sky Angel promoted its service as "completely portable."  *See, e.g.*, Ex. 24 (SA-0003781-3783 at 3782); *see also* SUMF ¶¶ 39, 44.

likewise "expressed his opinion that, <u>under the contract</u>, the Internet was not suitable for dissemination." Mot. at 35-36 n.16 (emphases added); *see also* SUMF ¶ 58.  These were not mere "generalized concerns," Mot. at 35, as Sky Angel misrepresents in repeatedly pointing to deposition questions posed to Mr. Goodwyn concerning contract provisions that were not the basis for Discovery's termination decision, *id.* at 35-36 n.16.  As Mr. Goodwyn expressly testified, "I found out [Sky Angel was] carrying it through the Internet.  I specifically did not grant that right.  And I terminated the agreement."  Ex. 14 (Goodwyn Dep. at 176:5-177:1); *id.* at 249:12-16 ("The contract specifically prohibits using the Internet.").  Thus, in contrast to the cases cited by Sky Angel, in which one party nullifies a contract based upon a determination that lay "outside" the "rights or obligations [specified] by the contract," Mot. at 40 (citing *Devoine Co., Inc. v. Int'l Co., Inc.*, 136 A, 37, 38 (Md. 1927)),[18] here the record shows that Discovery's decision to terminate the Agreement was firmly rooted in Sky Angel's failure to comply with the Agreement itself.

Sky Angel protests that Discovery did not "make a good-faith effort to avoid termination" because Discovery purportedly refused to give "an explanation and an opportunity to address whatever concerns Discovery had."  Mot. at 43-44.  On the contrary, even though § 12.1 of the Agreement did not require that Discovery provide an explanation or a cure period, the record establishes that Mr. Kaminski and Ms. Freeman asked Sky Angel if there was another way for Sky Angel to distribute the Services.  Sky Angel's answer was no.  *See* Ex. 13 (Kaminski Dep. at 70:5-13; 73:12-74:5).  As Maryland's

---

[18] Similarly, *Questar* does not support Sky Angel's motion for summary judgment.  There, even on a full trial record, the appellate court remanded for further fact-finding due to "unresolved factual conflicts" that could be relevant to whether the terminating party "acted in bad faith," including whether its termination decision was part of a "scheme[]" to contract with a third party.  *Questar*, 978 A.2d at 676-677.  There are no analogous claims here.  The *Questar* court also reaffirmed that "[a]s the party with the discretion to terminate . . . Questar was entitled to decide whether continuing with the contract would subject it to an unnecessary risk," and that it was "not the court's role to make that decision for Questar."  *Id.* at 676.

highest court has held, "[t]he covenant of good faith and fair dealing 'does <u>not</u> obligate a party to take affirmative actions that the party is clearly not required to take under the contract." *Blondell v. Littlepage*, 991 A.2d 80, 90 (Md. 2010) (citation omitted) (emphasis added). Because Sky Angel's motion for summary judgment under the subjective standard does not come close to establishing as a matter of law that Discovery's termination decision was "pretended" or "dishonest," Mot. at 34, but rather, at best, conflicts sharply with record evidence to the contrary, Sky Angel's motion for summary judgment must be denied.[19]

**C.    Sky Angel's Motion Must Also Be Denied For Its Admitted Breach of § 7.1**

Sky Angel's Motion must also be denied because it admittedly breached § 7.1 of the Agreement. For the reasons set forth in § II(C), the Court should not grant Sky Angel summary judgment because it is in violation of § 7.1 by failing to inform Discovery of other programmers' decision to terminate their agreements and the reasons therefore. For this reason, summary judgment must be denied.

<u>**CONCLUSION**</u>

For all of the foregoing reasons, Sky Angel's motion for summary judgment should be denied, and Discovery's cross-motion for summary judgment should be granted.

 Dated:  August 11, 2014

Respectfully submitted,

WEIL, GOTSHAL & MANGES LLP

By:    _____/s/_____

Peter D. Isakoff

---

[19] Sky Angel concedes that even if it were successful on summary judgment – which it should not be for all the reasons above – the issue of damages is highly fact specific and would require a trial. And, if the issue of damages is ever reached in this case, Discovery disputes Sky Angel's damages analysis and amount. Further, although Sky Angel purports to seek "the alternative relief of specific performance," Mot. at 49 n.24, it fails to address how any injunctive relief would be appropriate in connection with a contract that would have expired shortly. *See* Ex. 1 § 1.11. Indeed, given that Sky Angel's programming distribution business has shut down, *see* SUMF ¶ 75, the notion of specific performance is especially dubious.

