**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**Southern Division**

| | |
|---|---|
| **SKY ANGEL U.S., LLC,** | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| v. | ) **Civil Action No. 8:13-cv-00031-DKC** |
| | ) |
| **DISCOVERY COMMUNICATIONS, LLC, et al.,** | ) |
| | ) |
| *Defendants*. | ) |
| | ) |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DISCOVERY'S**
**CROSS-MOTION FOR SUMMARY JUDGMENT**

## **TABLE OF CONTENTS**

**Page**

INTRODUCTION ....................................................................................................................1

ARGUMENT ..........................................................................................................................3

I.    SKY ANGEL CANNOT AVOID THE AGREEMENT'S UNAMBIGUOUS
      MEANING...................................................................................................................3

      A.    Sky Angel's Subjective View Concerning The Agreement's "Essence" Is
            Wrong, And The Grant Of Rights Provision Is Unambiguous In
            Discovery's Favor.............................................................................................3

      B.    Even If The Grant Of Rights Provision Is Deemed Ambiguous, The
            Undisputed Extrinsic Evidence Supports Discovery's Interpretation ....................9

      C.    The Termination Provision Is Unambiguous In Discovery's Favor.....................13

II.   SKY ANGEL FAILS IN ITS ATTEMPTS TO MANUFACTURE FACT ISSUES........14

      A.    There Are No Material Facts In Dispute As To Discovery's Objectively
            Reasonable Exercise Of Its Unambiguous Termination Right ..............................15

      B.    Even If The Court Looks To Discovery's Subjective Intent, There Is No
            Material Factual Dispute As To Discovery's Honest Dissatisfaction ..................16

            1.    Discovery's Internet Policy And Third-Party Agreements.......................16

            2.    Misstatements And Omissions By Sky Angel ...........................................19

            3.    Protections For Discovery In The Agreement ...........................................21

III.  SKY ANGEL HAS NO ANSWER FOR ITS BREACH OF § 7.1 OF THE
      AGREEMENT.............................................................................................................23

CONCLUSION......................................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
 477 U.S. 242 (1986).................................................................................................14

*Atl. Contracting & Material Co. v. Ulico Cas. Co.*,
 844 A.2d 460, 469 (Md. 2004) ..................................................................................4

*Bollino v. Balt. & Ohio R.R. Co.*,
 856 F.2d 186 (4th Cir. 1988) ...................................................................................25

*Celotex Corp. v. Catrett*,
 477 U.S. 317 (1986).................................................................................................18

*Cremi v. Brown*,
 955 F. Supp. 499 (D. Md. 1997) .........................................................................14, 15

*First Nat'l Realty Corp. v. Warren-Ehret Co., Inc.*,
 233 A.2d 811 (Md. 1967) ........................................................................................15

*Fountain Powerboat Indus., Inc. v. Reliance Ins. Co.*,
 119 F. Supp. 2d 552 (E.D.N.C. 2000)........................................................................6

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
 475 U.S. 574 (1986).................................................................................................14

*Molex Inc. v. Wyler*,
 No. 04 C 1715, 2005 WL 497812 (N.D. Ill. Feb. 17, 2005)...................................25

*Mona v. Mona Elec. Grp., Inc.*,
 934 A.2d 450 (Md. App. 2007).................................................................................24

*Moore v. Loney*,
 Civ. No. GLR-11-2638, 2014 WL 671446 (D. Md. Feb. 19, 2014)........................11

*People for Ethical Treatment of Animals v. Doughney*,
 263 F.3d 359 (4th Cir. 2001) ...................................................................................25

*Sharafeldin v. Md. Dept. of Pub. Safety & Corr. Servs.*,
 131 F. Supp. 2d 730 (D. Md. 2001).........................................................................14

*S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*,
 318 F.3d 592 (4th Cir. 2003) ...................................................................................24

*U.S. v. Chapman*,
   209 F. App'x 253 (4th Cir. 2006) ..................................................................19

*U.S. v. Leftenant*,
   341 F.3d 338 (4th Cir. 2003) ......................................................................17

*Walton v. Wash. Cnty. Hosp. Ass'n*,
   13 A.2d 627, 630 (Md. 1940) .......................................................................4

*Wash. Metro. Area Transit Auth. v. Potomoc Inv. Props., Inc.*,
   476 F.3d 231 (4th Cir. 2007) ........................................................................9

**Rules**

Fed. R. Civ. P. 26(e)(1) ...................................................................................24

Fed. R. Civ. P. 37(c)(1) ...................................................................................24

Fed. R. Civ. P. 56(c)(4) ...................................................................................18

Fed. R. Civ. P. 56(e) .......................................................................................18

Fed. R. Evid. 401 ............................................................................................17

Fed. R. Evid. 402 ............................................................................................17

Fed. R. Evid. 701 ............................................................................................18

Fed. R. Evid. 801(c)(2) ...................................................................................11

**Other Authorities**

2 McCormick On Evid. § 249 (7th ed.) ...........................................................11

Barbara A. Wrigley, "Medtech Industry IP Licensing Strategies," *Intell. Prop. Licensing Strategies*, 2013 WL 936375 (Feb. 2013) ...................................................19

*Chicago Manual of Style* (16th ed. 2010) ........................................................6

Donald M. Cameron & Rowena Borenstein, "Key Aspects of IP License Agreements" (2003), *available at* http://www.jurisdiction.com/lic101.pdf .........................19

*Merriam-Webster's Collegiate Dictionary* (10th ed. 1999) ...............................7

*The Shorter Oxford English Dictionary* (3d ed. 1973) ......................................7

*Webster's Third New Int'l Dictionary, Unabridged* (2002) ...............................7

## **INTRODUCTION**

Sky Angel's opposition contains various admissions about the true nature of its service that demonstrate why summary judgment should be entered for Discovery.  Sky Angel now admits that its IPTV system – an unsuccessful gamble that it happened upon in 2007 following the failure of its satellite business – utilized the Internet as part of its distribution methodology.  As Discovery has shown, however, the Grant of Rights provision in the parties' Affiliation Agreement (the "Agreement") expressly prohibited Sky Angel from distributing Discovery's Services "for viewing on personal computers *or otherwise via the Internet*."  Ex. 1 § 2 (emphasis added).  That is exactly what Sky Angel has admitted doing.

In attempting to stave off summary judgment, Sky Angel first purports to read the foundational Grant of Rights provision out of the Agreement by claiming that it does not have any impact on the Agreement's "essence," as unilaterally determined by Sky Angel.  That is obviously incorrect:  the Agreement at its "essence" is a license of distribution rights, and there is no provision more important in delineating the parties' rights and obligations than the Grant of Rights provision, without which Sky Angel would have had no rights to Discovery's programming at all.

Sky Angel then offers a distorted interpretation of the Grant of Rights provision by asserting that it does not relate to distribution methodology at all but only to the type of "device on which Subscribers will view the Services."  Sky Angel's flawed interpretation finds no basis in the plain contractual language, but rather seeks to override it.  Read in accord with well-settled contract interpretation standards and undisputed dictionary definitions, the Grant of Rights provision unambiguously prohibited Sky Angel from distributing Discovery's Services for viewing on either computers *or otherwise* (*i.e.*, "anything else") – including, for example, a television set – "via" (*i.e.*, "by way of" or "through") the

Internet.  It is now undisputed that Sky Angel's distribution methodology distributed Discovery's Services in that exact prohibited fashion.  Equally unavailing is Sky Angel's reference to the provision defining "IP System," as that definition does not reference the Internet as a distribution method, and does not alter the Grant of Rights provision in any way.[1]  *See infra* Part I(A).

Sky Angel has also failed to identify any genuine issues of material fact as to the reasonableness of Discovery's termination.  Indeed, Sky Angel does not even attempt to provide an alternate interpretation of the termination right conferred to Discovery in § 12.1.  Under the objective reasonableness standard – which Sky Angel concedes is appropriate – it is undisputed that Discovery terminated the Agreement in 2009 upon learning that Sky Angel's Service utilized the public Internet in violation of the Agreement.  Sky Angel does not dispute that it was then that Discovery and its executive William Goodwyn first found out that Sky Angel was touting its system to customers as "us[ing] ***your*** [*i.e.*, the customer's] high-speed ***Internet service***."  Ex. 32.

