IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

SKY ANGEL U.S., LLC                    :

                                        :

        v.                              :   Civil Action No. DKC 13-0031

                                        :

DISCOVERY COMMUNICATIONS,               :
    LLC, ET AL.                         :


**MEMORANDUM OPINION**

Several motions are presently pending and ready for review in this breach of contract case: (1) a motion for partial summary judgment (ECF No. 177), filed by Plaintiff Sky Angel U.S., LLC ("Sky Angel"); (2) a cross-motion for summary judgment (ECF No. 186), filed by Defendants Discovery Communications, LLC, and Animal Planet, L.L.C. (collectively, "Defendants" or "Discovery"); and (3) motions to seal and unseal certain documents filed by both parties (ECF Nos. 179, 180, 181, and 189). The issues have been fully briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, the parties' cross motions for summary judgment will be denied. Sky Angel's motion to seal will be granted and its motion to unseal will be granted in part and denied in part. Discovery's motion to seal will be granted.

I.    **Background**

A.    **Factual Background**[1]

Sky Angel operates a national subscription-based, multichannel video distribution service that operates using Internet protocol technology ("IPTV"). Sky Angel delivers faith-based and family-friendly television channels to its subscribers. Sky Angel enters into contracts with individual content providers to receive their programming. Defendants, Discovery Communications, LLC and Animal Planet, L.L.C., are program content providers who offer family-friendly television programming.

On October 3, 2007, Sky Angel entered into an Affiliation Agreement with Defendants ("the Agreement") that was to expire on December 31, 2014. (ECF No. 177-3). Pursuant to the Agreement, Defendants agreed to provide Sky Angel a non-exclusive license and right to distribute five channels via its "Affiliate Systems": Discovery Channel, Discovery Kids Channel, Discovery Home Channel, Military Channel, and Animal Planet (together, "the Services"). In exchange for this license and the right to distribute the Services, Sky Angel agreed to pay Defendants monthly licensing fees on a per-subscriber basis. The contract provisions that are at issue in this dispute are discussed more fully below in the analysis section.

---

[1] Unless otherwise noted, the facts are undisputed.

The Agreement between the parties was negotiated primarily by Elisa Freeman and Stephen Kaminski from Discovery, and Kathy Johnson and Thomas Scott from Sky Angel.  Prior to entering into the Agreement, Discovery had Charles Myers conduct due diligence into Sky Angel's IPTV system.  Mr. Myers sought information from both Sky Angel and NeuLion, Inc. ("NeuLion").  NeuLion, Sky Angel's third-party technology vendor, assisted Sky Angel in using IPTV to deliver multiple video programming services on a subscription basis to proprietary set-top boxes.  During his due diligence review, Mr. Myers sent Sky Angel a written questionnaire regarding its system, which Mr. Myers discussed orally with Raymond LaRue, Sky Angel's engineer.  Mr. Myers also spoke with NeuLion personnel regarding its technology platform to get a more complete picture of how Sky Angel's system worked.  Because IPTV was new to Sky Angel in 2007, some of its personnel were not familiar with how Sky Angel's IPTV system operated and often directed Mr. Myers to NeuLion to answer technical questions.  (ECF No. 186-3).  Mr. Myers learned during his due diligence review that Sky Angel's System, which used NeuLion's technology, could either use the Internet or a private fiber optic circuit to transmit the programming signal from NeuLion's centralized location to subscriber's set-top boxes.  (ECF No. 177-28, at 6-9).  Mr. Myers informed Ms. Freeman and Mr. Kaminski that he was uncertain of exactly how Sky Angel's System

would be transmitting its programming, but that he had concerns that it may be using the public Internet which could implicate "rights issues" for Discovery. (ECF No. 177-28, at 9-11, 13-15, 27-30; ECF No. 177-30, at 19-20). As discussed in the analysis below, although the parties had several discussions concerning Sky Angel's technology and Discovery performed some due diligence into this issue, the parties dispute what representations were made and what understanding was reached prior to execution of the Agreement.

In February 2008, several months after the Agreement was executed, Sky Angel launched its services to Sky Angel subscribers. (ECF No. 177-40 ¶ 5). Sky Angel's system used IPTV to deliver video programming services over a closed and encrypted path to NeuLion's central location for subsequent distribution over the Internet to proprietary set-top boxes provided by NeuLion. The NeuLion set-top boxes, which were owned or leased by Sky Angel subscribers, received the programming signals in order for the subscriber to view the Services on their televisions. From February 2008 through mid-December 2009, Sky Angel received no complaints from Discovery regarding its distribution methods, and believed it was in compliance with the parties' Agreement.

On November 8, 2009, Discovery received a letter from DISH Network, one of its larger clients, informing it that it had

"recently become aware of distribution [of Discovery's programming] by the IPTV distributor known as Sky Angel." (ECF No. 177-9). DISH requested, via the Most Favored Nation ("MFN") clause in its contract with Discovery, to be given the same "Internet Rights and Mobile Rights" that were given to Sky Angel. (ECF No. 178-4). Discovery responded on November 25, 2009, stating, *inter alia*, "Thank you for bringing the Sky Angel matter to our attention. We will review the matter and take appropriate action. . . . We trust that this is sufficient to resolve the matters raised in your letter[.]" (ECF No. 177-11).

On November 22, 2009, William Goodwyn, President of Discovery's Domestic Distribution group, wrote an email to Elisa Freeman asking:

> When you have a moment, take a look at Sky Angel to see how they are positioning themselves in the marketplace, how they talk about their service, and also see what other cable nets are also on their platform, etc,. I want to see if there are any sensitivities around this for us.
>
> Dish is making an issue around our granting IPTV rights to them so I would like to see what may be problematic for us.

(ECF No. 177-10, at 3). Ms. Freeman checked Sky Angel's website and wrote back the same day, stating:

> On their website they market themselves as:
>
> "Sky Angel is a revolutionary television that uses your high-speed Internet service to deliver over 70 faith and family channels

5

> — not to your computer — but directly to
> your TV.   The service comes with the Sky
> Angel set-top box that delivers a digital-
> quality picture and does not require an
> outside dish, antenna, or professional
> installation."

(*Id.* at 2).   Based on this information alone, Mr. Goodwyn decided to terminate the Agreement.   (ECF No. 177-37, at 69-76).

In mid-December 2009, Elisa Freeman telephoned Tom Scott of Sky Angel to inform him that Discovery was terminating the Agreement.   The only details she would provide Mr. Scott were that the decision was coming from senior management and because Discovery was uncomfortable with Sky Angel's distribution methodology it was exercising its right to terminate under § 12.1 of the Agreement.   (ECF No. 177-27, at 45-51).   Thereafter, Brian Collins, the Senior Vice President of Programming for Sky Angel, telephoned Ms. Freeman asking for additional information regarding the termination and inquiring whether there were any specific concerns Discovery had with Sky Angel's distribution methodology, but again was provided no additional information. (ECF No. 177-33, at 4-8).   On January 22, 2010, Discovery sent Sky Angel a termination letter stating:

> We have determined that the distribution
> methodology used by and on behalf of [Sky
> Angel] is not satisfactory.   Accordingly,
> pursuant to Section 12.1 of the Agreement,
> we hereby elect to terminate the Agreement.
> In order to provide for an orderly
> transition process, including notification
> to your subscribers, we will provide you

> with a three (3) month transition period;
> accordingly, the Agreement will terminate
> effective on April 22, 2010.

(ECF No. 177-12). Sky Angel's response, dated March 4, 2010, stated that:

> [D]iscovery has known that Sky Angel
> operates an IP System for its distribution
> of video programming, as provided for in []
> the Affiliation Agreement. The IP System
> operated by Sky Angel has functioned
> flawlessly throughout the term of the
> Affiliation Agreement, Discovery did not
> object to it for more than two years, and
> Discovery has no reasonable basis for any
> belief that this IP distribution methodology
> is in any way unsatisfactory.

(ECF No. 177-13, at 2). In this letter, Sky Angel also offered to "cooperate in establishing the security of its system to Discovery's reasonable satisfaction." (*Id.* at 3). On March 19, 2010, Defendants responded reiterating that Discovery's decision to terminate the Agreement was based on § 12.1 of the Agreement, but providing no additional details, and confirming that Sky Angel's access to Discovery's programming would cease on April 22, 2010. (ECF No. 177-14).