1300 Eye Street, N.W., Suite 900
Washington, DC 20005
Telephone:  (202) 682-7000
peter.isakoff@weil.com

David L. Yohai *(admitted pro hac vice)*
Theodore E. Tsekerides *(admitted pro hac vice)*
David Yolkut *(admitted pro hac vice)*
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
david.yohai@weil.com

*Counsel for Defendants*

## REQUEST FOR HEARING

Pursuant to Local Rule 105.6, defendants Discovery Communications, LLC and Animal Planet, LLC, by their undersigned counsel, request a hearing on Defendants' Motion for Summary Judgment and Plaintiff's Motion for Partial Summary Judgment.

_____/s/_____
Peter D. Isakoff

51

## INDEX OF EXHIBITS FILED CONCURRENTLY HEREWITH

| Exhibit | Description |
|---|---|
| 1 | Affiliation Agreement between Sky Angel and Discovery, dated by Sky Angel on October 5, 2007 and by Discovery on October 16, 2007, bates numbered DIS-000328-342 |
| 2 | Excerpts to Deposition Transcript of Thomas Scott, dated January 30, 2014 |
| 3 | Excerpts to Deposition Transcript of Robert Johnson, dated February 12, 2014 |
| 4 | Excerpts to Deposition Transcript of Kathleen Johnson, dated January 9, 2014 |
| 5 | E-mail from Kathy Johnson to Rob Johnson re: New Media, NHL Deal & Major IPTV Transitions, dated July 31, 2007, bates numbered SA-0001383 |
| 6 | E-mail from Kathy Johnson to Rob Johnson and Thomas Scott  re: Discovery Networks, dated July 30, 2007, bates numbered SA-0001818-1819 |
| 7 | Excerpts to Deposition Transcript of Raymond LaRue, dated January 7, 2014 |
| 8 | E-mail from Greg Yavello to Elisa Freeman re: Fw: Sky Angel Marketing Incentives, dated July 30, 2007, bates numbered DIS-001437-1444 |
| 9 | Excerpts to Deposition Transcript of Elisa Freeman, dated February 5, 2014 |
| 10 | E-mail from Kathy Johnson to Elisa Freeman re: FW: Technical Questions, dated August 2, 2007, bates numbered DIS-001453-1470 |
| 11 | Excerpts to Deposition Transcript of Charles Myers, dated January 21, 2014 |
| 12 | E-mail from Elisa Freeman to Thomas Scott re: Discovery Draft Agreement, dated October 1, 2007, attaching Redline of Discovery Draft Agreement, dated September 26, 2007, bates numbered DIS-000420-424; DIS-002847-2862 |
| 13 | Excerpts to Deposition Transcript of Stephen Kaminski, dated January 28, 2014 |
| 14 | Excerpts to Deposition Transcript of William F. Goodwyn, dated February 11, 2014 |
| 15 | E-mail from Glenn Christopher to Nancy Christopher re: Great article about IPTV and Streaming: Distinguishing the Differences, dated May 25, 2007, bates numbered SA-0002680-2682 |
| 16 | E-mail from Kevin Alexander to Christine Sas, John Rap, Margaret Boller, and Stephanie Gerstein re: Value Voters Debate Handout Brochure…ideas, dated August 31, 2007, bates numbered SA-0003742-3745 |
| 17 | E-mail from Stephanie Gerstein to Nancy Christopher re: FW: Sky Angel January SMC, dated November 28, 2007, bates numbered SA-0003293-3301 |