Sky Angel's reliance on its customers' own Internet service providers as part of the distribution path plainly violated the Grant of Rights provision's prohibition against distribution "via the Internet."  Because Sky Angel was *not* using a private "Internet tunnel" that it alone managed and controlled, but instead used its customers' various and random uncontrolled Internet service providers to distribute the Services, Discovery's termination was objectively reasonable.[2]  *See infra* Part II(A).  Even if the

---

[1] As explained below, both parties' witnesses agree that the term "Internet protocol," or "IP," does not mean the use of the Internet as a distribution methodology.  As Sky Angel's engineer admitted, "Internet protocol . . . does not mean that it has to be distributed over the Internet."  Ex. 7 at 48:9-12.  Rather, the term denotes the manner in which the signal is packaged (*i.e.*, the way the data is formatted into "packets" for subsequent delivery across various distribution paths), not the path on which it is then distributed.  *See infra* p. 8; Ex. 45 (Kaminski Dep. at 251:3-21); Ex. 19 (Sky Angel Resp. to Interrog. No. 8).  And similarly, the term "high-speed data connection" can be many things (*e.g.*, private fiber-optic circuits) and does *not* require the use of the Internet.  SUMF ¶¶ 36-37; Ex. 11 (Myers Dep. at 7:20-8:6); *see infra* p. 8.

[2] Contrary to Sky Angel's repeated erroneous assertions, Discovery's interpretation of the Agreement as precluding distribution via the Internet is not newly fashioned.  Rather, it has been Discovery's position since the outset of this dispute, including before the FCC and throughout this action.  *See infra* Part I(B).

subjective dissatisfaction standard applied, Sky Angel's attempts to confuse the record and assert meritless evidentiary challenges do not negate the undisputed facts establishing Discovery's honest dissatisfaction.  *See infra* Part II(B).

Finally, Sky Angel has no answer for its breach of § 7.1 of the Agreement, which provides a separate, independent ground for summary judgment.  Sky Angel now grudgingly concedes that it failed to notify Discovery – as it was required to do under the Agreement – that two programmers ceased to provide programming to Sky Angel during the Agreement's term.  This failure entitled Discovery to terminate the Agreement by the express terms of § 7.1.  Sky Angel seeks to excuse its failure as merely a "slight breach" of an "isolated provision," Pl. Combined Reply & Opp. ("Opp.") at 1, 20, and also argues that Discovery should somehow be barred from raising Sky Angel's breach now because Discovery only learned of the breach in the course of discovery.  But neither argument saves Sky Angel: far from being an "isolated provision," the parties expressly agreed that a breach of § 7.1 entitled Discovery to terminate the *entire* Agreement – which means that it was, by definition, "material."  And, Sky Angel's own failure to disclose its breach until the very end of fact discovery cannot serve as a valid defense.  *See infra* Part III.

<u>**ARGUMENT**</u>

## I.    SKY ANGEL CANNOT AVOID THE AGREEMENT'S UNAMBIGUOUS MEANING

### A.    Sky Angel's Subjective View Concerning The Agreement's "Essence" Is Wrong, And The Grant Of Rights Provision Is Unambiguous In Discovery's Favor

Discovery demonstrated that the clear and unambiguous Grant of Rights provision both extends certain distribution rights to Sky Angel under the Agreement *and* limits those rights by precluding distribution "via the Internet."  Defs. Cross-Mot. & Opp. ("Cross-Mot.") 24-25.  Discovery also established that § 12.1 gave it the right to terminate the Agreement based on dissatisfaction with Sky

Angel's distribution methodology. *Id.* at 25-27. Sky Angel first responds that these provisions do not matter because they do not go to the "essence" of the Agreement. Opp. at 4-7.[3] As Sky Angel acknowledges, however, the Agreement was a licensing contract, such that Sky Angel had *no* rights to distribute Discovery's programming *but for* the distribution rights expressly granted to it in the Grant of Rights. *Id.* at 7 ("the Agreement between Sky Angel and Discovery is a contract for Sky Angel to distribute Discovery's programming . . . ."). Indeed, the grant of distribution rights signifies the core purpose of the Agreement, as reflected in the Agreement's very first sentence: "Agreement made as of October 3, 2007, by and among Discovery . . . and Sky Angel . . . *for the distribution and exhibition of the programming services . . .* on [Sky Angel's] Affiliate Systems." Ex. 1 at 1 (emphasis added). Thus, there can be no more "essential" or "material" term than the Grant of Rights provision, which expressly delineates the scope of the distribution rights licensed to Sky Angel.[4]

Discovery's interpretation of the Grant of Rights provision is based on the provision's plain language (rather than on any extrinsic evidence, as Sky Angel incorrectly contends, Opp. at 24):

> [Discovery] hereby grants to [Sky Angel] and [Sky Angel] hereby accepts, subject to the terms and conditions hereof, a non-exclusive *license and right to distribute and exhibit the Services* to Subscribers of Affiliate Systems within the Territory, for viewing by such Subscribers on television sets on a subscription basis . . . .
>
> [Sky Angel] acknowledges and agrees that the rights granted to [Sky Angel] herein are limited to *distribution* of the Services for viewing by Subscribers on television sets on a

---

[3] Sky Angel attempts to defend this flawed approach by claiming that only three discrete sets of obligations were designated as "material" under the Agreement – the carriage requirements set forth in § 5.1, Sky Angel's obligation to maintain the security of the Service signal set forth in §12.1, and its obligation to seek Discovery's consent to assignment of the Agreement set forth in § 13.3. Opp. at 25-26. To Sky Angel, anything not expressly designated as "material" – *e.g.*, the Grant of Rights provision – is thereby rendered "non-material." *Id.* That contention is absurd, as it wholly ignores a number of other provisions that are obviously material. For example, the payment of license fees by Sky Angel to Discovery is clearly a material term of the Agreement, even though it is not expressly labeled as such in the Agreement. *See* Ex. 1 § 3.

[4] In addition to lacking any basis in the contract, Sky Angel's self-serving segregation of the Agreement's terms as "essential" or "non-essential" is contrary to Maryland law. As Sky Angel admits, "the Court is required to look at *all terms* of [the] agreement" when "interpreting a contract." Opp. at 4 (emphasis added) (citing *Walton v. Wash. Cnty. Hosp. Ass'n*, 13 A.2d 627, 630 (Md. 1940); *Atl. Contracting & Material Co. v. Ulico Cas. Co.*, 844 A.2d 460, 469 (Md. 2004)).

> subscription basis **and not** *for viewing on personal computers* **or otherwise via the Internet**.

Ex. 1 § 2 (emphasis added).  This provision unambiguously (i) confers the right to distribute "the Services for viewing by Subscribers on television sets on a subscription basis," and (ii) *precludes* any right to "distribution of the Services . . . for viewing on personal computers or otherwise via the Internet."  *Id.*; *see* Cross-Mot. at 24-25.  Thus, under the plain meaning of the provision, Sky Angel was prohibited from distributing the Services "via the Internet."  Cross-Mot., Defs. Statement of Undisputed Material Facts ("SUMF") ¶¶ 2-3.  This is the beginning and end of the matter.

Sky Angel responds with an astonishing argument that flies directly in the face of the Grant of Rights provision, *i.e.*, that it relates only to "the means that the Subscriber will *view* the programming," and "is not referring to Sky Angel's distribution methodology."  Opp. at 15-17; *see also id.* at 15 n.4.  But that interpretation improperly plucks the word "viewing" out of the context of the provision so as to artificially elevate its importance, while wholly ignoring the word "distribution."  As stated in the provision's first sentence, the Grant of Rights extends the "license and right to *distribute* and exhibit the Services."  Ex. 1 § 2 (emphasis added).  "Viewing" is simply the end-point of the distribution process, which is made clear in a subsequent sentence of the Grant of Rights provision:  "the rights granted to [Sky Angel] herein are limited to **distribution** of the Services for viewing by Subscribers on television sets on a subscription basis and not for viewing on personal computers or otherwise via the Internet."  *Id.* (emphasis added).