In an effort to avert termination, Sky Angel filed an emergency petition with the Federal Communications Commission ("FCC") seeking to halt any disruption in programming signals. (ECF No. 177-34, at 3-4). The FCC denied Sky Angel's request for a temporary injunction (*Id.* at 4), but Discovery made several representations to the FCC that provide additional

details regarding its termination decision.  Discovery explained
to the FCC that it had terminated its agreement with Sky Angel
because it had identified "serious and irreparable business
risk[s] in the form of damaged relations with its distributors,
who might view [Discovery] as having granted Sky Angel rights
that it refused them and that Discovery claimed not to grant
anyone." (ECF No. 177-38, at 10).  Discovery also stated that
it could potentially face legal or business risks if any of its
distributors viewed Sky Angel's distribution methodology as
exceeding the distribution rights that Discovery itself has.
(*Id.* at 3-5).  Discovery further represented that:

> The extensive due diligence conducted by
> Discovery regarding the nature of Sky
> Angel's distribution network underlines the
> experimental nature of the affiliation.  Sky
> Angel carefully parses that it does not make
> available programming via the Internet.  But
> it does not deny that it uses the Internet
> to distribute its programming.  No other
> distributor of Discovery's linear
> programming networks uses the Internet as
> the distribution path to end users, which
> was precisely why Discovery considered the
> affiliation to be an experiment.

(ECF No. 177-17, at 6) (footnotes omitted).[2]

_____

[2] As described by William Goodwyn of Discovery, a linear
programming network is a:

> full and continuous 24-hour, 7-day year-
> round feed of the programming appearing on a
> particular network at set times and on a
> defined and predetermined set schedule from
> week to week.  This means that the

On April 22, 2010, Discovery ceased disseminating its programming to Sky Angel. (ECF No. 177-41 ¶ 18). During 2009 and early 2010, the five Discovery channels were among the most popular channels that Sky Angel carried. Upon Discovery's termination, many subscribers called and emailed Sky Angel to complain and cited the loss of Discovery programming as the reason they decided to terminate Sky Angel's services. (ECF Nos. 177-44 ¶ 7; 177-40, at 72-76; 177-32). Sky Angel asserts that it sustained financial losses of approximately $6.3 to $9.5 million due to this loss of subscribers. (ECF No. 176-48 and 177-46).

### B.   Procedural Background

On January 3, 2013, Sky Angel filed a complaint asserting that Defendants' termination of the Agreement constituted a breach of contract. (ECF Nos. 1 and 5). On March 1, 2013, Defendants filed their answer. (ECF No. 23). On July 9, 2013, Defendants' motion for judgment on the pleadings was denied (ECF No. 37), and discovery commenced. On February 18, 2014, discovery closed and Defendants filed a motion for a jury trial.

---

> individual discrete programs appearing on the network appear in a linear fashion one after the other. [] [T]here are also commercial advertisements throughout the linear programming.

(ECF No. 187, at 2).

(ECF No. 108).   On June 30, 2014, the motion for a jury trial was denied.

On July 21, 2014, Plaintiff filed a motion for partial summary judgment, seeking judgment against Defendants as to liability, along with a motion to seal.  (ECF Nos. 177 and 179).  The following day, Plaintiff filed a motion to *unseal* other unredacted documents.[3]  (ECF No. 180).   On August 11, 2014, Defendants opposed Plaintiff's motion for partial summary judgment and filed a cross-motion for summary judgment, along with a motion to seal.[4]  (ECF Nos. 186 and 189).   The parties' cross motions for summary judgment have been fully briefed.  (ECF Nos. 194 and 196).

## II.  Cross Motions for Summary Judgment

Sky Angel argues that it is entitled to partial summary judgment against Defendants as to liability for breach of contract.[5]   According to Sky Angel, Discovery breached the

---

[3] Plaintiff's motion to unseal has been fully briefed.  (ECF Nos. 185 and 192).   On August 6, 2014, Plaintiff also filed a consent motion temporarily to seal previously filed documents.  (ECF No. 181).

[4] Plaintiff opposed Defendants' motion to seal (ECF Nos. 193), and Defendants filed a supplement (ECF No. 195).

[5] Sky Angel notes that the expert it hired to assess its damages disagrees with Discovery's expert on the extent damages incurred.   It notes that "[a]s the quantum of damages is in dispute, the determination will need to be made by the fact finder upon the presentation of evidence."  (ECF No. 177-1, at 28 n.11).

Agreement by prematurely terminating it without a valid justification.  Sky Angel contends that the termination was a business decision made after DISH, who also does business with Discovery, demanded increased distribution rights based on Discovery's Agreement with Sky Angel.  Sky Angel asserts that Discovery's termination was in breach of the Agreement because it was not related to Sky Angel's performance under the Agreement and was not consistent with Sky Angel's reasonable expectations based on the terms of the Agreement.  Sky Angel argues that it has been injured because it lost existing and future subscribers and their subscription fees due to Discovery's early termination.  (ECF No. 177-1, at 50).

In response, Discovery argues that, not only is Sky Angel not entitled to summary judgment, but instead summary judgment should be entered in its favor because the Agreement makes clear that Sky Angel's method of distributing Discovery's programming *via the Internet* violated the Agreement, specifically the Grant of Rights provision.  Discovery contends that as soon as it learned of Sky Angel's improper distribution method, it exercised its rights in good faith, terminating the Agreement under § 12.1, the specifically-negotiated termination provision that permitted termination if at any time Discovery was "dissatisfied with Sky Angel's 'distribution methodology.'" (ECF No. 186-1, at 8).

11

A.    Standard of Review

A court may enter summary judgment only if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Emmett v. Johnson,* 532 F.3d 291, 297 (4th Cir. 2008).  Summary judgment is inappropriate if any material factual issue "may reasonably be resolved in favor of either party."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986); *JKC Holding Co. LLC v. Wash. Sports Ventures, Inc.,* 264 F.3d 459, 465 (4th Cir. 2001).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'"  *Bouchat v. Balt. Ravens Football Club, Inc.,* 346 F.3d 514, 522 (4th Cir. 2003) (*quoting* former Fed.R.Civ.P. 56(e)).  "A mere scintilla of proof . . . will not suffice to prevent summary judgment."  *Peters v. Jenney,* 327 F.3d 307, 314 (4th Cir. 2003).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Liberty Lobby,* 477 U.S. at 249-50 (citations omitted).  At the same time, the court must construe the facts that are presented in the light most favorable to the party opposing the motion.  *Scott v. Harris,* 550 U.S. 372, 378 (2007); *Emmett,* 532 F.3d at 297.

"When cross-motions for summary judgment are before a court, the court examines each motion separately, employing the familiar standard under Rule 56 of the Federal Rules of Civil Procedure." *Desmond v. PNGI Charles Town Gaming, LLC,* 630 F.3d 351, 354 (4th Cir. 2011).  The court must deny both motions if it finds there is a genuine dispute of material fact, "[b]ut if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment." 10A Charles A. Wright, et al., *Federal Practice & Procedure* § 2720 (3d ed. 1998).

**B.   Objective Good Faith Standard for Evaluating Discovery's Dissatisfaction**

The crux of the parties' dispute is whether Discovery's termination under § 12.1 of the Agreement, which was premised on its dissatisfaction with Sky Angel's distribution methodology, was a proper exercise of its termination rights or whether it was a breach of the Agreement.  Section 12.1, the "Default and Termination" provision states, in relevant part, that:

> Due and timely performance by [Sky Angel] is of the essence hereof.  If [Sky Angel] defaults in the (a) making of any payments hereunder or (b) performance of any of its material obligations hereunder, . . . then [Discovery] may, in addition to any and all other rights which [Discovery] may have against [Sky Angel], terminate this Agreement by giving written notice to [Sky Angel] at any time after the occurrence of an Event of Default. . . .  Notwithstanding anything to the contrary herein, *in the*

13

> *event [Discovery] determines that the*
> *Service signal integrity or the Service*
> *signal security measures or distribution*
> *methodology used by or on behalf of [Sky*
> *Angel] are not satisfactory, [Discovery]*
> *shall have the right to terminate the*
> *Agreement.*

(emphasis added).