| Exhibit | Description |
|---|---|
| 18 | E-mail from John Rapp to Kevin Alexander, Paul Cestari, Nancy Christopher, and Violetta Avedsian re: Sky Angel Launch Proposal, dated July 30, 2007, bates numbered SA-0003784-3793 |
| 19 | Plaintiff Sky Angel U.S., LLC's Objections and Responses to Defendants Discovery Communications, LLC's and Animal Planet, LLC's First Set of Interrogatories, dated September 16, 2013 |
| 20 | Excerpts to Deposition Transcript of Kevin Alexander, dated February 6, 2014 |
| 21 | Excerpts to Deposition Transcript of Steven Jones, dated January 29, 2014 |
| 22 | Excerpts to Deposition Transcript of Brian Collins, dated February 7, 2014 |
| 23 | E-mail from Felicia Rogers to Glenn Christopher re: GenFAQs_Final Draft, dated October 29, 2009, bates numbered SA-0004111-4119 |
| 24 | E-mail from Felicia Rogers to jimmysites@bellsouth.net re: Two ways we are offering to support your ministry, dated March 17, 2009, bates numbered SA-0003781-3783 |
| 25 | C-SPAN Affiliation Agreement, dated May 28, 2009 |
| 26 | Sky Angel U.S., LLC v. National Cable Satellite Corp., 947 F. Supp. 2d 88 (D.D.C. 2013) ["C-SPAN I"] |
| 27 | Sky Angel U.S., LLC v. Nat'l Cable Satellite Corp., 12-1834 (RC), 2014 WL 1266776 (D.D.C. Mar. 28, 2014) ["C-SPAN II"] |
| 28 | E-mail from Thomas Scott to Chris Wagner re: Channel and VOD encryption, dated September 15, 2009, bates numbered Neulion_0000044-45 |
| 29 | E-mail from Sherrod Munday to Darren Moorman re: Content Questionnaires and Documents, dated January 8, 2009, bates numbered SA-0018258-18283 |
| 30 | Excerpts to Deposition Transcript of Jeff Cross, dated January 24, 2014 |
| 31 | E-mail from David Broughton to Elisa Freeman re: Fw: Sky Angel, dated November 11, 2009, bates numbered DIS-001108-1111 |
| 32 | Letter from David Broughton to Elisa Freeman re: Fw: Sky Angel, dated November 11, 2009, bates numbered DIS-001166-1168 |
| 33 | Excerpts to Deposition Transcript of Eric Phillips, dated February 14, 2014 |
| 34 | Licensing Agreement, dated April 15, 2008, bates numbered DIS-002672-2690_AEO |
| 35 | Licensing Agreement, dated March 15, 2005, bates numbered DIS-002640-2649_AEO |

| Exhibit | Description |
|---------|-------------|
| 36 | Echostar Satellite L.L.C. Affiliation Agreement, dated January 1, 2007, bates numbered DIS-002543-2596_AEO |
| 37 | Excerpts to Deposition Transcript of Harold Furchtgott-Roth, dated February 13, 2014 |
| 38 | Letter from Stephen Kaminski to Thomas Scott re: Termination of Affiliation Agreement, dated January 22, 2010, bates numbered DIS-001160 |
| 39 | Letter from Stephen Kaminski to Thomas Scott, dated March 19, 2010, bates numbered DIS-000846 |
| 40 | FCC Order Denying Emergency Petition for Temporary Standstill, dated April 21, 2010 |
| 41 | E-mail from Alberto Hering to Violetta Avedisian re: Removing references to the portability of our STB service on our FAQs, dated April 22, 2010, bates numbered SA-0003749-3750 |
| 42 | Letter from Robert W. Johnson, Jr. to "Valued Customer," dated December 10, 2013, bates numbered SA-0017688 |
| 43 | Excerpts to Deposition Transcript of Joy Skelton, dated January 28, 2014 |
| 44 | E-mail from Elisa Freeman to Kathy Johnson re: FW: Technical Questions, dated August 2, 2007, bates numbered SA-0000718-722 |

54

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on August 11, 2014, I electronically filed the foregoing with the

Clerk of the Court by using the CM/ECF system:

> Lynn E. Calkins, Bar No. 12121
> Cheryl A. Feeley, Bar No. 28862
> Jessica L. Farmer, Bar No. 18978
> Holland & Knight LLP
> 800 17th Street, N.W., Suite 1100
> Washington, DC 20006
> (202) 955-3000 (telephone)
> Lynn.calkins@hklaw.com
> Cheryl.feeley@hklaw.com
> Jessica.farmer@hklaw.com

*Counsel for Plaintiff*

_____/s/_____
Peter D. Isakoff

55