Notwithstanding this dispositive unambiguous language, Sky Angel also contends, by way of a strained and incorrect grammatical argument, that the Grant of Rights provision "does not preclude Sky Angel from using the Internet," but instead "expressly relates to the device on which Subscribers will view the Services."  Opp. at 24; *see also id.* at 6-7, 13, 16-17.  Sky Angel begins with the assumed

5

premise that the word "or" in the key phrase "or otherwise via the Internet" is a "subordinating conjunction connect[ing] clauses of unequal grammatical rank." Opp. at 16. It then argues that this phrase "qualifies only the clause immediately antecedent to it regarding 'personal computers,'" under the last antecedent rule. *Id.* On this basis, Sky Angel contends that the phrase "or otherwise via the Internet" must be a reference to an Internet-enabled "device," like a tablet or smartphone (*i.e.*, "something akin to a personal computer"). *Id.* at 16-17.

One of the several errors in Sky Angel's forcible misreading of this central provision is that the word "or" is *not* a subordinating conjunction linking a dependent clause, but instead is a *coordinating* conjunction, as Sky Angel's cited authority confirms. "The two main classes of conjunctions are coordinating and subordinating." *Chicago Manual of Style* § 5.194 (16th ed. 2010). "Coordinating conjunctions join words or groups of words of equal grammatical rank, such as two nouns, two verbs, two phrases, or two clauses ['Are you speaking to him *or* to me']." *Id.* (emphasis added). One sub-class of the coordinating conjunctions are the disjunctive coordinating conjunctions, which "denote separation or *alternatives* . . . and include *either*, **or**, *else*, *but*, *nor*, *neither*, *otherwise*, and *other*." *Id.* §§ 5.194, 5.198 (emphasis added); *see also Fountain Powerboat Indus., Inc. v. Reliance Ins. Co.*, 119 F. Supp. 2d 552, 557 (E.D.N.C. 2000) (construing a contract's use of "the alternative coordinating conjunction 'or'"). Thus, the phrase "or otherwise via the Internet" is not a qualifier regarding "something akin to a personal computer," as Sky Angel contends, but instead presents an ***equal alternative*** to the proscription of distribution of the Services on personal computers.[5]

The meaning of this equal alternative – "or otherwise via the Internet" – is unambiguous in

---

[5] Because "or otherwise via the Internet" is not a dependent clause, the rule that Sky Angel cites about exclusion of a comma between a "dependent clause" and a "main clause" is irrelevant. *See* Opp. at 16 (citing *Chicago Manual of Style* § 6.31). The lack of a comma simply accords with the general rule that, "[i]n a series whose elements are all joined by conjunctions, no commas are needed unless the elements are long and delimiters would be helpful." *Chicago Manual of Style* § 6.18.

Discovery's favor.  As Sky Angel agrees, the word "otherwise" means "something or anything else." *Merriam-Webster's Collegiate Dictionary* 823 (10th ed. 1999); Opp. at 16-17.  Thus, the Grant of Rights provision unambiguously precludes Sky Angel not only from distributing the Services "for viewing on personal computers," but *also* separately and broadly precludes Sky Angel from distributing the Services on "anything else" – including television sets – "*via the Internet.*"  This latter prohibition plainly precluded Sky Angel from doing what it now admits to have done:  distributing the Services to television sets via the Internet.  *See* Pl. Mot. for Partial Summ. J. at 10, 32, 36.

Sky Angel's argument also glaringly ignores the provision's last three words:  "via the Internet." But the meaning is plain.  The key word "via" does not mean "on an Internet website" or "on the Internet."  Rather, "via" means "by way of; by a route passing through," or "through the medium of." *Webster's Third New Int'l Dictionary, Unabridged* 2548 (2002); *see also Merriam-Webster's Collegiate Dictionary* 1315 (10th ed. 1999) ("by means of"); *The Shorter Oxford English Dictionary* 2471 (3d ed. 1973) ("by the route which passes through or over").  Therefore, the plain meaning of "via the Internet" is "by way of the Internet" or "through or over the Internet."  Thus, the Grant of Rights expressly precluded Sky Angel from distributing its services for viewing on ***anything*** through or over the Internet. Given that it is undisputed that this is precisely how Sky Angel distributed Discovery's Services, SUMF ¶ 41, Sky Angel's method of distribution violated the Grant of Rights.

Sky Angel also contends that the Grant of Rights cannot preclude distribution over the Internet because its first sentence references "Affiliate Systems," which in turn incorporates the definition of "IP System" found in § 1.1.2.  Opp. at 15.  According to Sky Angel, this definitional section somehow conveys Internet-distribution rights to Sky Angel notwithstanding the express proscription on distribution "via the Internet" in the Grant of Rights provision.  *Id.*  Sky Angel's convoluted argument is

wrong, as the definition of "IP System" does not undermine the Grant of Rights in any way.  Sky Angel notes that the definition of "IP System" does not *prohibit* the use of the Internet, but it identifies nothing that grants such use either.  *Id.*  The lack of an express prohibition does not translate to a positive grant of rights under the Agreement.  Indeed, the opposite is true.  Under the Agreement, "[a]ll rights not specifically granted to [Sky Angel]" are "reserved to [Discovery]."  Ex. 1 § 13.1.

Nor can Sky Angel rely on the terms "Internet protocol ('IP') technology" and "high-speed data connection" – which appear in the definition of "IP System" – to infer a grant of Internet distribution rights where none were granted.  Ex. 1 § 1.1.2; *see* Opp. at 15.  Nowhere in the definition of "IP System" does it say that the Internet will be used or involved in any way as a method of distribution.  Ex. 1 § 1.1.2.  The technical terms "Internet protocol" and "high-speed data connection" do not mean that the Internet would be used as a means of distribution, as both parties' witnesses have testified.  SUMF ¶¶ 35-37.  Sky Angel's engineer Mr. LaRue forthrightly conceded that the term "Internet protocol . . . does not mean that it has to be distributed over the Internet."  Ex. 7 at 48:9-12.  Rather, as Discovery's draftsperson Stephen Kaminski testified – and as Sky Angel previously acknowledged in its discovery responses – Internet protocol refers to "the way a signal is packaged," not "what the transmission path is."  Ex. 45 (Kaminski Dep. 251:3-21); *see also* Ex. 19 (Sky Angel Resp. to Interrog. No. 8) ("[Sky Angel] formats the programming content using Internet protocol ('IP') technology and . . . then transmits the encrypted, *IP-formatted* programming via a closed and encrypted fiber optic transmission path . . . [and from there] via broadband Internet connections") (emphasis added).  And while a "high-speed data connection" does refer to the transmission path, it does *not* require use of the Internet.  SUMF ¶ 36.

**B.**    **Even If The Grant Of Rights Provision Is Deemed Ambiguous, The Undisputed Extrinsic Evidence Supports Discovery's Interpretation**

Even where a contract is deemed ambiguous, summary judgment remains appropriate "when an ambiguity can be definitely resolved by reference to extrinsic evidence." *Wash. Metro. Area Transit Auth. v. Potomoc Inv. Props., Inc.*, 476 F.3d 231, 235 (4th Cir. 2007). To be clear, as Discovery has shown, the Grant of Rights provision is unambiguous in Discovery's favor. *See supra* Part I(A). If, however, the Court believes the provision is ambiguous, the undisputed extrinsic evidence confirms that the Grant of Rights provision precludes Sky Angel from using the Internet to distribute the Services.[6]

Specifically, the undisputed evidence shows that in 2007, Sky Angel was looking to transition to a new technology following the failure of its satellite, and it came upon IPTV. SUMF ¶ 10. Having no experience with IPTV, SUMF ¶ 11, Sky Angel's negotiators had only "incomplete" knowledge of how Sky Angel's distribution system was to work, such that its lead negotiator Kathy Johnson could not answer even "basic" questions that Discovery posed.[7] SUMF ¶¶ 13-15. This lack of knowledge led to misstatements to Discovery that Sky Angel's technology used a private, closed feed and did not use the public Internet in distributing Discovery's Services to its subscribers. SUMF ¶ 18. This was critical because, as Discovery's negotiator Elisa Freeman testified, Discovery "could not allow distribution over the public Internet." Ex. 9 at 25:9-15. Both Ms. Freeman and Mr. Kaminski testified that they understood in 2007 that, as a matter of long-standing company policy, Discovery never granted any

---

[6] Although Sky Angel submits extrinsic evidence to support its alternative argument that "the undisputed extrinsic evidence actually supports Sky Angel's interpretation," Opp. at 27-31, it tellingly declines to address Discovery's evidence, claiming that it is barred by the "parol evidence rule" and § 13.5 of the Agreement, *id.* at 25-27. Sky Angel cannot have it both ways.