As noted in the July 9, 2013 memorandum opinion:

> Where a contractual provision conditions
> continued performance on the satisfaction of
> a party, the "exercise of judgment [by the
> party to be satisfied] must be in accordance
> with the duty of good faith and fair
> dealing" to preclude the contract from being
> rendered illusory. Restatement (Second)
> Contracts § 228 cmt. a (1981); *see also*
> *Questar Builders, Inc. v. CB Flooring, LLC,*
> 410 Md. 241, 273 (2009) (explaining that, in
> Maryland, "a party with [contractual]
> discretion is limited to exercising that
> discretion in good faith and in accordance
> with fair dealing"). Good faith is a
> question of fact that, depending on the
> nature of the contract, is assessed pursuant
> to one of two standards: an objective
> standard of reasonableness or a subjective
> standard of honest satisfaction. *See, e.g.,*
> *First Nat'l Realty Corp. v. Warren-Ehert*
> *Co.,* 247 Md. 652, 658-59 (1967); *Questar,*
> 410 Md. at 281-82.
>
> The subjective standard typically applies to
> satisfaction clauses found in contracts
> involving matters of "fancy, personal taste,
> or judgment." Williston on Contracts §
> 38:23 (4th ed. updated 2013); *see also*
> *Clancy v. King,* 405 Md. 541, 565 n.24 (2008)
> (subjective standard applied to a contract
> provision pursuant to which an author
> retained creative control over a television
> project); *Ferris v. Polansky,* 191 Md. 79, 86
> (1948) (subjective standard applied to an
> inn owner's contract with a band). The

> objective standard applies to contract
> provisions that require satisfaction "as to
> mechanical fitness, utility, or
> marketability" and "in other situations in
> which a performance or objective test is
> feasible." Williston on Contracts §§ 38:21,
> 38:24 (4th ed. updated 2013). "If there is
> ambiguity in the contract in regard to which
> test applies, the Courts will prefer a
> construction that the objective test applies
> inasmuch as this test is more likely to
> prevent a forfeiture." *Volos, Ltd. v.*
> *Sotera,* 264 Md. 155, 170 (1972); *see also*
> Restatement (Second) Contracts §228, cmt. b
> (expressing a general preference for an
> objective standard).

(ECF No. 37, at 12-14).  In their summary judgment papers, the

parties made arguments under both the objective and subjective

standards, but both parties believe that the objective standard

of satisfaction should apply.  (ECF Nos. 177-1, at 33-35 and

186-1, at 35).  Based on a review of the record and supporting

case law, the undersigned agrees.

As noted in *Questar Builders*, the objective standard of

good faith and fair dealing asks whether the party to-be-

satisfied has exercised its discretion "in accordance with the

'reasonable expectations of the other party.'  What constitutes

a 'reasonable expectation,' of course, depends on the language

of the contract."  410 Md. at 282; *see also First Nat. Realty*

*Corp.*, 247 Md. at 655-62 (finding that the contractor's

dissatisfaction with and subsequent termination of the

subcontractor was not reasonable because the contractor's

15

allegations that the subcontractor delayed the project were not supported by the record).  In *Questar Builders,* 410 Md. at 274, the Court of Appeals of Maryland applied an objective standard of good faith to the construction contract at issue finding that the "termination for convenience provision" did not permit the contractor to terminate the contract for any reason whatsoever or no reason at all because that would make the contract illusory; rather, the court found that the provision was "subject to the implied limitation that [it] be exercised in good faith and in accordance with fair dealing." *Id.* at 279. Similarly, in *Simpson v. Prudential Ins. Co. of Am.,* 227 Md. 393 (1962), the Court of Appeals of Maryland held that an objective test of insurability should be applied to the insurance company's contract clause that required it to "*determine to its satisfaction* that the proposed insured was insurable on [the date in question] on the plan, for the amount, for the benefits and at the premium rate applied for[.]" *Id.* at 405-06 (emphasis added).  The court determined that:

> the explicit terms as to plan, amount, benefits and premium rates do strongly suggest the existence of some definite, ascertainable standard of insurability. . . . We think that the clause means that the applicant must meet an objective standard of insurability[.]

As with the contract provisions at issue in *Questar Builders* and *Simpson,* the Agreement's termination provision, specifically the

16

portion permitting Discovery to terminate based on its dissatisfaction with Sky Angel's distribution methodology, did not permit Discovery to terminate based on any reason whatsoever; rather, sections 1.1.2, 2, and 7 of the Agreement provide specific guidelines for Sky Angel regarding its distribution of Services. Accordingly, these guidelines provide objective criteria by which to measure Discovery's satisfaction with Sky Angel's distribution methodology.

Moreover, in *Ard Dr. Pepper Bottling Co. v. Dr. Pepper Co.,* 202 F.2d 372, 376 (5th Cir. 1953), the United States Court of Appeals for the Fifth Circuit clarified that once a party has alleged that a party has not acted in good faith in terminating the contract, the moving party has the burden of proving that the contract was wrongfully terminated. In that case, Dr. Pepper was permitted to terminate its licensing contract with its distributor if it made a good faith determination that the distributor had violated the agreement. The agreement required the distributor, among other things, to use "modern, automatic, and sanitary equipment" and "faithfully [to] promote the sale" of Dr. Pepper. Dr. Pepper presented evidence to justify its termination, including evidence of the distributor's unsanitary conditions and the distributor's failure to comply with the advertising expenditures required under the license agreement. The court found that the plaintiff had provided "no evidence of

actual ill will [in terminating the contract], nor of financial advantage to Dr. Pepper. . . .   If [plaintiff] would make out his case by proof of performance, such proof must extend to such perfect performance as would negative Dr. Pepper's good faith." *Id.* at 377.   Accordingly, Sky Angel bears the burden of proving that the Agreement was wrongfully terminated, and as a part of this burden, it must show that its distribution of services was fully in compliance with the terms of the Agreement in order to establish that Discovery's termination was wrongful.

### C.   Discovery's Dissatisfaction with Sky Angel's Distribution Methodology

### 1.   Distribution Methodology Based on § 2 of the Agreement

Discovery first argues that its dissatisfaction with Sky Angel was objectively reasonable and in good faith because § 2 of the Agreement, the "Grant of Rights" provision, purportedly bars Sky Angel from distributing its services "via the Internet."   Discovery argues that it is entitled to summary judgment based on this provision alone, which justified its termination of the Agreement after it learned from Sky Angel's website that Sky Angel "use[d] [subscribers'] high-speed Internet service to deliver" its programming.   (ECF No. 186-1 ¶ 57).

Sky Angel responds that Discovery's argument is premised on a flawed reading of the Grant of Rights provision that is not

objectively reasonable.  Sky Angel argues that the clause "via the Internet" in the Grant of Rights provision describes "a limitation on the means by which Sky Angel will enable Subscribers to *view* the programming after the signal reaches the set-top box — not on the distribution methodology Sky Angel can use to get the signal to the set-top-box." (ECF No. 194, at 23) (emphasis in original).  In addition, Sky Angel argues that even if the termination decision was based on a violation of the Grant of Rights provision it was unreasonable because Discovery did not review its contractual terms with Sky Angel nor investigate Sky Angel's actual use of the Internet to distribute its programming prior to terminating the Agreement.

As noted by Judge Quarles in *Ambling Mgmt. Co. v. University View Partners, LLC,* 581 F.Supp.2d 706, 712 (D.Md. 2008):

> In Maryland, the interpretation of a contract is a question of law, and courts interpret contracts objectively. *Nova Research, Inc. v. Penske Truck Leasing Co.,* 405 Md. 435, 448 (2008).  The Court seeks to ascertain the parties' intent. *Phoenix Servs. Ltd. P'ship v. Johns Hopkins Hosp.,* 167 Md.App. 327, 391 (Md.Spec.App. 2006). If a contract is unambiguous, the Court gives effect to the terms' plain meaning, not what the parties subjectively intended. *Nova Research, Inc.,* 405 Md. at 448.  "A contract is ambiguous if, when read by a reasonably prudent person, it is susceptible of more than one meaning." *Id.*  "A contract is not ambiguous merely because the parties do not agree as to its meaning." *Floyd v.*

> *Mayor of Baltimore,* 179 Md.App. 394, 451
> (Md.Spec.App. 2008).

The disputed portion of the Grant of rights provision reads as follows:

> [Sky Angel] acknowledges and agrees that the
> rights granted to [Sky Angel] herein are
> limited to *distribution* of the Services for
> *viewing by Subscribers* on television sets on
> a subscription basis and not for viewing on
> personal computers or otherwise **via the
> Internet.**

(ECF No. 177-3 § 2 "Grant of Rights") (emphasis added).  The
parties dispute whether the clause "via the Internet" modifies
distribution or viewing.  As aptly noted by Plaintiff, a
subordinate clause generally modifies only the word or phrase
immediately preceding it.  *See* William Strunk & E.B. White, *The
Elements of Style* 29-30 (3d ed. 1979) ("Modifiers should come,
if possible, next to the word they modify."); *cf. Sullivan v.
Dixon,* 280 Md. 444, 451 (1977) (describing the principle used in
statutory interpretation that "a qualifying clause ordinarily is
confined to the immediately preceding words or phrase").
Indeed, as recognized by the United States Court of Appeals for
the Fourth Circuit in *Bakery & Confectionary Union & Indus.
Int'l Pension Fund v. Ralph's Grocery Co.,* 118 F.3d 1018, 1026
(4th Cir. 1997), "[g]rammatical construction of contracts
generally requires that a qualifying phrase be construed as
referring to its nearest antecedent . . . .  This is not only

20

the better grammatical construction of the clause, it is also the more plausible construction." *Id.* (internal quotations and citations omitted). Discovery's interpretation alleging that "otherwise via the Internet" is not a qualifier of viewing but an "***equal alternative*** to the proscription of distribution of the Services on personal computers" is a forced and awkward interpretation of the language in question. A reasonable person reading this language would believe it is capable of only one interpretation – that Sky Angel was granted the limited right to let its subscribers view Discovery's programming on television sets, but was not permitted to allow subscribers to view programming on personal computers or other devices capable of streaming the programming over the Internet.