[7] Sky Angel disputes that "Discovery has presented any evidence" that Ms. Johnson could not answer "even 'basic' questions Discovery posed" during the 2007 negotiations, Opp. at 43, but ignores Ms. Johnson's own email to her superiors that Discovery's questions "seemed to be simple – I just didn't want to say something wrong because I still am unclear how it works . . . . We look stupid when our counterparts at the networks start asking questions and we can't answer them." Ex. 5; *see also* Ex. 6 (email from Ms. Johnson stating that Discovery's questions covered "[s]ome basic stuff – I just don't have a handle yet on the technology enough yet to speak intelligently on it").

distributor the right to distribute its full, linear programming networks over the Internet.  SUMF ¶ 60.

Ms. Freeman confirmed that she asked Sky Angel if it "was utilizing the public Internet as part of its distribution methodology" while cautioning that Discovery "could not allow usage of the public Internet."  Ex. 9 at 26:18-27:4.  In response, Ms. Johnson assured Discovery that Sky Angel used a *private* connection in the form of "a closed feed similar to Verizon."[8]  SUMF ¶ 18.  Likewise, Sky Angel's President Tom Scott testified that he told Discovery that Sky Angel would not use the "World Wide Web," which, he explained, meant "the public Internet."  SUMF ¶ 23.  Ms. Freeman similarly testified that Mr. Scott and Ms. Johnson told Discovery during the negotiations that Sky Angel would not be using the public Internet.  Ex. 9 at 27:2-14, 34:9-15; Ex. 47 at 30:12-17, 31:7-20.

During its diligence Discovery was unable to obtain a complete understanding of Sky Angel's distribution methodology.  SUMF ¶¶ 24-25, 27-28, 30, 34, 37.  Among other things, Sky Angel refused to provide written answers to Discovery's comprehensive questionnaire or even a block diagram detailing its system.  SUMF ¶ 24.  Because Sky Angel's head engineer Mr. LaRue "wasn't well-versed" in the technology, he referred Charlie Myers (the engineer charged with leading Discovery's technological diligence) to Sky Angel's technology partner NeuLion.  SUMF ¶ 25.  NeuLion, however, went "radio silent on Discovery" following a "single conversation" with Mr. Myers in which he "learned very little" because NeuLion was "unwilling to give . . . specific details."  SUMF ¶ 26.

Having been provided with assurances from Sky Angel that it did not use the public Internet, but "with a lack of full understanding" regarding the particulars of the technology, Mr. Kaminski "built in [to the Agreement] termination based on distribution methodology, a carve-out from Internet

---

[8]  Sky Angel suggests a lack of evidence exists that Verizon "does not utilize the public Internet," Opp. at 37 n.13, but Sky Angel's own industry expert admitted that Verizon is "not an Internet service" but rather employs its own "private network." Ex. 46 (Furchtgott-Roth Dep. at 26:4-7, 28:2-4).  Sky Angel's expert further conceded that, in contrast to Verizon, Sky Angel does not have a private network, and that a Sky Angel customer needed a separate high-speed Internet connection provided by a third-party Internet service provider that is not controlled by Sky Angel.  *Id.* at 28:5-22.

distribution in the Grant of Rights and full indemnification if any programming rights were violated."
SUMF ¶ 34.  Sky Angel went ahead with the deal anyway, just as it went ahead with a deal with C-SPAN that similarly barred distribution over the Internet.[9]  SUMF ¶¶ 32, 46-47.  C-SPAN, like Discovery, terminated Sky Angel when it learned that Sky Angel's distribution methodology ran counter to contractual restrictions.  SUMF ¶¶ 48-49.

Sky Angel's purportedly contrary extrinsic evidence does not conflict with the above evidence, and certainly cannot be used to defeat the contract's plain language.  While Sky Angel claims that Discovery "understood that Sky Angel would be using the Internet," it bases this erroneous contention solely on a forwarded NeuLion email with an embedded reference to the Internet and on Mr. Myers' indication that it was "possible" Sky Angel "may be" using the Internet.  Opp. at 28.  Sky Angel's assessment of the extrinsic evidence ignores that NeuLion told Mr. Myers that it **could** use *either* the Internet *or* private fiber, as well as Sky Angel's assurances that its technology **would** use a closed, private network.  SUMF ¶ 28.[10]

Moreover, contrary to Sky Angel's contention, Discovery's statements to the FCC and its interrogatory responses in this case are *entirely* consistent with its position that, in 2007, it believed Sky Angel's distribution methodology would use a closed, private network separate and apart from the

_____

[9] Although Sky Angel asserts that it is "inaccurate" that the C-SPAN agreement "prohibited distribution over the public Internet," Sky Angel nowhere provides any basis for a different construction of Section 1(a) of that agreement, which prohibited the use of the "public Internet" on its face.  *Compare* Opp. at 46 *with* Ex. 25.  Thus, Discovery's SUMF ¶¶ 46-47 are undisputed.

[10] Contrary to Sky Angel's evidentiary objection, Opp. at 44-45, Mr. Myers' testimony regarding his conversations with NeuLion is not hearsay because Discovery does not offer it for the truth of the matter asserted, *i.e.*, whether NeuLion actually could use the Internet or private fiber.  Fed. R. Evid. 801(c)(2).  Rather, Mr. Myers' testimony is offered to show the effect on the listener, that is, the beliefs induced in Discovery in 2007 regarding Sky Angel's non-use of the Internet.  *See* 2 McCormick On Evid. § 249 (7th ed.) ("A statement that D made a statement to X is not subject to attack as hearsay when its purpose is to establish the state of mind thereby induced in X, such as receiving notice or having knowledge or motive, or to show the information which X had as bearing on the reasonableness, good faith, or voluntariness of subsequent conduct . . . ."); *Moore v. Loney*, Civ. No. GLR-11-2638, 2014 WL 671446, at *4 (D. Md. Feb. 19, 2014) (statements offered to show "the effect on the listeners' state of mind" were non-hearsay).

public Internet, just as Sky Angel had represented. Opp. at 30. Sky Angel focuses on an excerpt from Mr. Kaminski's declaration filed with the FCC at the time of termination stating that Discovery understood in 2007 that Sky Angel would transmit its signal using "a secure, closed and encrypted fiber optic network" and "an Internet 'tunnel' over which the service would be sent, in encoded format, to deliver the Sky Angel service from that central distribution location to a subscriber home." Ex. C at ¶ 7. But Sky Angel ignores the entire rest of Mr. Kaminski's declaration, which makes clear that Discovery understood a "tunnel" to be distinct from the public Internet and that it never granted Sky Angel Internet distribution rights. *See*, *e.g.*, *id.* at ¶¶ 8-11, 34-35, 38. Instead, the word "tunnel" noted in Discovery's FCC declaration, as well as in its consistent interrogatory responses, Ex. K, refers to a closed, private network, like that of Verizon (an IPTV provider that does not use the public Internet). SUMF ¶ 19; Goodwyn Decl. ¶ 10. It certainly does not mean, as Sky Angel argues, that Discovery knew when it entered the Agreement that Sky Angel was using the public Internet through its subscribers' own Internet connections. Opp. at 31 n.8; SUMF ¶ 44.[11] Rather, it means that Sky Angel had sold Discovery on "the notion of a private data stream traveling over wires that Sky Angel described as its closed system" in a manner "*distinguishable from the Internet*." Ex. 30 (Cross Dep. at 254:17-256:9) (emphasis added). Sky Angel's representations, however, "turned out to be . . . not true." *Id.*

In fact, as Discovery came to learn for the first time in late 2009, Sky Angel's System was neither private nor a "tunnel." *See* Ex. 32 ("Sky Angel . . . uses *your* [*i.e.*, the customer's] *high-speed*

---

[11] Sky Angel disputes that its use of the public Internet enabled subscribers to access its System "anywhere there was an Internet connection" and that its System was "completely portable." Opp. at 46. However, Sky Angel's marketing materials trumpeting those very facts, directly quoted by Discovery, speak for themselves. SUMF ¶ 44 (quoting Ex. 23 ("Completely portable. Available anywhere in the U.S. where a TV and high-speed Internet is available – just bring your receiver with you.")). Indeed, Sky Angel acknowledged the portability of its System in its Interrogatory Responses. Ex. 19 (Sky Angel Resp. to Interrogs. Nos. 9-10). Discovery's SUMF ¶ 44 is thus undisputed. As an additional matter, even if Sky Angel encrypted the signal before it was sent over the Internet, that did not render the system private or closed because it still went over the public Internet for its means of distribution. *Compare* Ex. 19 (SA Response to Interrog. No. 8), *with* Ex. 48 (Myers Dep. 161:10-162:22). Discovery's SUMF ¶ 42 is therefore also undisputed.