When the disputed language is looked at in context, it is clear that the Grant of Rights provision is meant to limit the manner in which Sky Angel subscribers may *view* Discovery programming, rather than unequivocally to prohibit Sky Angel from using the Internet during distribution. Although the Grant of Rights provision repeatedly mentions distribution, this section merely regulates the manner in which Sky Angel may *exhibit* and subscribers may *view* the programming:

> [Discovery] hereby grants to [Sky Angel] and
> [Sky Angel] hereby accepts, subject to the
> terms and conditions hereof, a non-exclusive
> license and right to *distribute and exhibit*
> the Services to Subscribers of [Sky Angel]

> Systems within the Territory, for *viewing by
> such Subscribers on television sets* on a
> subscription basis, during the Term and the
> right, subject to the further provisions of
> this Agreement, to sell and obtain revenue
> from certain commercial announcements
> presented in the course of *distributing and
> exhibiting the Services via television*. . .
> . [Sky Angel] acknowledges and agrees that
> the rights granted to [Sky Angel] herein are
> limited to *distribution* of the Services for
> *viewing by Subscribers on television sets* on
> a subscription basis and *not for* viewing on
> personal computers or otherwise ***via the
> Internet.***

(ECF No. 177-3 § 2 "Grant of Rights") (emphases added).

Accordingly, Discovery cannot base termination of the Agreement

on a reading of this provision alone.

## 2. Distribution Methodology Based on the Agreement as a Whole

Discovery next contends that, even if the court finds that

it is not entitled to summary judgment as a matter of law based

on § 2, it nevertheless could have terminated the Agreement

properly due to dissatisfaction with the distribution

methodology based on the Agreement as a whole.  For summary

judgment purposes, however, Discovery argues that the evidence

is conflicting.  It argues that Sky Angel's motion for summary

judgment must be denied because it "rests on a fundamental

mischaracterization of the parties' rights and obligations under

the Agreement, relies upon heavily-disputed facts, and requires

the Court to make numerous credibility determinations."  (ECF

22

No. 186-1, at 10). Discovery argues that Sky Angel's motion fails under the objective standard because there is a genuine dispute over whether Discovery's termination was made in accordance with the reasonable expectations of Sky Angel, as the parties heavily dispute the underlying issue of whether Sky Angel's use of the Internet to distribute Discovery's linear services violated the parties' Agreement. Specifically, Discovery contends that there are disputed facts around the parties' pre-contract negotiations and what rights the parties actually believed had been granted to Sky Angel.

Sky Angel argues that Discovery's termination rights were limited by the Agreement and when Discovery terminated the Agreement, it did not have an adequate contractual basis for termination. (ECF No. 177-1, at 26). Specifically, Sky Angel points to Discovery's January 22, 2010 letter that advised Sky Angel that, "[Discovery has] determined that the distribution methodology used by and on behalf of [Sky Angel] is not satisfactory." (ECF No. 177-12). Sky Angel states that "when a contract grants a party discretion to terminate or calls for the party's satisfaction with the other party's performance, the party exercising discretion may not do so arbitrarily or capriciously but must exercise its discretion in accordance with the reasonable expectations of the other party." (ECF No. 177-1, at 32). According to Sky Angel, "[t]he parameters and

requirements of distribution set forth in Sections 1.1.2 and 7.1 of the Agreement provide definite and objective criteria by which Discovery's purported dissatisfaction with Sky Angel's distribution methodology may be tested for reasonableness." (ECF No. 177-1, at 35).  Sky Angel goes on to argue that Discovery's dissatisfaction was unreasonable based on the objective criteria set forth in the Agreement and the undisputed facts regarding its actual distribution of Discovery's programming, which would have satisfied a reasonable person.

First it must be determined whether the Agreement, when read as a whole, unambiguously banned Sky Angel from using the Internet to distribute Discovery's Services.  In discussing whether a contract's language is ambiguous, meaning it is "susceptible of more than one meaning," the court in *Ambling Mgmt. Co.,* 581 F.Supp. at 712-13, noted:

> To determine whether contract language is susceptible to more than one meaning, the Court can consider "the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution."  *Id.,* 946 A.2d at 48-49.  The Court considers "the customary, ordinary and accepted meaning of the language used." *Nova Research, Inc.,* 405 Md. at 448, 952 A.2d at 283 (*quoting Atl. v. Ulico,* 380 Md. 285, 301, 844 A.2d 460, 469 (2004)). Whether a contract is ambiguous is itself a question of law for the Court.  *Essex Corp. v. Susan Katharine Tate Burrowbridge, LLC,* 178 Md.App. 17, 32, 940 A.2d 199, 207 (Md.Spec.App. 2008).  If the contract is unambiguous, and there is no dispute of

> fact, summary judgment is proper. *Bollech v. Charles County, Maryland,* 166 F.Supp.2d 443, 455 (D.Md. 2001).
>
> If there is ambiguity, the Court reviews extrinsic evidence to determine the parties' intent, including dictionaries, the history of the parties' negotiations, the parties' conduct and an interpretation of the term used by one of the parties before the dispute arose. *Holland v. Psychological Assessment Res., Inc.,* 482 F.Supp.2d 667, 673-74 (D.Md. 2007); *Ohio Cas. Ins. Co. v. Chamberlin,* 172 Md.App. 229, 241, 914 A.2d 160, 167 (Md.Spec.App. 2007). If extrinsic evidence is dispositive of the term's meaning, the Court may grant summary judgment. *Holland,* 482 F.Supp.2d at 674. However, if after resorting to extrinsic evidence there is a genuine dispute with respect to interpretation, summary judgment is improper and the trier of fact decides the proper interpretation. *Id.; see Bd. of Educ. of Charles County v. Plymouth Rubber Co.,* 82 Md.App. 9, 26, 569 A.2d 1288, 1296 (Md.Spec.App. 1990) ("Only when there is a *bona fide* ambiguity in the contract's language or legitimate doubt as to its application . . . is the contract submitted to the trier of fact for interpretation.").

There are several provisions in the Agreement aside from the Grant of Rights that delimit Sky Angel's distribution of Discovery's Services. First, the opening paragraph of the Agreement states that Discovery and Sky Angel are agreeing to the "distribution and exhibition" of Discovery's programming on Sky Angel's "Affiliate Systems." In the Definitions section that follows, Affiliate System is defined as either a "cable

television system" or "IP System." (*See* ECF No. 177-3 § 1.1).

An "IP System" is subsequently defined in § 1.1.2 as:

> A multichannel video distribution system which utilizes Internet protocol ("IP") technology to deliver video programming services over a closed and encrypted transmission path over a national fiber-optic network to a central location for subsequent distribution of such video programming services with proprietary-encoding over a high-speed data connection to set-top-boxes that are secured by industry-standard encryption and conditional access technologies and are connected to Subscribers' television sets.

In addition, section 7 titled "Distribution of Services by Affiliate" provides numerous requirements pertaining to Sky Angel's distribution methodology, the most relevant of which in § 7.1 states: "[Sky Angel] shall encrypt each of the Service signals or use a substantially similar method of security to secure each of the Service signals from [Sky Angel]'s point of receipt of the Service signals through the points of reception by the Service Subscribers."

Sky Angel argues that its distribution method, which utilized the Internet, met the parties' agreed upon definition of IP System and the distribution requirements in § 7.1.[6]   Sky

---

[6] Specifically, Sky Angel asserts that:

> [i]t applied proprietary encoding to protect the signals from unauthorized access, and transmitted the encrypted signals over national fiber-optic network to a central

26

Angel specifically points to the definition of IP System and notes that it does not include a "prohibition against the use of the Internet and no restriction on what would constitute the 'high-speed data connection.'" (ECF No. 194, at 22).