*Internet service* to deliver over 70 faith and family channels . . . directly to your TV.") (emphasis added); *see also* SUMF ¶¶ 56-57.  As Sky Angel's engineer Mr. LaRue admitted, "[w]e can't control the portion from NeuLion to the set-top box" of the subscriber, as each Sky Angel subscriber has its "own service to the Internet" through a contract with any number of separate Internet service providers throughout the country.  SUMF ¶ 42.  Sky Angel's conceded use of the Internet in a manner that was not closed or controlled, but which instead utilized its customers' "high-speed Internet service," Ex. 32, was contrary to the Agreement, and Discovery terminated the Agreement accordingly.[12]

The email exchange between Mr. Scott and Ms. Freeman in September 2007 cited by Sky Angel regarding the definition of "Affiliate System" is entirely consistent with Discovery's understanding that Sky Angel would be employing a private network.  Opp. at 28-30; Exs. E, F.  Mr. Scott's initial email *nowhere* refers to use of the Internet, but rather proposes language referencing a "high-speed data connection."  Ex. E.  Ms. Freeman's response – which proposed language precluding "the public Internet" – reflected Discovery's firm policy *against* the use of the Internet as a means of distributing its linear networks.  Ex. F.  In accord with that position, the language ultimately included in the Grant of Rights unambiguously precluded distribution of Discovery's Services by means of the Internet and nothing in the definition of IP System stated that the Internet would be used as the means of distribution. *See supra* Part I(A).

## C.      The Termination Provision Is Unambiguous In Discovery's Favor

Discovery showed in its opening brief that § 12.1 of the Agreement entitled it to terminate the Agreement based solely on its determination that it was dissatisfied with Sky Angel's distribution

---

[12] Contrary to Sky Angel's assertion, Discovery did not conduct any further diligence relating to Sky Angel's system in September 2009 after Sky Angel "contacted [Discovery] about additional carriage of [Discovery] networks," Ex. 47 (Freeman Dep. 338:9-339:3); *id.* at 332:8-16; Ex. 49 (DIS-001664-1670 at DIS-001670), nor does the "evidence" Sky Angel relies upon support any such assertion.  Opp. at 19.

methodology due to its use of the public Internet, which did not meet Discovery's expectations for the distribution methodology or comply with the Agreement.  Cross-Mot. at 25-27.  In response, Sky Angel does not even address, let alone dispute, Discovery's plain language interpretation, nor does it refute any of the case law on which Discovery relied.  Further, Sky Angel does not argue that § 12.1 is ambiguous.

At most, Sky Angel once more contends that a satisfactory distribution methodology must be determined solely by reference to § 7.1.  Opp. at 12-13.  Sky Angel is wrong, as nothing in the Agreement restricts Discovery's termination right to Sky Angel's failure to fulfill § 7.1.  Cross-Mot. at 45-46.  Section 7.1 does not purport to define what constitutes a satisfactory distribution methodology, but rather only provides for certain non-exclusive minimum requirements in how Sky Angel "shall distribute each Service."  Ex. 1 § 7.1; *see* Cross-Mot. at 46.  Sky Angel's argument must be rejected because it ignores the many other requirements governing Sky Angel's distribution imposed by several other sections, including, as dispositive here, the Grant of Rights provision.

## II.    SKY ANGEL FAILS IN ITS ATTEMPTS TO MANUFACTURE FACT ISSUES

Sky Angel also believes that if it nit-picks enough of Discovery's facts, it can call them "disputed" and thereby survive summary judgment.  But that approach is unavailing.  As Sky Angel concedes, a non-moving party must "'do more than simply show that there is some metaphysical doubt as to the material facts.'"  Opp. at 3 (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *see also Cremi v. Brown*, 955 F. Supp. 499, 506 (D. Md. 1997) ("[T]he non-movant cannot rest on evidence that is 'merely colorable' or a mere 'scintilla,' in order to defeat a motion for summary judgment.") (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50, 252 (1986)); *Sharafeldin v. Md. Dept. of Pub. Safety & Corr. Servs.*, 131 F. Supp. 2d 730, 736-37 (D. Md. 2001) ("'Factual disputes that are irrelevant or unnecessary will not be counted.'") (internal citation

omitted).[13]

Sky Angel's lengthy recital of purported "fact disputes" does nothing to detract from Discovery's entitlement to summary judgment, as all of the material facts on which Discovery relies are supported by admissible, undisputed record evidence that Sky Angel improperly seeks to exclude, mischaracterize, or ignore.  At best, Sky Angel has identified issues of fact that require only that its *own* motion for summary judgment must be denied because it is premised on highly-disputed issues surrounding Sky Angel's purported compliance with the Agreement.  By contrast, Discovery's motion can and should be granted based on the plain and unambiguous language of the Agreement alone.

## A.    There Are No Material Facts In Dispute As To Discovery's Objectively Reasonable Exercise Of Its Unambiguous Termination Right

This Court should decide Discovery's motion under the objective standard because "objective criteria" for reasonableness appear on the face of the contract.  *See* Cross-Mot. at 29 (citing *First Nat'l Realty Corp. v. Warren-Ehret Co., Inc.*, 233 A.2d 811, 815 (Md. 1967)).  Discovery has demonstrated why its decision to terminate the Agreement was objectively reasonable under the Agreement: Discovery did not grant rights to Sky Angel to distribute the Services "via the Internet," and when Discovery learned conclusively in November 2009 that Sky Angel was in fact using the Internet to distribute the Services, it terminated the Agreement pursuant to § 12.1.  Cross-Mot. at 28-30.

Sky Angel does not dispute these facts but argues that Discovery did not first conduct a "review" of Sky Angel's distribution methodology.  Opp. at 31-32.  But Sky Angel's acknowledgment that Mr. Goodwyn asked Discovery personnel to "look into" Sky Angel "to see if they're using the

---

[13] Sky Angel devotes several pages of its Opposition to a hodgepodge of irrelevancies and *non-sequiturs* in the guise of manufacturing "additional disputed facts."  Opp. at 42-47.  For example, Sky Angel claims that its Service is "suspended," but "not defunct," *compare id.* at 42, *with* Ex. 50 at 66:3-23; that Ms. Johnson was not the "primary" negotiator, but rather the "lead negotiator," Opp. at 43; and that it did not seek to add "as many programming channels as possible" in 2007, but rather focused on "*family friendly* programming," *id.*  Plainly, none of these manufactured "disputes" are in any way material or sufficient to defeat Discovery's summary judgment motion.  *Cremi*, 955 F. Supp. at 505.

Internet" refutes that argument.  *Id.* at 32.  Sky Angel even quotes the e-mail Mr. Goodwyn relied upon

in determining that Sky Angel's distribution methodology ran afoul of the Agreement.  *Id.* (citing Ex.

32).  That email quoted Sky Angel's website, on which Sky Angel proclaimed that its System "uses *your*

[*i.e.*, the customer's] *high-speed Internet service* to deliver over 70 faith and family channels . . . ."  Ex.