Discovery takes issue with the second transmission path in Sky Angel's distribution process, which used the public Internet to transmit its Services to end users. Discovery argues that this second distribution path is not in compliance with the parties' Agreement, by pointing to deposition testimony from Raymond LaRue, Sky Angel's head engineer, who admitted that "[Sky Angel] can't control the [distribution pipe transmitted over the Internet] from NeuLion to the set-top box" of the subscriber, because the subscriber "provides his own service to the Internet." (ECF No. 186-8, at 12-13). Discovery argues that it "never agreed to license Sky Angel rights to distribute

---

> location (NeuLion's headend facilities). The programming signals were subsequently transmitted through a *high-speed Internet* connection to subscribers' set-top boxes, protected by proprietary encoding, where, only then, they could be decoded and made available for viewing on connected television sets.

(ECF No. 177-1, at 37) (emphasis added) (internal citations omitted). Sky Angel also asserts that it is in compliance with § 7.1 as it "encoded Discovery's content prior to transmission, and the content remained protected from access until it reached subscribers' authenticated set-top boxes." (*Id.* at 38). Sky Angel acknowledges, however, that it used the Internet as its second transmission path to send the encoded content.

its Service via the Internet or on a portable basis (*i.e.,* anywhere the subscriber had an Internet connection.)" (ECF No. 186-1, at 21). Discovery points to the fact that "[t]he parties negotiated a definition of 'IP System' that did not reference the Internet[,]" and states that just because Internet distribution was not expressly banned does not mean one can infer a positive grant of rights especially in light of § 13.1, which reserved all rights not granted to Discovery. (ECF No. 186-1, at 14, 18).

After reviewing the Grant of Rights provision, the parties' definition of IP System, and the distribution requirements set forth in § 7 of the Agreement, the Agreement is ambiguous as to whether Sky Angel was permitted to use the public Internet as its second distribution path. Moreover, based on the plain language of the Definitions section, it is not possible to distill the parties' intent as to whether the Internet constitutes "proprietary-encoding over a high speed data connection" and therefore, whether it would have been permissible for Sky Angel to use the Internet as part of its IP System. Because the Agreement lacks specificity as to this issue, and both parties' interpretations are plausible based on the plain language of the Agreement, extrinsic evidence must be examined.

### 3.   Distribution Methodology Based on the Parties' Pre-Contract Negotiations

Discovery contends that the definition of IP System in the Agreement intentionally did not reference the Internet, because during pre-contract negotiations it expressly communicated that it could not permit Sky Angel to use the public Internet as a distribution method.  (ECF No. 186-1, at 15-18).  Discovery also asserts that Sky Angel communicated during negotiations that it would not be using the public Internet, but rather a closed, private transmission path similar to that employed by Verizon. According to Discovery, when it attempted to obtain more information to clarify how Sky Angel's distribution technology actually worked, Sky Angel would answer incompletely or defer to NeuLion,[7] who informed Discovery that its technology could transmit services over the Internet *or* through a private fiber. (ECF No. 186-1, at 13-16).  Discovery contends that it specifically bargained for a broad termination provision based on "distribution methodology" due to its lack of understanding about how Sky Angel's distribution technology operated.  (*Id.* at 17).

Sky Angel responds that Discovery understood, at the time it signed the Agreement, that Sky Angel may be using the

---

[7] NeuLion is Sky Angel's third party vendor who provided part of the technology for Sky Angel's Internet protocol System, which delivered the programming to subscribers.

Internet as part of its distribution methodology.   Sky Angel points out that Charles Myers, the Discovery engineer who had been slated to perform pre-contract due diligence concerning Sky Angel, was informed that NeuLion used the Internet to transmit content and that Mr. Myers communicated this information to Discovery.   (ECF Nos. 177-1, at 14 and 194, at 35). Accordingly, Sky Angel claims that Discovery had knowledge that Sky Angel may be using the Internet and if "Discovery had wanted to ensure that Sky Angel would not use the Internet as part of its distribution methodology, it could have included an express prohibition in the Agreement — but it did not."   (ECF No. 194, at 33).

The parties' evidence regarding pre-contract negotiations does not resolve as a matter of law whether Sky Angel was prohibited from using the Internet *in any manner* to distribute Discovery's programming, such that Discovery's observation of advertising language on Sky Angel's website indicating as much, was reasonable grounds for terminating the Agreement.   It is disputed whether Discovery clearly communicated to Sky Angel that Sky Angel was prohibited from using the "public Internet" to transmit its signal and whether Sky Angel represented that it would not be using the "public Internet."[8]   Indeed, the evidence

---

[8] Elisa Freeman has stated that she informed Thomas Scott and Kathy Johnson from Sky Angel that Discovery could not permit

presented   suggests   that   the   parties'   may   have   been
inconsistently  using  terminology,  including  "public  Internet"[9]
and  "closed  feed,"  such  that  communications  were  muddled.  (ECF
No.  186-3,  at  8-27  and  186-5,  at  2-3).   Neither  party  is
entitled  to  summary  judgment  because  there  are  genuine  disputes
of  material  fact  as  to  this  issue.

### D.  Discovery's Honest Dissatisfaction and Extra-Contractual Reasons for Termination

There  is  also  a  genuine  dispute  as  to  whether  Discovery's
termination  was  based  on  an  extra-contractual  reason  or
Discovery's  honest  and  reasonable  dissatisfaction  with  Sky
Angel's  distribution  methodology.   According  to  Sky  Angel,
Discovery's  true  reason  for  terminating  the  Agreement  was
because  DISH  Network,  one  of  Discovery's  most  lucrative
customers,  learned  that  Sky  Angel  had  been  given  more  favorable
distribution  rights,  and  requested  via  the  most  favored  nation

---

Sky  Angel  to  use  to  use  the  "public  Internet"  (ECF  No.  186-10,
at  8-9),  and  that  Mr.  Scott  and  Ms.  Johnson  indicated  at  some
point  during  the  negotiation  process  that  Sky  Angel's  technology
did  not  use  the  "World  Wide  Web"  (ECF  No.  186-3,  at  26-27),  but
rather  a  "closed  feed  similar  to  Verizon."   (ECF  Nos.  186-5,  at
3  and  186-9,  at  2).   Sky  Angel,  however,  disputes  this  fact,
stating  that  it  explained  to  Discovery  that  the  Internet  was
part  of  its  distribution  methodology.   (ECF  No.  186-3,  at  15-
16).

[9] Although  the  parties'  use  of  this  term  varies,  Discovery
seems  to  be  arguing  that  during  negotiations  its  use  of  this
term  meant  that  Sky  Angel  could  not  use  the  public  Internet
infrastructure  to  transmit  its  programming,  rather,  it  must  use
its  own  private  fiber  optic  circuits.

("MFN") provision in its contract with Discovery to be given the same treatment. (ECF Nos. 177-1, at 44). Rather than contesting DISH's request or taking a financial loss by providing DISH the distribution rights it sought,[10] Sky Angel contends that Discovery decided to cut its losses and terminate its Agreement with Sky Angel in order to avoid having to provide these rights to DISH. Sky Angel argues that Discovery knew prior to receiving the letter from DISH that Sky Angel was using the Internet as part of its IP System and thus, its purported dissatisfaction is dishonest and there were ulterior business motives for its termination decision.

Discovery argues that although it was aware at the time the Agreement was executed that Sky Angel might be using the Internet, it did not know for sure and when it attempted to seek such information it was "stone-walled" by Sky Angel. (ECF No. 186-1, at 43). Accordingly, it argues that when it received the letter from DISH informing it that Sky Angel was in fact using

---

[10] In his deposition, Discovery's Senior Vice President, Jeffrey Cross, stated that Internet distribution rights call for higher pricing than "standard cable rights." (ECF No. 177-38, at 15). Accordingly, based on the MFN provisions in DISH and other distributor's contracts, Discovery was concerned that it may be forced to give DISH and other distributors additional distribution rights (via Internet rather than just standard cable) and potentially lose an opportunity to profit from charging DISH and other distributors higher Internet distribution rates, if these other distributors viewed Sky Angel as having distribution rights that Discovery had refused to give to them. (ECF No. 177-38, at 8-21).

the Internet, its dissatisfaction was honest and its termination of Sky Angel's Agreement based on this knowledge was objectively reasonable and in good faith.  To support that it was honestly dissatisfied, Discovery asserts that it "knew that it did not grant Sky Angel Internet distribution rights precisely *because* at the time the Agreement was signed — and for several years thereafter — Discovery had *never* granted rights to distribute its linear Services over the Internet to any of its at least one thousand distributors."  (ECF No. 186-1, at 48) (emphases in original).  In addition, Discovery disputes that it terminated the Agreement to preserve its business relationships with other distributors, arguing instead that its contracts with third-party distributors explain why it would never have granted Sky Angel Internet distribution rights in the first place.