32 (emphasis added).  This made clear to Discovery that Sky Angel did not use a closed service of its

own to distribute the Services, but was instead relying on its customers' own myriad, uncontrolled

Internet service providers.  It is undisputed that upon reviewing the email, Mr. Goodwyn determined that

Sky Angel "was not in compliance with the [A]greement."  Ex. 14 at 184:15-20, 196:13-197:7.  That

Mr. Goodwyn did not also look back at the Agreement in making that determination, Opp. at 32, is

immaterial since he *already knew* that Sky Angel "did not have the grant of rights to allow them to use

the Internet to . . .  deliver the service."  Ex. 14 at 196:13-20.

> **B.    Even If The Court Looks To Discovery's Subjective Intent, There Is No Material Factual Dispute As To Discovery's Honest Dissatisfaction**

Even if the Court applies the subjective dissatisfaction standard, summary judgment for

Discovery remains appropriate.  Sky Angel does not take issue with any of the caselaw cited by

Discovery holding that under this alternative standard, a party's dissatisfaction must merely be "real and

not pretended, capricious, mercenary, or the result of a dishonest design."  *See* Cross-Mot. at 30-31

(citing cases).  Because the undisputed record establishes that Discovery's dissatisfaction with Sky

Angel's distribution methodology was honest and not "feigned," its termination decision easily

surmounts this low bar.

> **1.    Discovery's Internet Policy And Third-Party Agreements**

Sky Angel provides no evidence disputing the existence of Discovery's long-standing policy, in

place during the parties' negotiations in 2007 and for several years thereafter, not to grant *any* distributor

the right to distribute its 24/7 linear networks over the Internet.  SUMF ¶¶ 59-61.  Sky Angel tries to downplay this policy by referring to it as "Mr. Goodwyn's own unwritten policy against distributing over the Internet," Opp. at 35, but offers no evidence to dispute the unequivocal testimony that Discovery's legal and business teams, including Ms. Freeman and Mr. Kaminski, fully understood Discovery's  long-standing policy at the time the Agreement was negotiated.  *See*, *e.g.*, Ex. 9 at 398:12-399:19; Ex. 13 at 24:15-20; Ex. 14 at 36:5-38:20, 39:6-41:3.

Sky Angel also does not contest that Discovery was aware in 2007 of its agreements with third-party distributors, including DISH, that contained Most Favored Nations provisions, as well as its agreements with certain licensors – both before and after 2007 – that precluded distribution of certain licensed Discovery programming over the Internet.[14]  SUMF ¶¶ 63-64.  Instead, Sky Angel remarkably claims that the Court *should not even consider* this evidence because *Sky Angel* considers it irrelevant under Fed. R. Evid. 401 and 402.  Opp. at 34.  As Discovery has explained, this evidence is plainly relevant to the subjective intent inquiry – and certainly meets the threshold standards for relevance under the Federal Rules – as it shows that Discovery never would have entered into an agreement with Sky Angel that provided for distribution over the Internet where doing so would have been contrary to Discovery's policies, business strategies, and contracts.  SUMF ¶¶ 59-68; *U.S. v. Leftenant*, 341 F.3d 338, 346 (4th Cir. 2003) ("[R]elevance typically presents a low barrier to admissibility.").

Sky Angel next claims that hearsay objections and the Best Evidence Rule should preclude the

---

[14] There can be no genuine dispute that these agreements "contain prohibitions on Discovery allowing Sky Angel to utilize the Internet as part of its distribution methodology."  Opp. at 36.  As Sky Angel notes, Exhibit 34 includes a prohibition on the distribution of content "over the world wide web/*internet*."  Ex. 34 § 3 (emphasis added); *see* Opp. at 36.  Sky Angel, however, represented to its subscribers that its Service "uses *your* high-speed *Internet* . . . ."  Ex. 32 (emphasis added).  Similarly, Exhibit 35 – which was entered into two years before the Agreement – expressly precluded distribution over "the interconnecting computers using the World Wide Web."  Ex. 35 § D.  These types of contractual prohibitions on Internet-distribution "existed in 2007 when Discovery entered into its agreement with Sky Angel and continue[] to this day."  Goodwyn Decl. ¶ 12.

Court from considering the undisputed fact that in 2007 and for several years thereafter, Discovery never granted any of its at least one thousand distributors the right to distribute Discovery's full, linear programming networks over the Internet.  SUMF ¶¶ 60, 65; *see* Opp. at 34.  Sky Angel's procedural objections, including its previously-denied request for thousands of contracts with other distributors, are misplaced.[15]  Mr. Goodwyn provided a sworn declaration and entirely consistent deposition testimony unequivocally attesting to Discovery's Internet policy from his personal knowledge as the CEO of Domestic Content Distribution for Discovery.  *See* Goodwyn Decl. ¶¶ 3, 12-23; Ex. 14 at 33:20-34:21, 278:15-20.  Given that Mr. Goodwyn was the executive in charge of domestic distribution of all programming networks for Discovery at all relevant times, Goodwyn Decl. ¶ 5, he has clearly "set out facts that would be admissible in evidence," and is "competent to testify on the matters stated."  *See* Fed. R. Civ. P. 56(c)(4), 56(e); *see also* Fed. R. Evid. 701; *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986) ("Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves.").

Sky Angel also challenges Mr. Kaminski's testimony that "the grant of rights is the fundamental provision of any affiliate agreement," Ex. 13 at 277:7-10, by claiming that it is an "inadmissible" "personal opinion."  Opp. at 25.  Not so.  Mr. Kaminski provided lay testimony that would be admissible at trial, and can be considered on summary judgment.  Mr. Kaminski has personal knowledge of facts relevant to the case as the draftsperson of the Agreement at issue.  Ex. 45 (Kaminski Dep. Tr. at 233:9-16).  Mr. Kaminski's testimony regarding the Grant of Rights provision was clearly "based on the witness's perception," and will be "helpful . . . to determining a fact in issue" under Fed. R. Evid. 701.

---

[15] Sky Angel's assertion that Discovery is "relying on information it refused to produce," Opp. at 34, is unavailing.  Sky Angel concedes that "Discovery produced contracts with two distributors and three licensors," and that Discovery has attached certain of these agreements to its motion papers as representative examples. *Id.* at 35-36; *see* Exs. 34-36.  As Discovery has stated time and again, it has produced to Sky Angel the contracts about which Discovery was concerned and considered following its determination in 2009 that Sky Angel was utilizing the Internet.  SUMF ¶¶ 63-64.

*See U.S. v. Chapman*, 209 F. App'x 253, 267 (4th Cir. 2006) (affirming admission of employee's testimony "about his personal understanding of the obligations imposed by a contract to which his company was a party, a typical and proper subject for lay witness testimony").  Moreover, Mr. Kaminski's testimony is entirely consistent with the well-accepted view across the industry that a grant of rights provision is a touchstone component of licensing agreements.  *See*, *e.g.*, Donald M. Cameron & Rowena Borenstein, "Key Aspects of IP License Agreements" at 7 (2003) ("The license grant provision is one of the most critical elements of the Agreement.  It sets out the scope and extent of the rights granted to the licensee, as well as any limitations on those rights.") *available at* http://www.jurisdiction.com/lic101.pdf; Barbara A. Wrigley, "Medtech Industry IP Licensing Strategies," *Intell. Prop. Licensing Strategies*, 2013 WL 936375, at *9 (Feb. 2013) ("While there are many important terms in a license agreement, one of the most important is the grant clause.").[16]

### 2.    Misstatements And Omissions By Sky Angel

Sky Angel has also failed to show that there is any genuine dispute regarding the various misstatements made to Discovery's negotiators and engineer about Sky Angel's System during the 2007 negotiations, as well as the critical information Sky Angel and NeuLion withheld from Discovery during that time.  Sky Angel first attempts to deflect the statement of its negotiator Kathy Johnson to Discovery that "the technology will be a closed feed similar to Verizon," SUMF ¶ 18, by claiming that the "one statement" that Discovery relies upon constitutes hearsay.  Opp. at 37.  But Sky Angel ignores Discovery's citation to Ms. Johnson's own deposition testimony:  "Q. Did you ever tell Mr. Yavello that

---

[16] The importance of the Grant of Rights does not rest "exclusively" on Mr. Kaminski's testimony.  Opp. at 25.  On the contrary, the Agreement's very first sentence sets forth the purpose of the entire Agreement by reference to the "distribution and exhibition" rights conferred by and limited in the Grant of Rights provision.  Ex. 1 at 1; *see supra* p. 4.  There was thus no need for the kind of "bolding, italics, [or] underlining" that Sky Angel suggests was somehow necessary for "important" provisions.  Opp. at 25-26.  It is virtually self-evident that there can be nothing more important to a licensing agreement than the provision actually licensing the rights.  *See supra* p. 4.

the Sky Angel technology will be a closed feed similar to Verizon?  A. Yes, I do recall that."  SUMF ¶ 18 (quoting Ex. 4 at 105:17-22).  Ms. Johnson's statement to Discovery's Mr. Yavello is thus an admission.  In any event, Discovery is not using Ms. Johnson's statement likening Sky Angel to Verizon for the truth of the matter asserted but, on the contrary, to show that it was *untrue*.