Based on the evidence presented, there is a genuine dispute of material fact related to Discovery's termination of the Agreement that precludes granting summary judgment.  Sky Angel presented evidence that Discovery may have had knowledge when it executed the Agreement or was made aware in the first few years of the contract period that Sky Angel was using the Internet to distribute its Services (ECF Nos. 177-5, at 2-3; 177-18, at 2-3; 177-30, at 13-19; 177-16; 177-30, at 23), but the evidence concerning Discovery's knowledge and the extent of its knowledge is conflicting.  If prior to receiving the letter from DISH,

Discovery knew that Sky Angel was using the Internet as part of its distribution method, then its termination of the Agreement could have been based on extra-contractual reasons — DISH's demand that it receive Internet and Mobile Rights — rather than honest dissatisfaction with Sky Angel's distribution methodology. If Discovery did not become aware of Sky Angel's use of the Internet until it received the letter from DISH and verified such use on Sky Angel's website, then its dissatisfaction may have in fact been honest. This issue is intimately intertwined with the preceding dispute of fact, however, because even if Discovery's dissatisfaction was honest, its termination of the Agreement must have also been in accordance with the reasonable expectations of Sky Angel, as discussed above.

Accordingly, although the parties have presented extensive evidence, much of it is conflicting and requires the court to make credibility determinations which are appropriately reserved for trial. The evidence does not establish as a matter of law whether Discovery's termination was objectively unreasonable.

## E.   Sky Angel's Breach of § 7.1 and the Unclean Hands Doctrine

Discovery contends that it is entitled to summary judgment not only because its termination of the Agreement was proper due to Sky Angel's improper distribution methodology, but also

34

because Sky Angel committed an independent, material breach of the Agreement that was uncovered during discovery. Discovery contends that Sky Angel breached § 7.1 of the Agreement, which required Sky Angel immediately to notify Discovery if other programmers ceased to provide programming to Sky Angel. Discovery avers that Sky Angel's failure to inform it that other programmers had terminated their agreements with Sky Angel was a material breach of the Agreement, and would have permitted Discovery to terminate the Agreement on independent grounds had it discovered the violation sooner. (ECF No. 186-1, at 9).

Sky Angel responds that "[a] breach of a non-material provision is not sufficient to thwart a party's recovery for a [later] material breach." (ECF No. 194, at 27).[11]   It argues that § 7.1 is a non-material notice provision the violation of which would only create a material breach if the failure to provide notification deprived Discovery of a benefit that it

_____

[11] Sky Angel cites several sections of the Agreement which it believes provide its material obligations, including § 5.1 which provides Sky Angel's Carriage requirements and specifically states that Sky Angel's obligations under this section are material. (ECF No. 177-1, at 29). Sky Angel asserts that some of its other material obligations, which were provided in § 12.1, required that it: "provide security of Discovery's service signals sufficient to avoid theft of Discovery's programming in an amount of ten percent or more of Sky Angel's then-current subscriber base[;]" provide "timely and proper payment to Discovery[;]" and avoid "assign[ing] [its rights under] the Agreement to anyone else." (ECF No. 177-1, at 30). Sky Angel contends that it fulfilled all of these material terms under the Agreement.

reasonably expected.   Sky Angel also contends that Discovery's interpretation of § 7.1 is at odds with Maryland law, which requires all contract provisions to be read together to avoid a conflict.   Sky Angel argues that Discovery's interpretation "would permit a termination [of the Agreement] without further inquiry" as soon as Discovery learned of another programmer's termination of their contract with Sky Angel, which would be at odds with § 12.1 of the Agreement:

> Discovery cites [§ 7.1] only because it purportedly gave Discovery an additional termination right under the Agreement.   This purported additional termination right is not a material benefit.   Even if Sky Angel had, in fact, provided notice to Discovery that a third-party was no longer providing programming signals to Sky Angel, Discovery would still be bound by the requirements of Section 12.1, which governs defaults and terminations under the Agreement.   Thus, unless Discovery had actually determined that *Sky Angel* had failed to perform one of *its* material obligations (and failed to cure after notice), a termination by Discovery would not comport with 12.1 itself (not to mention the law governing good faith and fair dealing).

(*Id.* at 29) (emphasis in original).   According to Sky Angel, Discovery has provided no evidence that it actually would have terminated the Agreement had it been provided the notice it was due.   In addition, Sky Angel argues that Discovery is precluded from asserting this unclean hands defense under Fed.R.Civ.P. 26(e) and 37(c)(1), because it did not raise this new factual

basis for this defense until the motions stage and did not properly supplement its prior interrogatory responses that indicated a different factual basis for the defense. (ECF No. 194, at 47-49).

Discovery responds that "Sky Angel's breach of § 7.1 was clearly material given that the section expressly entitled Discovery to terminate the Agreement, without qualification, solely based on Sky Angel's notification of any programmer's 'cessation and the reason therefore.'" (ECF No. 196, at 27). Discovery points to Mr. Goodwyn's declaration — that Discovery would have terminated the Agreement had it learned that C-SPAN had terminated its Agreement with Sky Angel — as definitive proof that it would have terminated the Agreement had it known of Sky Angel's violation of § 7.1. Discovery also disputes that there is any procedural bar to raising this unclean hands defense. Discovery argues that it is not too late to raise this issue because Sky Angel did not admit to the other programmers' terminations until the deposition of Sky Angel's CEO Rob Johnson which took place only a week before discovery closed. Finally, Discovery asserts that Sky Angel never disputed that its actions fall within the unclean hands defense, and suggests that the court may conform Discovery's pleadings to the new evidence adduced during discovery. (ECF No. 196, at 28-29).

**1.    Sky Angel's Breach of § 7.1**

The first issue raised by Defendants is whether Sky Angel's failure to notify Discovery under § 7.1 of the Agreement was a *material* breach that gave Discovery the right to terminate the Agreement.    In *Jay Dee/Mole Joint Venture v. Mayor & City Council of Baltimore,* 725 F.Supp.2d 513, 526 (D.Md. 2010), Judge Motz described the differences between material and non-material breaches:

> Although any breach of contract may give rise to a cause of action for damages, RESTATEMENT (SECOND) OF CONTRACTS § 236 cmt. a., only a material breach discharges the non-breaching party of its duty to perform. 23 WILLISTON ON CONTRACTS § 63:3 (4th ed.); *see Final Analysis Comm'c Serv. v. Gen. Dynamics Corp.,* 253 Fed.Appx. 307, 313 (4th Cir. 2007) (unpublished) (citing *Rogers Refrigeration Co., Inc. v. Pulliam's Garage, Inc.,* 66 Md.App. 675, 505 A.2d 878, 883 (Md.Ct.Spec.App. 1986); *Fromm Sales Co. v. Troy Sunshade Co.,* 222 Md. 229, 159 A.2d 860, 863 (1960)).  Under Maryland law, "[a] breach is material 'if it affects the purpose of the contract in an important or vital way.'"  *Gresham v. Lumbermen's Mut. Cas. Co.,* 404 F.3d 253, 260 (4th Cir. 2005) (*quoting Sachs v. Regal Sav. Bank, FSB,* 119 Md.App. 276, 705 A.2d 1, 4 (Md.Ct.Spec.App. 1999)).  . . .  [Moreover,] "[w]here the contract itself is clear in making a certain event a material breach of that contract, a court must ordinarily respect that contractual provision."  23 WILLISTON ON CONTRACTS § 63:3 (4th ed.) (*citing Dunkin' Donuts of Am., Inc. v. Middletown Donut Corp.,* 100 N.J. 166, 495 A.2d 66 (1985)).

*Id.* (second alteration in original).

Section 7.1, the disputed provision, states in relevant part that:

> If any programmer that provides one or more
> programming services to [Sky Angel] for
> distribution during the Term ceases to
> provide a programming service to [Sky Angel]
> (other than based on expiration of the
> applicable contract for such service), [Sky
> Angel] shall immediately *notify* [Discovery]
> of such cessation and the reason therefore,
> and [Discovery] shall be *entitled* to
> terminate this Agreement.

(ECF No. 177-3, at 7) (emphases added).  The parties did not explicitly designate Sky Angel's notification obligation under § 7.1 "material," as they did in other sections of the Agreement, such as § 5.1.2, where they expressly acknowledged that "the carriage requirements contained in the entirety of this Paragraph 5.1 are material obligations under this Agreement."  And it is not necessary at this juncture to resolve this question, because summary judgment will be denied for other reasons.  Although Discovery asserts that it would have exercised its termination rights had it learned of C-SPAN and VAN's terminations, this assertion is not dispositive under the circumstances.  Sky Angel has raised sufficient question as to the reliability of that assertion.