Despite Sky Angel's efforts to confuse the testimony, Opp. at 38, Ms. Freeman corroborated Ms. Johnson's admission.  Specifically, Ms. Freeman testified that Ms. Johnson told her that Sky Angel's system was "a closed feed, private."  SUMF ¶ 19.  When asked what Ms. Johnson meant by that, Ms. Freeman explained that her understanding was that "it would be on a private transmission path outside of the public Internet . . . as is Verizon."  *Id.*  There is thus no dispute that Ms. Johnson told Discovery that Sky Angel would be using a "closed feed," and Ms. Johnson further admitted that "I'm sure the word 'Verizon' came up."  Ex. G at 107:16-108:10; *see also* Ex. 47 at 163:4-11 ("Kathy Johnson had told us . . . that it was similar to Verizon.").  Moreover, Sky Angel does not dispute that at the same time that its "lead" negotiator was making these statements to Discovery, Opp. at 43, internal emails at Sky Angel – not shared with Discovery – confirmed that Sky Angel was *not* a "'closed, managed system' . . . We are going over the public Internet and our service is closed (meaning subscription based or needing authorization) but we do not deliver our services over lines or bandwidth we manage or control, such as AT&T and [Verizon] FiOS."  SUMF ¶ 38; Ex. 15.

Sky Angel next claims that Mr. Scott did not tell Discovery during the 2007 negotiations that "Sky Angel would not be using the public Internet,"  Opp. at 38, but the deposition testimony speaks for itself:  Mr. Scott admitted telling Discovery that Sky Angel would not be utilizing the World Wide Web as part of its distribution methodology.  *See* Ex. 2 at 84:13-17, 85:8-17 ("Q.  Did you tell my clients, Discovery Communications and Animal Planet, that Sky Angel would not distribute Discovery Channel

and Animal Planet over the World Wide Web?  A. Yes . . . . Q.  And that would have been in 2007 before the contract was signed, correct?  A. Yes.").  And, as Mr. Scott repeatedly testified, "the World Wide Web is the public Internet."  *Id.* at 73:9-15; Ex. 51 at 89:5-7 ("Q. And you understand public Internet to mean the World Wide Web?  A.  Yes."); *see also* Ex. 15 (Sky Angel internal admission that "[w]e are going over the public Internet").  SUMF ¶ 23 is thus correct and unrebutted.

Finally, while Sky Angel suggests that there was no "lack of information provided to Discovery during the 2007 negotiations," Opp. at 39, the undisputed facts are to the contrary.  As noted above, Sky Angel never answered Discovery's detailed questionnaire and was unwilling to provide even a simple block diagram that would have explained its System.  SUMF ¶¶ 24-25.[17]  By contrast, Sky Angel did provide written responses to technology questionnaires submitted by other programmers as well as block diagrams explaining its use of the "open" Internet; several of these programmers did not subsequently sign an agreement with Sky Angel.  SUMF ¶¶ 54-55.

### 3.    Protections For Discovery In The Agreement

The Agreement contains several provisions that protected Discovery in the event Sky Angel's service indeed distributed Discovery's linear programming networks over the Internet.  SUMF ¶¶ 29-37; Cross-Mot. 32-33.  In addition to the Grant of Rights, Discovery included a unilateral termination right premised solely on its dissatisfaction with Sky Angel's distribution methodology (§ 12.1); a provision reserving to Discovery all rights not granted to Sky Angel (§ 13.1); and an indemnification provision if Sky Angel's distribution violated Discovery's other programming contracts (§ 10.3).  SUMF ¶¶ 2-7.

---

[17] While Sky Angel references two telephone calls between Mr. Myers and Mr. LaRue, Opp. at 39, the undisputed testimony cited by Sky Angel is that Mr. LaRue spent less than an hour in total discussing Sky Angel's technology with Discovery, and never provided substantive answers to Discovery's questions.  Ex. H at 260:14-21; Ex. 11 at 73:3-13, 92:18-94:4, 156:7-158:21.  Significantly, Mr. LaRue could not and did not answer questions about NeuLion's technology – which was the portion of the distribution method that utilized the Internet to distribute Sky Angel's services.  Ex. 52 (LaRue Dep. at 208:4-13, 228:2-19, 242:15-243:25); SUMF ¶¶ 25, 42.

Sky Angel does not dispute that the Agreement contains these terms; instead, it merely claims that they were not "specifically negotiated," and that "it is entirely unknown" if the termination language Discovery undisputedly added to § 12.1 is "standard, boilerplate language," as if such speculation could render the termination right a nullity.  Opp. at 40-42.

Citing no evidence, Sky Angel then questions the veracity of Discovery's contention that it "did not have a full understanding of the technology" when it entered into the Agreement.  *Id.* at 41.[18]  As to each of these points, Sky Angel ignores the testimony of the draftsperson of the Agreement, Mr. Kaminski, who expressly testified that "we had a lack of full understanding, which is why I built in termination based on distribution methodology, a carve-out from Internet in the grant of rights and full indemnification if any programming rights were violated."  SUMF ¶ 34.  As the Court has observed, "Mr. Kaminski testified that a number of protections were put into the Agreement to protect Discovery based on representations made regarding Sky Angel's technology."  Dkt. No. 172 at 37.  Mr. Kaminski further testified that the termination language he added to § 12.1 was "not standard language" (*i.e.*, it was not mere boilerplate from other contracts).  Ex. 13 at 282:6-16; *see also* Ex. 9 at 38:9-39:13, 189:18-190:19, 203:22-204:22.  And, although  Sky Angel purports to "dispute[]" that Mr. Scott "actually understood the termination right to be . . . 'additional,'" Opp. at 41, his testimony clearly says otherwise:  "Q. So there was an additional termination right for Discovery Communications relating to a right to terminate regarding the distribution methodology, correct?  A. Correct."  Ex. 2 at 195:14-18.[19]

---

[18] In this regard, Sky Angel is wrong that it has been prevented from learning about Discovery's understanding of the technology because Discovery properly invoked the attorney-client privilege over a small number of documents that assisted Mr. Kaminski in rendering legal advice.  Opp. at 41.  Sky Angel was provided with thousands of non-privileged documents about which it extensively questioned Discovery's witnesses, including Messrs. Kaminski and Myers, concerning Discovery's diligence efforts, thus belying any argument that Sky Angel has not been allowed to inquire as to Discovery's pre-contract understanding of the technology.  *See* Dkt. No. 172 at 37-38.

[19] Sky Angel contends it is disputed that Mr. Scott had a conversation with Ms. Freeman about the "word changes made in

**III.    SKY ANGEL HAS NO ANSWER FOR ITS BREACH OF § 7.1 OF THE AGREEMENT**

Sky Angel does not dispute that Section 7.1 of the Agreement required it to "immediately notify" Discovery if "any programmer . . . ceases to provide a programming service" to Sky Angel, and that, once notified, Discovery "shall be entitled to terminate this Agreement."  Ex. 1 § 7.1.  Sky Angel concedes that two other programmers (C-SPAN and Visual Arts) ceased to provide their programming services during the term of the Agreement, and that it never informed Discovery about these terminations or why they occurred.  *See* Opp. at 47-49.  The most that Sky Angel musters in response is that: (1) Sky Angel "slight[ly]" breached a "non-material provision," *id.* at 20; (2) Discovery purportedly offers "no facts" that it would have terminated the Agreement had Sky Angel provided the requisite disclosure under the Agreement, *id.* at 48; and (3) Discovery should be barred as a procedural matter from pointing to Sky Angel's breach, *id.* at 47-49.  Each of these excuses fails.