## 2.    The Unclean Hands Doctrine

Discovery has also argued that Sky Angel's breach of § 7.1's "notice" provision prevents it from recovering based on

39

the unclean hands doctrine.  As noted in *Maxtena, Inc. v. Marks,*
No. DKC 11-0945, 2014 WL 4384551, at *14 (D.Md. Sept. 2, 2014),
the doctrine of unclean hands provides that:

> courts of equity will not lend their aid to
> anyone seeking their active interposition,
> who has been guilty of fraudulent, illegal,
> or inequitable conduct in the matter with
> relation to which he seeks assistance.  The
> doctrine does not mandate that those seeking
> equitable relief must have exhibited
> unblemished conduct in every transaction to
> which they have ever been a party, but
> rather that the particular matter for which
> a litigant seeks equitable relief must not
> be marred by any fraudulent, illegal, or
> inequitable conduct.

*Id.* (*quoting Dickerson v. Longoria,* 414 Md. 419, 455 (2010))
(citations and internal quotation marks omitted).  Moreover, as
noted in *Mona v. Mona Elec. Group, Inc.,* 176 Md.App. 672, 714
(2007), "[f]or the unclean hands doctrine to apply, there must
be a nexus between the misconduct and the transaction [at
issue], because what is material is not that the plaintiff's
hands are dirty, but that [plaintiff] dirties them in acquiring
the right [plaintiff] now asserts."  *Id.* (second alteration in
original) (internal quotation and citations omitted).  A motion
for summary judgment based on the unclean hands defense may be
granted if there is no material dispute of fact that plaintiff's
misconduct is directly related to the relief now sought by the
plaintiff.  *See Hicks v. Gilbert,* 135 Md.App. 394, 399-401
(2000) (affirming the trial court's grant of summary judgment to

defendants based on the unclean hands defense because there was no material dispute that plaintiff fraudulently conveyed his property to avoid creditors, which directly related to the relief he sought, which was return of the same property).

Here, Discovery has not provided any evidence that Sky Angel's failure to notify Discovery was done with any fraudulent intent. The only evidence Discovery provided is deposition testimony from Rob Johnson, stating that Sky Angel did not inform Discovery when C-SPAN and VAN ceased providing programming to Sky Angel. (ECF No. 186-4, at 10-11). Sky Angel does not admit to any misconduct and the cited deposition testimony does not provide an inference of misconduct by Sky Angel, as there are numerous reasons why Sky Angel may have failed to notify Discovery of changes with its other programmers.[12] For example, Rob Johnson of Sky Angel states in his deposition that part of the reason it did not inform Discovery that C-SPAN had ceased providing Sky Angel programming was because C-SPAN did not immediately provide Sky Angel an explanation as to why it was terminating its agreement. Mr. Johnson asserts that Sky Angel was still in contact with C-SPAN

---

[12] Discovery has failed to show an affirmative link between any alleged misconduct and the relief sought by Sky Angel in this suit. In order to prevail on a defense of unclean hands as to Sky Angel's violation of § 7.1, Discovery would need to show that Sky Angel fraudulently concealed the other programmers' termination of their services so that Discovery would continue providing Sky Angel programming.

following termination and did not believe the termination decision was final, rather, it thought it could work out an arrangement with C-SPAN to restart distribution of its services. (ECF No. 194-11, at 5-6). Accordingly, Discovery has not met its burden, and is not entitled to summary judgment on its unclean hands defense.

## III. Motions to Seal and Unseal Documents

The parties submitted multiple motions to seal and unseal certain documents filed in conjunction with their cross motions for summary judgment. (ECF Nos. 179, 180, 181, and 189). At issue in any request to seal are the principles of common law access and the more rigorous First Amendment analysis that applies to judicial records. The First Amendment test for access to judicial records extends to "'dispositive' civil motions, such as a motion for summary judgment that is *successful either in full or part*." *Allstate Ins. Co. v. Warns*, No. CCB-11-1846, 2012 WL 681792, at *17 (D.Md. Feb. 29, 2012) (emphasis added); *Rushford v. New Yorker Magazine, Inc.*, 846 F.2d 249, 252 (4th Cir. 1988).[13] The Fourth Circuit also recently

_____

[13] In *Rushford,* the Fourth Circuit explained that:

> [I]f the case had gone to trial and the documents were thereby submitted to the court as evidence, such documents would have been revealed to the public and not protected[.] Because summary judgment adjudicates substantive rights and serves as

remarked in *In re U.S. for an Order Pursuant to 18 U.S.C. Section 2703(D)*, 707 F.3d 283 (4th Cir. 2013), that "documents filed with the court are 'judicial records' if they play a role in the adjudicative process, or adjudicate substantive rights." *Id.* at 290.

The parties have complied with Local Rule 105.11 by publicly filing redacted versions of all of the exhibits at issue, and filing under seal unredacted versions of these documents along with justifications for the redactions. In their motions to seal, the parties dispute, however, the propriety of the various redactions in the publicly filed versions and Sky Angel contends that certain exhibits should be unsealed in their entirety. As will be explained, the parties' proposed redactions are largely reasonable. In almost all instances, Discovery provided sufficient justification for why its interests in redacting the commercially sensitive information outweighed the public's interest in access. Moreover, most of the redactions at issue involved information

---

> a substitute for a trial, we fail to see the difference between a trial and the situation before us now[.]

*Id.* at 252. Here, the parties dispute the relevancy of some of the redacted information, and whether it is necessary to adjudicate the parties' dispute. As discussed below, most of the redacted information was immaterial at the summary judgment stage. If the case proceeds to trial, however, the relevance of the evidence will be revisited, as will the decision whether any material can or should be sealed from the public record.

that was only tangentially related to the parties' dispute. Because the information was not necessary to adjudicate the parties' summary judgment motions, and because it often implicated commercially sensitive information of non-parties to this litigation, it is reasonable that this information should remain redacted at this stage.   The exhibits at issue and whether they will be unsealed in their entirety is addressed below.

**A.   Sky Angel's Motion to Seal (ECF No. 179)**

Sky Angel filed an unopposed motion to seal two unredacted exhibits to its motion for partial summary judgment, and has requested that Exhibit B to the parties' Agreement remain under seal pursuant to the court's earlier order.  (ECF No. 179).  Sky Angel has provided sufficient justifications for why the redacted information is commercially sensitive or implicates privacy concerns for its customers.  Sky Angel's redactions of the 500 Code Report (Plaintiff's Exhibit C-1, ECF No. 177-40), the NeuLion Contract (Plaintiff's Exhibit C-6, ECF No. 177-45), and the Agreement's Ratecard for Services (Plaintiff's Exhibit A-1, ECF No. 177-3), are reasonable and narrowly tailored to maintain confidentiality of Sky Angel's sensitive commercial information and its customers' privacy, yet permit the public to view the information relevant to the current dispute. Accordingly, the unredacted versions of the aforementioned

exhibits shall remain under seal.  (ECF Nos. 178-10, 178-11, and 178-2).

## B.  Sky Angels Motion to File Unredacted Documents Publicly (ECF No. 180)

Sky Angel also submitted a motion to unseal unredacted versions of Discovery's contract with DISH, correspondence between Discovery and DISH, portions of deposition testimony from three Discovery executives, as well as its memorandum in support of its motion for partial summary judgment.  (ECF No. 180).  Sky Angel contends that Discovery has not provided adequate support for redacting this information and "much of the information Discovery seeks to keep from public access lies at the very heart of Discovery's defense to this litigation."  (ECF No. 180-1, at 6).  Discovery opposed Sky Angel's motion to unseal these unredacted documents arguing that none of the redacted information is "at the very heart" of this case; rather, Discovery contends that this information has only tangential relevance to the adjudication of the dispositive motions, and that it has requested only narrowly tailored redactions for "certain specific commercially sensitive information" that could significantly harm its competitive and financial position if disclosed.  (ECF No. 185, at 3).  Discovery included an affidavit from a Senior Vice President, Jeffrey Cross, who has provided specific factual reasons why its

proposed redacted information should remain under seal. (ECF No. 185-2).