*First*, Sky Angel's breach of § 7.1 was clearly material given that the section expressly entitled Discovery to terminate the Agreement, without qualification, solely based on Sky Angel's notification of any programmer's "cessation and the reason therefore."  Ex. 1 § 7.1.  That is the paradigm example of "material."  It is also untrue that "even if Sky Angel had provided notice . . . the parties would be in the same position as they are now."  Opp. at 49.  Had Sky Angel told Discovery about these programmers' terminations when they occurred (*i.e.*, October 2008 and July 2009), *see id.*, Discovery would have been entitled to terminate the Agreement far earlier than it did.

*Second*, Sky Angel is incorrect that Discovery has not shown it would have terminated the Agreement had Sky Angel provided the obligated disclosure.  Opp. at 48-49.  Sky Angel simply ignores Mr. Goodwyn's declaration confirming exactly that:  "If Sky Angel had informed Discovery of C-

---

Section 12.1" (*i.e.,* the termination right at issue), but only cites to irrelevant deposition testimony concerning "a termination for convenience aspect in [Section] 1.11, the term clause."  Opp. at 41 (citing Ex. I at 354:7-11).

SPAN's termination of its service and the reasons why, I would have terminated our agreement with Sky Angel even sooner." Goodwyn Decl. ¶ 24.[20] Sky Angel cannot first conceal its breach so as to deprive Discovery of its right to terminate the Agreement under § 7.1, and then self-servingly speculate as to what Discovery would have done. To allow Sky Angel to do so would be to reward Sky Angel's wrongful conduct by allowing it to use its own breach as a defense.

*Finally*, there is no "procedural[] bar[]" that precludes Discovery from raising Sky Angel's admitted breach. Opp. at 47-48. When Discovery asked "whether any Programming Network has expressed concern about Sky Angel's distribution methodology," Sky Angel affirmatively misrepresented that it "is not aware of any such Programming Network." Ex. 19 (Sky Angel Resp. to Interrog. No. 15). It was not until the deposition of Sky Angel's CEO Rob Johnson – which took place less than a week before the close of fact discovery – that Sky Angel *finally admitted* that it had never notified Discovery about these programmers' terminations. *See* Ex. 3 at 204:11-205:5.[21]

Sky Angel does not dispute that its failure to abide by its contractual obligations falls within the unclean hands doctrine, Discovery's fourth affirmative defense. Dkt. No. 26 at 9; *see Mona v. Mona Elec. Grp., Inc.*, 934 A.2d 450, 474 (Md. App. 2007). Instead, Sky Angel asserts that Discovery should have informed it about its own breach, Opp. at 47-48 – a spurious position given that all relevant facts were known to Sky Angel, but not Discovery. Further, Ms. Freeman could not have testified about all

---

[20] Sky Angel further distorts the record when it claims that C-SPAN terminated its agreement "without explanation." *Compare* Opp. at 49 *with* SUMF ¶ 49; Ex. 26 (quoting email from C-SPAN that the "'IPTV [A]greement does not allow for the type of delivery' implemented by Sky Angel").

[21] Sky Angel also misconstrues Rules 26(e)(1) and 37(c)(1). Opp. at 47. Rule 26(e)(1)(A) requires supplementation *only* where "the additional . . . information has not otherwise been made known to the other parties during the discovery process." Here, Sky Angel was well aware of its failure to inform Discovery of the C-SPAN and Visual Arts terminations. Moreover, Rule 37(c)(1) exempts further supplementation where a party is "substantially justified" or when the nondisclosure is "harmless." Here, Discovery was "substantially justified" by Sky Angel's refusal to admit its breach, and any nondisclosure was "harmless" as Sky Angel cannot have been surprised by its own, knowing breach. *See S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 597 (4th Cir. 2003).

factual underpinnings of Discovery's unclean hands defense because Mr. Johnson's deposition took place *after* Ms. Freeman's deposition.[22] Ex. 3 at 1; Ex. 9 at 1.  Moreover, Sky Angel does not contest that when a party learns of an additional claim or defense in the course of discovery, a court on summary judgment may conform the pleadings to the evidence adduced during discovery.  *People for Ethical Treatment of Animals v. Doughney*, 263 F.3d 359, 367-68 (4th Cir. 2001); *Bollino v. Balt. & Ohio R.R. Co.*, 856 F.2d 186, at *3 n.1 (4th Cir. 1988) (Table); *Molex Inc. v. Wyler*, No. 04 C 1715, 2005 WL 497812, at *2 (N.D. Ill. Feb. 17, 2005) ("This Court may conform the pleadings to the evidence at the summary judgment stage and even where there has been no formal motion by the parties.").

## CONCLUSION

For the foregoing reasons, as well as those set forth in Discovery's moving brief, Discovery's cross-motion for summary judgment should be granted.

Dated:  October 2, 2014

Respectfully submitted,
WEIL, GOTSHAL & MANGES LLP

By:　　　　/s/
　　　　Peter D. Isakoff
　　　　1300 Eye Street, N.W., Suite 900
　　　　Washington, DC 20005
　　　　Telephone:  (202) 682-7000
　　　　peter.isakoff@weil.com

　　　　David L. Yohai *(admitted pro hac vice)*
　　　　Theodore E. Tsekerides *(admitted pro hac vice)*
　　　　David Yolkut *(admitted pro hac vice)*
　　　　767 Fifth Avenue
　　　　New York, NY 10153
　　　　Telephone: (212) 310-8000
　　　　Facsimile: (212) 310-8007
　　　　david.yohai@weil.com
　　　　*Counsel for Defendants*

[22] Sky Angel claims that it produced a letter to Senator Orrin Hatch that purportedly "explained the C-SPAN situation."  Opp. at 48.  That letter, however, does not address Discovery's point regarding Sky Angel's failure to notify Discovery that other programmers had terminated their agreements with Sky Angel.  Nor does it even mention Visual Arts.

**INDEX OF EXHIBITS FILED CONCURRENTLY HEREWITH**

| Exhibit | Description |
|---------|-------------|
| 45 | Excerpts to Deposition Transcript of Stephen Kaminski, dated January 28, 2014 |
| 46 | Excerpts to Deposition Transcript of Harold Furchtgott-Roth, dated February 13, 2014 |
| 47 | Excerpts to Deposition Transcript of Elisa Freeman, dated February 5, 2014 |
| 48 | Excerpts to Deposition Transcript of Charles Myers, dated January 21, 2014 |
| 49 | E-mail chain between Jacqueline Gallup, Elisa Freeman, and Darren Moorman, dated December 5, 2008 through April 14, 2009, bates numbered DIS-001664-DIS001670 |
| 50 | Excerpts to Deposition Transcript of Robert Johnson, dated February 12, 2014 |
| 51 | Excerpts to Deposition Transcript of Thomas Scott, dated January 30, 2014 |
| 52 | Excerpts to Deposition Transcript of Raymond LaRue, dated January 7, 2014 |

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on October 2, 2014, I electronically filed the foregoing with the

Clerk of the Court by using the CM/ECF system and served the same by CM/ECF upon:

> Lynn E. Calkins, Bar No. 12121
> Cheryl A. Feeley, Bar No. 28862
> Jessica L. Farmer, Bar No. 18978
> Holland & Knight LLP
> 800 17th Street, N.W., Suite 1100
> Washington, DC 20006
> (202) 955-3000 (telephone)
> Lynn.calkins@hklaw.com
> Cheryl.feeley@hklaw.com
> Jessica.farmer@hklaw.com
>
> *Counsel for Plaintiff*

                                   /s/
                          _____
                          Peter D. Isakoff