The first exhibit Sky Angel seeks to file publicly is an unredacted version of the contract between Defendants and DISH Network (f/k/a EchoStar Satellite L.L.C.) dated January 1, 2007 (the "DISH Contract"). (Plaintiff's Exhibit A-25, ECF No. 178-3). Mr. Cross's rationale for the significant number of redactions to the DISH Contract shows that they are justified. (ECF No. 177-8). In simply comparing the Sky Angel Agreement with the DISH Contract, it is evident how vastly different the terms of Discovery's affiliation agreements can be, and how Discovery could suffer significant harm to its business dealings if the full terms of the DISH contract were released, giving its competitors and other distributors information that could cause a competitive disadvantage to Discovery. While the DISH Contract generally is relevant to this dispute, in that Sky Angel has argued that the MFN provision and specifically Internet distribution rights were the true reason for Discovery's termination of the Sky Angel's Agreement, not every provision of the DISH Contract is germane to adjudicating the current dispute. Moreover, Mr. Cross's justification for the extensive reductions to the MFN provision also appears to be justified considering that MFN terms are highly competitive and valuable. Similarly, the redacted portions are narrowly

46

tailored to protect Discovery's sensitive commercial information. Accordingly, the unredacted version of the DISH Contract, ECF No. 178-3, shall remain sealed.

Sky Angel next seeks to unseal unredacted versions of two letters, (Plaintiff's Exhibits A-26 and A-29, ECF Nos. 178-4 and 178-5), exchanged between Discovery and DISH in November 2009 which discuss Sky Angel's distribution rights. Discovery's proposed limited redactions to Exhibit A-26 (ECF No. 185-1, at 2) and its original redactions (ECF No. 177-9) are not reasonable. Discovery's redactions eliminate any reference to the MFN provision that was purportedly the basis for DISH sending the letter in the first place. The correspondence between DISH and Discovery in November 2009 is relevant to this dispute because it has been identified by Sky Angel as Discovery's true reason for terminating the Sky Angel Agreement. Moreover, the redacted materials are relied upon in adjudicating the summary judgment motion. In addition, Discovery acknowledges in its summary judgment motion that the DISH Contract contained an MFN provision. Therefore, it is not apparent why all references to the MFN provision must be redacted in the letter. Accordingly, this exhibit will be unsealed in its entirety. Discovery's proposed redactions to Exhibit A-29 are reasonable, given that they protect the confidentiality of portions of Discovery's MFN provision but

47

leave unredacted the information relevant to this dispute —
namely, Discovery's acknowledgement of the DISH letter and
assurance that it would "take appropriate action" in response.
The unredacted version of Exhibit A-29 shall remain under seal.
(ECF No. 178-5).

Sky Angel also seeks to unseal unredacted deposition
testimony from three Discovery executives — Eric Phillips
(Plaintiff's Exhibit B-9, ECF No. 178-7), William Goodwyn
(Plaintiff's Exhibit B-11, ECF No. 178-8), and Jeffrey Cross
(Plaintiff's Exhibit B-12, ECF No. 178-9) — relating to
communications and contracts with third-party distributors.[14]
Discovery's redactions of its executives' deposition testimony
are reasonable given that the redacted portions largely pertain
to Discovery's relationships with third parties, including
estimated revenue streams, negotiations, favorable contract
terms, and other commercially sensitive information. Although
the redacted information is tangentially related to this
dispute, the relevant information contained therein — for
instance, the fact that Discovery had MFN provisions with other
distributors that may have impacted its decision to terminate

---

[14] Exhibit B-9 was originally filed publicly with Sky
Angel's motion for partial summary judgment, but then Sky Angel
filed a consent motion to seal temporarily Exhibit B-9 (ECF No.
177-35), pending disposition of its motion to file unredacted
documents publicly. (ECF No. 181). Because the unsealing of
Exhibit B-9 has been addressed in Sky Angel's motion to unseal,
Plaintiff's consent motion will be denied as moot.

the Agreement — is contained elsewhere in the record and was not relied upon in the foregoing memorandum opinion. Accordingly, the unredacted versions of Discovery's executives' deposition testimony shall remain under seal, however, the redacted version of Exhibit B-9 (ECF No. 177-35), which is currently under seal, shall be unsealed.

Sky Angel also moved to unseal a proposed ratecard that was sent by email on August 20, 2007 from Ms. Freeman of Discovery to Ms. Johnson of Sky Angel. (Plaintiff's Exhibit A-95, ECF No. 178-6). Sky Angel states that it "does not oppose the continued sealing of the unredacted document" but states that Discovery must meet its burden of showing that the redacted information in this document is truly confidential. (ECF No. 180-1, at 4 n.3). The unredacted version of Exhibit A-95 shall remain under seal because Discovery's proposed rate information is not necessary to adjudicate this dispute, and is commercially sensitive information. (ECF No. 178-6).

Finally, Sky Angel moved to file publicly the unredacted version of its memorandum in support of its summary judgment motion. Discovery requests that the court maintain under seal Sky Angel's unredacted memorandum in support of its summary judgment motion because a redacted version is available to the public (ECF No. 177-1), and "the redactions reference only confidential documents and testimony that Discovery seeks to

49

keep under seal." (ECF No. 185, at 4 n.2). Generally, the redactions in Sky Angel's memorandum are reasonable, as they correspond to confidential information that Discovery has justified as being commercially sensitive. The portions of Sky Angel's memorandum which correspond to documents which will be unsealed, however, may not be redacted, namely, the letter sent from DISH to Discovery. Accordingly, Sky Angel is directed to unredact the following pages of its Memorandum, ECF No. 177-1, at 19, 20, and 43 (13, 14, and 38 based on internal pagination) and resubmit this redacted version to the clerk.

C.  **Discovery's Motion to Seal (ECF No. 189)**

Discovery moved to file under seal unredacted versions of five of the exhibits to its summary judgment motion. (ECF No. 189). Discovery argues that the information relevant to this dispute has been left unredacted and it only redacted commercially sensitive information. Discovery provided an affidavit from Jeffrey Cross, a Senior Vice President at Discovery, as well as affidavits from executives of the businesses who are parties to the agreements that Discovery seeks to redact, attesting to why the redacted information is commercially sensitive and, should it be disclosed, would negatively impact Discovery and these businesses who are not parties to this litigation. Sky Angel opposed Discovery's motion to seal, arguing that the redacted information plays a

role in the adjudicative process because Discovery relies upon some of it in its summary judgment motion, and Discovery has not met its burden of establishing why its interest in keeping this information confidential overrides the public's interest in access. (ECF No. 193).

The first Discovery exhibit at issue is the DISH Contract (Defendants' Exhibit 36, ECF No. 186-37). As discussed above, however, the redactions to the DISH Contract are reasonable. Accordingly, the unredacted version of Discovery's Exhibit 36 will remain under seal. (ECF No. 188-5).

The next exhibits at issue are two licensing agreements that Discovery entered into with third parties to obtain rights to certain programs that appear on its networks. (Defendants' Exhibits 34 and 35, ECF Nos. 186-35 and 186-36). Mr. Cross states that licensing agreements are similar to affiliation agreements in that each is unique and the terms are highly negotiated and tied to pricing. Mr. Cross avers that revealing, *inter alia*, the terms, pricing, identity, or length of these licensing agreements, would negatively impact Discovery and these licensors by affecting their bargaining positions within the marketplace by giving their competitors and other business partners commercially sensitive information. (ECF No. 189-6, at 3-5). Discovery's redactions to the licensing agreements are reasonable, as the redacted information is not necessary to the

adjudication of the current dispute and Discovery and its licensors' interests in keeping this commercially sensitive information confidential outweighs any public interest in access.  Accordingly, the unredacted versions of Exhibits 34 and 35 shall remain under seal.  (ECF Nos. 188-3 and 188-4).

Finally, Discovery seeks to retain under seal unredacted versions of deposition testimony from two of its executives, Jeffrey Cross and William Goodwyn.  (Defendants' Exhibits 14 and 30).  Discovery states that it has only redacted the identities of counter-parties who are not parties to the current suit, whose identities are not necessary to adjudicate this dispute and whose affiliation with Discovery is not public knowledge. Discovery provided affidavits from executives at these entities, who are parties to the aforementioned licensing agreements.  The affidavits relate that it is important for their identities to remain redacted because "revealing that [they are] part[ies] to an agreement with those provisions would competitively harm" them, because many of the provisions in the licensing agreements are competitively sensitive.  The redactions of these counter-parties' identities is reasonable considering that their identity is not relevant or necessary to the adjudication of this dispute.  Accordingly, the counter-parties' interest in anonymity and preventing commercially sensitive information from

reaching their competitors overrides the public's interest in access to information that is not relevant to this dispute.

## IV.  Conclusion

For the foregoing reasons, the parties' cross motions for summary judgment will be denied.   In addition, Sky Angel's motions to seal will be granted, and its motion to unseal certain exhibits will be granted in part and denied in part. Discovery's motion to seal will be granted.   A separate order will follow.

_____/s/_____
DEBORAH K. CHASANOW
United States District Judge
