IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| SKY ANGEL U.S., LLC | : | |
| | : | |
| v. | : | Civil Action No. DKC 13-0031 |
| | : | |
| DISCOVERY COMMUNICATIONS,<br>  LLC, ET AL. | : | |

### MEMORANDUM OPINION

Plaintiff Sky Angel U.S., LLC ("Sky Angel") sued Defendants Discovery Communications, LLC and Animal Planet, LLC (collectively, "Discovery") for breach of contract, arising from the termination of their Affiliation Agreement. A bench trial was held from November 12 to November 24, 2015. The following findings of fact and conclusions of law are issued pursuant to Fed.R.Civ.P. 52(a).[1]

---

[1] Rule 52(a) provides, in relevant part, that "[i]n an action tried on the facts without a jury . . . , the court must find the facts specially and state its conclusions of law separately. The findings and conclusions . . . may appear in an opinion or a memorandum of decision filed by the court." To comply with this rule, the court "'need only make brief, definite, pertinent findings and conclusions upon the contested matters,' as there is no need for 'over-elaboration of detail or particularization of facts.'" *Wooten v. Lightburn*, 579 F.Supp.2d 769, 772 (W.D.Va. 2008) (quoting Fed.R.Civ.P. 52(a) advisory committee's note to 1946 amendment). As stated by Judge Nickerson: "Rule 52(a) 'does not require the court to make findings on all facts presented or to make detailed evidentiary findings; if the findings are sufficient to support the ultimate conclusion of the court they are sufficient.'" *Sherwin-Williams Co. v. Coach Works Auto Collision Repair Ctr. Inc.*, No. WMN-07-

## I.   Procedural Background

On January 3, 2013, Sky Angel filed a complaint asserting that Discovery's termination of the parties' contractual relationship constituted a breach of contract. (ECF Nos. 1; 5). The two-count complaint asserts breach of contract claims against both Discovery Communications, LLC (Count I) and Animal Planet, LLC (Count II). Specifically, Sky Angel alleged that § 12.1 of the Affiliation Agreement (the "Agreement") "did not permit Discovery to terminate the Agreement at any time without cause," but instead required it to make a determination that the "distribution methodology" established by § 7 was not satisfactory. (ECF No. 5 ¶¶ 50, 66). Sky Angel further asserted that Discovery did not make, and could not have made, such a determination, but instead "terminated the Agreement for other reasons including [its] extra-contractual legal and business concerns about maintaining the contract with Sky Angel" – a rationale that "was not sufficient under the Agreement and thus constituted an unauthorized, improper termination." (*Id.* ¶¶ 58, 74; *see id.* ¶¶ 53, 69). By terminating the Agreement without "allowing Sky Angel a chance to resolve any purported problems," Discovery allegedly breached the implied covenant of

---

2918, 2012 WL 2343235, at *5 (D.Md. June 19, 2012) (quoting *Darter v. Greenville Comm. Hotel Corp.*, 301 F.2d 70, 75 (4th Cir. 1962)).

good faith and fair dealing.  (*Id.* ¶¶ 60, 76).  Sky Angel seeks both injunctive and compensatory relief.  (*Id.* at 17).

Discovery filed an answer (ECF No. 23), and discovery commenced after its motion for judgment on the pleadings was denied (ECF No. 37).  On February 18, 2014, discovery closed and Discovery filed a motion for a jury trial.  (ECF No. 108).  The motion for a jury trial was denied.  (ECF No. 172).  Sky Angel then filed a motion for partial summary judgment seeking judgment against Discovery as to liability.  (ECF No. 177). Discovery opposed Sky Angel's motion for partial summary judgment and filed a cross-motion for summary judgment.  (ECF No. 186).  Both motions were denied because "[t]he evidence [did] not establish as a matter of law whether Discovery's termination was objectively unreasonable."  (ECF No. 197, at 34).

The crux of the issue at trial was whether Discovery properly exercised the right to terminate the Agreement under § 12.1, which provided the right to terminate as a result of dissatisfaction with signal integrity, signal security measures, or distribution methodology.  (PTX 1 § 12.1).[2]  Discovery's satisfaction – or, indeed, dissatisfaction - with Sky Angel's

---

[2] The designation "PTX" refers to exhibits offered by Sky Angel at trial.  "DTX" refers to exhibits offered by Discovery. References to trial testimony are designated by the ECF docket entry and page number.

distribution methodology is evaluated against the objective test of satisfaction, the standard of good faith, and Sky Angel's reasonable expectations as established by the Agreement itself. After Sky Angel completed its case-in-chief, Discovery moved for a judgment on partial findings under Fed.R.Civ.P. 52(c), but the court declined to render judgment until the close of the evidence.[3]  After the trial concluded, the court took the matter under advisement and reviewed the pleadings, twelve days of trial transcripts, and admitted exhibits.  As will be discussed, the court concludes that Discovery's dissatisfaction was reasonable and determined in good faith.  Accordingly, Sky Angel has not met its burden to prove by a preponderance of the evidence that Discovery breached the Agreement.

## II.  Factual Background

### A. The Parties

Sky Angel operated a national subscription-based, multichannel video distribution service, delivering faith-based and family-friendly television channels to its subscribers.[4]  Sky Angel entered into contracts with individual content providers

---

[3] Discovery argued that "the evidence adduced during [Sky Angel's] case . . . is insufficient as a matter of law for the case to proceed further and judgment on partial findings in [Discovery's] favor is appropriate."  (ECF No. 258, at 69-70).

[4] Sky Angel was formed in 2007 (ECF No. 266, at 26) and suspended its service in January 2014 (*id.* at 96; ECF No. 274, at 3; DTX 135).

to receive their programming, which it then delivered to its subscribers.  Robert Johnson, Sky Angel's founder and chief executive officer, previously served as the chief executive officer of Dominion Video Satellite ("Dominion"), a family company that distributed television programming via satellite for many years before the creation of Sky Angel.  (*See* ECF No. 266, at 4-6).  From 1996 through February 2008, Sky Angel or its predecessor, Dominion, operated a direct broadcast satellite ("DBS") system.  (*See id.* at 6-9).  Sky Angel began to transition to Internet protocol technology ("IPTV")[5] in the beginning of 2007.  (*Id.* at 26-27).  At that time, it was serving approximately 120,000 subscribers.  (*Id.* at 11; ECF No. 274, at 51-52).

Discovery is a program content provider that offers family-friendly television programming.  Discovery's programming can be found on networks such as Discovery Channel, Discovery Kids, Discovery Home (re-launched as Planet Green), Military Channel

---

[5]   Whether the parties understood "IPTV" to mean the same thing at the time the Agreement was negotiated is far from clear.  For example, Mr. Johnson described it as "Internet protocoled television that is basically digital packets that are sent through the Internet encrypted, and then when it reaches the set-top box, it un-encrypts it, puts those pieces together and actually creates a picture and audio."  (ECF No. 266, at 25-26).  According to him, it is different from "web streaming." (*Id.* at 26).  Charles Myers, a former employee at Discovery, said that the fact that a distributor is using Internet protocol does not mean that the "public Internet" is involved.  (ECF No. 259, at 64).

(now known as American Heroes Channel), and Animal Planet. (ECF Nos. 266, at 65; 276, at 53).

**B. Genesis of the Agreement**

In 2006, the satellite through which Dominion had been distributing programming and for which it had Federal Communications Commission ("FCC") licenses – EchoStar 3 – began to fail. (ECF Nos. 266, at 9, 17; 274, at 30). Appreciating the cost of acquiring a new satellite, Dominion searched for alternative means of distributing programming to its customers. Mr. Johnson formed Sky Angel and decided to design a new distribution system that would allow for programming to reach customers on a nation-wide basis via the Internet. (*See* ECF No. 266, at 5-9, 18-20, 23-29).[6]

Sky Angel learned of NeuLion, Inc. ("NeuLion"), a third-party vendor and potential IPTV partner, in 2007 at a trade show in Las Vegas, Nevada. (*Id.* at 30). Subsequently, Mr. Johnson made the decision for Sky Angel to pursue IPTV technology. (*Id.* at 40-43; *see* PTX 10). NeuLion was contracted to build the IPTV

---

[6] Again, there was no – and there may still not be a – universally accepted definition or understanding of the word "Internet." The parties also inconsistently qualified the term Internet with "public," which may or may not be significant. Discovery employee Elisa Freeman said, "The public Internet is the Internet. . . . I understood that the public Internet was the interconnection of computers throughout the world and included the World Wide Web as part of it." (ECF No. 259, at 35).

system and supply proprietary set-top boxes that delivered Sky Angel's programming to subscribers.  The IPTV platform developed with NeuLion involved transmitting the programming content from Sky Angel to NeuLion via a Multiple Protocol Label Switching ("MPLS") network.  (DTX 4).  Once the content was delivered to NeuLion via the proprietary MPLS network, NeuLion then sent the encoded signal over the Internet to subscribers' set-top boxes. The set-top boxes decoded the signal and displayed Sky Angel's programming content on subscribers' televisions.  (*Id.* at 7-10; DTX 66A).

Sky Angel understood that NeuLion was capable of building an IPTV system that could send programming over either private lines or the Internet.  (*See* ECF No. 255, at 54-59). Furthermore, Sky Angel was aware that it could not "control the final delivery 'pipe' of the Internet used from NeuLion to the set-top box at the subscriber's location."  (DTX 4, at 8).

### C. Negotiating the Agreement and Due Diligence

In 2007, Sky Angel reached out to Discovery, among other content providers, to obtain linear network programming for its new IPTV service.[7]  As negotiations began in July, Sky Angel was making a significant push to get television channels and

---

[7] A "linear" network or channel is one that is exhibited on television at all times – 24 hours per day, seven days per week, year-round – and displays scheduled programming.  (*See* ECF Nos. 266, at 63; 276, at 53).

programming onto the IPTV system. (ECF No. 268, at 53-54). In discussions to license Discovery's linear networks, Kathleen Johnson and Thomas Scott served as Sky Angel's lead negotiators. (*See* ECF Nos. 266, at 52-53; 274, at 4). Ms. Johnson was the vice president of programming, and Mr. Scott was Sky Angel's president and general counsel. (ECF Nos. 268, at 4-5; 269, at 4). Discovery's principal negotiators were Elisa Freeman, vice president of domestic distribution, and Stephen Kaminski, who worked in Discovery's legal department. (ECF Nos. 259, at 4-6; 256, at 3-4).

Prior to entering into the Agreement, Discovery charged Charles Myers with conducting due diligence concerning Sky Angel's IPTV system. Mr. Myers was Discovery's director of affiliate technology and vice president of distribution and technology. (ECF No. 259, at 62). During his due diligence review, he sought information from both Sky Angel and NeuLion. It was standard practice for Mr. Myers to send a representative of a prospective partner "a technical questionnaire that would ask specific questions that would allow [him] to understand the technology, the transport methodologies that would be used for carrying Discovery's content." (ECF No. 259, at 73). Mr. Myers sent Sky Angel a written questionnaire regarding its IPTV system, but Raymond LaRue, Sky Angel's engineer, did not complete it. (*Id.* at 75-76; *see* DTX 25). Mr. LaRue testified,

"[T]he questionnaire asked for an end-to-end diagram which is detailed; in other words, from one end of the system to the other end of the system and I thought that was very inappropriate.  I was not willing to convey that information." (ECF No. 255, at 37).   In response to some of Mr. Myers' inquiries, Sky Angel solicited responses directly from NeuLion and forwarded them along.   On August 9, 2007, Mr. LaRue forwarded an e-mail from NeuLion's Michael Her in which Mr. Her wrote, "The content/signal is delivered to the set-top box with unicast and the streaming protocol is our proprietary protocol, so this is additional protection when the content is transmitted on the Internet."  (PTX 23, at 2).   Mr. Myers testified that, upon receipt of Mr. LaRue's e-mail, he did not understand that NeuLion planned to use the public Internet to distribute Discovery's programming via Sky Angel's signal.  (ECF No. 259, at 79-81).  Mr. Myers contacted NeuLion personnel regarding its technology platform to get a better understanding of how the Sky Angel system functioned.  (*Id.* at 81-88; PTX 411, at 15-17). Discovery and NeuLion worked out a non-disclosure agreement, but Mr. Myers was unable to gain any additional information.   He testified, "[W]e kept requesting to have a meeting and NeuLion did not respond."  (ECF No. 259, at 85).

Through due diligence, Mr. Myers came to understand that Sky Angel's IPTV system, which used NeuLion's technology, could

either use the Internet or a private fiber optic circuit to transmit programming signals from NeuLion's centralized location to subscribers' set-top boxes. (*Id.* at 85-86, 101-02). Mr. Myers informed Ms. Freeman and Mr. Kaminski that he was uncertain of exactly how Sky Angel's system would transmit Discovery's content, but that he had concerns that it may be using the public Internet, which could present "rights issues" for Discovery. (PTX 14; PTX 15; PTX 411, at 18-22, 31, 40-41, 198-99, 207-08, 219-20, 236).[8]  After February 2008, when Sky Angel's IPTV system launched, Mr. Myers was not asked to monitor the technology and distribution of programming. (PTX 411, at 203-04, 214).

The parties began to exchange draft affiliation agreements in September 2007.  Ms. Freeman sent a contract "in draft form and subject to additional changes" to Ms. Johnson, who shared it with Mr. Scott. (PTX 34, at 1; *see* ECF No. 269, at 9-12).  This draft included language referring to a "cable television system" that Ms. Freeman understood did not accurately describe Sky

---

[8] Some of the confusion that led to this dispute arose from the use of the word "public" along with "Internet" in both e-mail and verbal communications, and its insinuation into contract drafts and documents.  At trial, the witnesses themselves could not be sure whether they used the term and, if they did, what they actually meant.  Some said that "public Internet" meant the World Wide Web; others said it was redundant to modify "Internet" with "public."  It is safe to say that, at the time of the contract negotiations in 2007, no one realized the confusion, and certainly no one attempted to clarify.

Angel's IPTV system. (*See* ECF Nos. 269, at 10-11; 259, at 12-13). Ms. Freeman followed up with additional information several days later. (PTX 38). Shortly thereafter, Mr. Scott responded to Ms. Freeman requesting that the contractual definition of "Affiliate System" "be expanded to acknowledge [Sky Angel's] right to utilize IPTV technology." (PTX 154, at 1; *see* ECF No. 269, at 13-17). In his proposed definition, Mr. Scott suggested that the IPTV system deliver programming "over a closed and encrypted transmission path over a national fiber-optic network and a high-speed data connection that may be a digital subscriber line . . . , cable or other broadband connection in a subscriber's home . . . to the secure IP address of a Set-Top Box." (PTX 154, at 1). In her response, Ms. Freeman shared with Mr. Scott Discovery's standard language, which authorized Sky Angel's IPTV system to deliver programming "provided that all transmissions shall be via [Sky Angel's] dedicated, private, closed Ethernet network, which shall have absolutely no connection to the public Internet." (PTX 41, at 1). Within a couple of days, the parties held a conference call to discuss the system and contractual language. Mr. Scott, Ms. Freeman, and Mr. Kaminski participated. (*See* ECF No. 269, at 24-28). Mr. Scott testified that he explained Sky Angel's IPTV system to Ms. Freeman and Mr. Kaminski. (*Id.* at 25-28). According to Mr. Scott, the parties agreed that "public

11

Internet" as used in the draft contract "described access and reflected the World Wide Web, and [he] told [Ms. Freeman and Mr. Kaminski] [Sky Angel] didn't use the World Wide Web." (*Id.* at 27). Ms. Freeman testified, "On that phone call, we discussed . . . what [Sky Angel's] distribution methodology was. We discussed that again it could not be the public Internet and we wanted to accurately depict what [it] [was] doing." (ECF No. 259, at 15).

After the conference call, Mr. Scott received a final draft of the contract from Ms. Freeman. (PTX 50; PTX 81). She noted in her cover e-mail, "[W]e have added an IP definition in [§] 1.1.1 and we made a couple of edits to [§] 12." (PTX 50). Mr. Scott testified that he reviewed the proposed agreement and responded "that the language was acceptable and that she should send [] a final draft agreement." (ECF No. 269, at 34). Ms. Freeman, however, recalled at trial:

> Q: Now following your transmission of these changes to Mr. Scott, what happened next?
>
> A: After I sent the document, I was -- I wanted to make sure that he received it and that he had a chance to look at the specific language that was changed. I called him and had a conversation with him and I pointed out the new [§] 1.1.2 and then in addition, I pointed out the language in [§] 12.1 that we had -- the only way we could move forward was if we had a right to terminate based on both the signal security,

integrity and the distribution methodology
since we didn't know what NeuLion was doing.

Q:    How did Mr. Scott react?

A:    He was not happy in my opinion.

Q:    Why not?

A:    He wasn't happy because he
basically said, well, this really -- it
really gives me a shorter term than what was
negotiated . . . and I replied, well, that
was the only way we could go forward because
again we were not sure about what the
distribution methodology was.

Q:    What happened after that?

A:    He signed the [A]greement and sent
it back.

(ECF No. 259, at 17-18; *see* DTX 49).

On October 3, 2007, Sky Angel entered into the Agreement
with Discovery that was to expire on December 31, 2014. (PTX 1
§ 1.11). Pursuant to the Agreement, Discovery agreed to provide
Sky Angel a non-exclusive license and right to distribute five
channels via its "Affiliate Systems": Discovery Channel,
Discovery Kids, Discovery Home, Military Channel, and Animal
Planet (together, "the Services"). (*Id.* at 1). In exchange for
this license and the right to distribute the Services, Sky Angel
agreed to pay Discovery monthly licensing fees on a per-
subscriber basis. (*Id.* § 3). William Goodwyn, president of
Discovery's domestic distribution group, did not describe the
contractual relationship as an experiment; rather, he considered

13

it "an agreement [Discovery] entered into with Sky Angel knowing that [it] [was] not using the public Internet, but [Discovery] did have the right to get out for any reason if [it] was not satisfied with the distribution methodology [Sky Angel] [was] using." (ECF No. 276, at 73).  According to Mr. Goodwyn, at the time the parties entered into the Agreement, he did not understand Sky Angel's IPTV system to utilize the "public Internet," as opposed to "private distribution pathway" or an Internet tunnel. (*Id.* at 69-71).

### D. Terms of the Agreement

The Agreement described Sky Angel's IPTV system as:

> a multichannel video distribution system which utilizes Internet Protocol ("IP") technology to deliver video programming services over a closed and encrypted transmission path over a national fiber-optic network to a central location for subsequent distribution of such video programming services with proprietary-encoding over a high-speed data connection to set-top-boxes that are secured by Industry-standard encryption and conditional access technologies and are connected to Subscribers' television sets.

(PTX 1 § 1.1.2).  Under § 2, Discovery granted certain rights to Sky Angel, which "acknowledge[d] and agree[d] that the rights granted . . . [were] limited to distribution of the Services for viewing by Subscribers on television sets on a subscription basis and not for viewing on personal computers or otherwise via the Internet."   The Agreement lacked specific language

14

establishing expectations regarding Sky Angel's distribution path or methodology, and "Internet" was left undefined. Furthermore, all rights not expressly granted to Sky Angel under the Agreement were reserved to Discovery.  (PTX 1 § 13.1).

Section 12.1, the provision at the center of this dispute, provides in pertinent part: "Notwithstanding anything to the contrary herein, in the event [Discovery] determines that the Service signal integrity or the Service signal security measures or distribution methodology used by or on behalf of [Sky Angel] are not satisfactory, [Discovery] shall have the right to terminate this Agreement."  These terms are not defined with additional specificity in the Agreement.

### E. Performance under the Agreement

In February 2008, several months after the Agreement was executed, Sky Angel launched its IPTV system and began providing the Services to its subscribers.  As outlined above, Sky Angel's IPTV system delivered video programming over a closed and encrypted path to NeuLion's central location for subsequent distribution over the Internet to proprietary set-top boxes provided by NeuLion.  The NeuLion set-top boxes, which were owned or leased by Sky Angel subscribers, received programming signals that allowed subscribers to view the Services on their televisions.

15

From February 2008 through mid-December 2009, Sky Angel received no complaints from Discovery regarding its distribution methods, and believed it was in compliance with the Agreement. Mr. Johnson testified:

> We weren't late paying our bills, we haven't had any pirating, so I couldn't figure out why they wanted to terminate the Agreement. . . . They never complained to us. They never called about anything. They wanted us to have the Science Channel in the fall of 2009. So we thought we had a good relationship with them.

(ECF No. 266, at 84; *see* ECF No. 257, at 84-87). In the fall of 2009, Discovery approached Sky Angel about a proposed amendment to the Agreement. (PTX 86). Mr. Scott testified, "The proposed amendment was they wanted us to take some additional channels, and then when we reached certain subscriber [numbers], that we had to take more of their channels. . . . They wanted six immediately and then some others depending on how our subscriber numbers went." (ECF No. 269, at 52).

Although Discovery did not appear to take issue with Sky Angel's performance under the Agreement until late 2009, at least one other content provider sought to halt distribution due to concerns regarding Sky Angel's use of the Internet. Sky Angel entered into an affiliation agreement with National Cable Satellite Corporation ("C-SPAN") in May 2009. (DTX 69). Under the contract, C-SPAN granted Sky Angel a non-exclusive right to

carry the C-SPAN networks "by means of an internet-protocol based stream which shall be secure and capable of being accessed only in a manner which would not allow any form of subsequent distribution . . . , including without limitation, distribution over public Internet." (DTX 69 § 1(a)). Several days after Sky Angel began carrying C-SPAN programming, C-SPAN requested that Sky Angel take down the programming voluntarily while its attorneys reviewed Sky Angel's distribution methodology. (ECF No. 269, at 45-46). The issue was not resolved, and Sky Angel filed a complaint against C-SPAN in November 2012. (*Id.* at 88-89; DTX 132).[9]

## F. Termination of the Agreement

On November 9, 2009, Discovery received a letter from DISH Network, LLC ("DISH"), one of its larger distributor clients, noting that DISH had "recently become aware of distribution [of Discovery's programming] by the IPTV distributor known as Sky

---

[9] In addition to C-SPAN, Visual Arts ceased providing programming to Sky Angel during the time Sky Angel carried the Services. According to Mr. Scott, "Visual Arts was having a financial problem and they eventually just closed their business down." (ECF No. 269, at 47). In spite of § 7.1 of the Agreement – which provides that Sky Angel shall notify Discovery "[i]f any programmer . . . during the Term ceases to provide a programming service to [Sky Angel]" (PTX 1 § 7.1) – Sky Angel did not notify Discovery when either C-SPAN or Visual Arts stopped providing content. Mr. Scott explained that it was an oversight on his part and testified that § 7.1 was not a material provision, or did not go to the central purpose of the Agreement. (ECF No. 269, at 45-48).

Angel." (DTX 74).[10]   DISH requested, via what the parties called

"the most favored nation" ("MFN") clause in its contract with

Discovery, to be given the same "Internet Rights and Mobile

Rights" that were given to Sky Angel under the Agreement. (*Id.;*

*see* ECF No. 277, at 19-22).[11]   On November 11, 2009, Mr. Goodwyn

e-mailed to Ms. Freeman asking:

> When you have a moment, take a look at
> Sky Angel to see how they are positioning
> themselves in the marketplace, how they talk

---

[10]   In late October, Mr. Goodwyn exchanged e-mails with Dave
Shull, an executive at DISH, who first alerted him to potential
issues with the Sky Angel IPTV system. (DTX 73).

[11]   DTX 165 "is [Discovery's] . . . contract for distribution
with [DISH], which at the time was known by [its] corporate
name, EchoStar Satellite, LLC." (ECF No. 277, at 21).   The MFN
provision from the Discovery-DISH affiliation agreement provided
that:

> In the event that any Network grants to any
> Other Distributor the right to exhibit or
> distribute any Service(s) to residential
> customers via the world-wide matrix of
> interconnecting TCP/IP protocols known as
> the "Internet" ("Internet Rights"), then,
> for so long as such Internet Rights are
> provided to such Other Distributor, EchoStar
> shall have the right to distribute the
> Service(s) to Service Subscribers using the
> Internet, provided that EchoStar must comply
> with the materially-related terms and
> conditions applicable to the distribution of
> such Service(s) by such Other Distributor,
> provided, however, that EchoStar will not be
> required to comply with terms and conditions
> with which it cannot reasonably comply.

DTX 165 § 3(h).   The contract also included a restriction on
distribution via the Internet in § 1(b).

about their service, and also see what other
cable nets are also on their platform, etc.,
I want to see if there are any sensitivities
around this for us.

[DISH] is making an issue around our
granting IPTV rights to them so I would like
to see what may be problematic for us.

(DTX 76, at 2). Ms. Freeman and her colleague, David Broughton,
checked Sky Angel's website and shared the below information
with Mr. Goodwyn:

On their website they market themselves as:
"Sky Angel is a revolutionary television
that uses your high-speed Internet service
to deliver over 70 faith and family channels
— not to your computer — but directly to
your TV. The service comes with the Sky
Angel set-top box that delivers a digital-
quality picture and does not require an
outside dish, antenna, or professional
installation."

(*Id.* at 1). Upon reviewing the language from Sky Angel's
website, Mr. Goodwyn immediately decided to terminate the
Agreement. He took such direct action "[b]ecause [Discovery]
[had] never granted the linear network rights over the Internet
and based on this and how Sky Angel was communicating to
consumers and subscribers, they were using the consumers' high-
speed Internet, which they did not have the right to." (ECF No.
276, at 62). At Mr. Goodwyn's direction, Discovery planned to
notify Sky Angel of the decision to terminate the Agreement and
provide "some period of time to replace [the Services] . . . to

avoid a lot of customer dissatisfaction or ambiguity or concerns." (*Id.* at 63).[12]

During the contractual relationship between the parties, Discovery maintained a company policy disallowing distribution of its programming over the Internet.  In 2007, and through late 2013, Discovery did not allow such distribution.  (*See id.* at 64-65).  Mr. Goodwyn testified that, at the time the Agreement was terminated, Discovery had never allowed distribution of its linear networks over the Internet:

> [F]irst of all, you don't have the rights
> for the networks to be -- for a channel to
> be carried over the Internet.  So, if you
> don't have the rights to license content
> over the Internet, you wouldn't enter into
> agreements to allow other people to carry
> those shows over the Internet.
>       . . . [I]n addition to rights, you'd
> also have . . . security, right.  If you
> offered your networks over the Internet, the
> -- the issue around hacking the Internet or
> unauthorized reception of your service is
> one factor.
>       Another one is signal quality, right.
> So if you're putting your shows on the
> Internet, depending on how much of the
> Internet is being used at a given time
> regarding bandwidth constraints, etc.,
> because you don't control the Internet, the
> distributor doesn't control the Internet.
> So you might have your service being
> received in a very, very poor quality

_____

[12] As Discovery prepared to inform Sky Angel of the decision to terminate, Jeffrey Cross, a director and senior corporate counsel at Discovery, wrote to DISH on November 25: "Thank you for bringing the Sky Angel matter to our attention.  We will review the matter and take appropriate action."  (PTX 29).

manner.   So, whether it's the quality and
degradation   of   what   they're   watching,
whether  you  have  a  buffering  experience,
it's  not  a  --  potentially  not  a  good
experience  for  consumers.   That  would  be
another factor.

Another one is measurement, because you
haven't  historically  been  able  to  measure
your  viewing  when  it's  over  the  Internet.
So, that's a challenge because in addition
to  building  up  a  licensing  revenue  stream
for  the  company,  the  other  half  of  your
revenue stream comes from advertising sales.

So,  if  you  license  linear  networks  over
the  Internet  and  you  couldn't  measure  that
from  a  ratings  standpoint,  then  you're  not
only  impacting  your  own  rights  agreements
and  your  consumer  reception,  but  you're  also
having  a  problem  with  advertising  sales,
because they're not able to monetize that.

With   the   Internet   also,   it   can
potentially  be  portable,  right.   And  you  --
if  it's  portable,  you  may  not  have  the
rights  to  do  that.   You  also  are  likely  not
able  to  measure  the  portability  factor  as
well.

And   then   also,   you   even   have   [MFN]
provision  issues,  because  historically,  many
of   the   major   operators   have   asked   for
Internet  rights  and  they  also  ask  for  other
terms  and  conditions.   And  if  you're  not
granting  those  terms,  conditions  to  the
distributor,  the  large  distributors  expect
some form of reasonable protection.

In  other  words,  if  they  are  some  of
your  largest  customers,  they  want  to  make
sure  that  they  are  treated  fair.   So,  if  you
grant  something  to  a  small  distributor  or  a
smaller  distributor,  but  you  haven't  granted
it  to  a  larger  distributor,  one  that  you
have  --  that's  been  a  good  customer  for
years,  for  example,  you're  disadvantaging
some of your better customers.
. . .

So  you'd  have  most  [MFN]  issues  as  well
when  we  grant  Internet  carriage  to,  for
example,  a  smaller  distributor  because  it

would automatically flow to your large
distributor.

(*Id.* at 54-56).  Other witnesses similarly explained the reasons

that Discovery did not, at the time, authorize transmission over

the Internet, including Mr. Cross (ECF No. 277, at 14, 24-25)

and Eric Phillips (PTX 414, at 293-99).[13]  Acknowledging that he

did not have primary responsibility over negotiating the

Agreement with Sky Angel, Mr. Goodwyn nonetheless explained that

Discovery's company policy precluded distribution of programming

via the Internet.  (*See* ECF No. 276, at 65-67).

In mid-December 2009, Ms. Freeman telephoned Mr. Scott to

inform him that Discovery would be terminating the Agreement.

She only relayed to him that the decision was coming from senior

management and that Discovery was exercising its right to

terminate under § 12.1 because it was uncomfortable with Sky

Angel's distribution methodology.  Mr. Scott also spoke to Mr.

Kaminski, who repeated what Ms. Freeman had shared.  (ECF No.

269, at 53-55; *see* ECF No. 259, at 24-26).  Shortly thereafter,

Brian Collins, Sky Angel's senior vice president of programming,

called Ms. Freeman to request additional information regarding

the termination and any specific concerns Discovery had with the

---

[13] Mr. Phillips testified by video deposition.  He must have
attended the witness school that teaches how to say nothing
using the most possible words.  He added very little of
substance.

distribution methodology. (*See* ECF No. 257, at 16-19). Mr. Collins spoke to both Ms. Freeman and Mr. Kaminski, who asked whether there was another method by which Sky Angel could deliver the Services to subscribers. Mr. Collins replied that there was not. (*Id.* at 50-52; ECF No. 259, at 25).[14]

On January 22, 2010, Mr. Kaminski sent Sky Angel a termination letter on behalf of Discovery stating:

> We have determined that the distribution methodology used by and on behalf of [Sky Angel] is not satisfactory. Accordingly, pursuant to Section 12.1 of the Agreement, we hereby elect to terminate the Agreement. In order to provide for an orderly transition process, including notification to your subscribers, we will provide you with a three (3) month transition period; accordingly, the Agreement will terminate effective on April 22, 2010.

(DTX 83). Mr. Scott responded on March 4:

> Discovery has known that Sky Angel operates an IP System for its distribution of video programming, as provided for in [] the [] Agreement. The IP System operated by Sky Angel has functioned flawlessly throughout the term of the [] Agreement, Discovery did not object to it for more than two years,

---

[14] Mr. Kaminski had convenient memory lapses during his trial testimony. At times, he not only said he had no recollection, but supplied the reason: it was more than "five years and two industries ago" (ECF No. 256, at 11), implying that no one could recall after that time. Then, when a response seemed more favorable to his former employer, he was able to have his recollection refreshed. (*See id.* at 44-45). Any of Mr. Kaminski's testimony that relied on his recollection will not be credited.

> and Discovery has no reasonable basis for
> any belief that this IP distribution
> methodology is in any way unsatisfactory.

(PTX 32).  In this letter, Sky Angel also offered to "cooperate in establishing the security of its system to Discovery's reasonable satisfaction." (*Id.*).  Discovery responded on March 19, reiterating that its decision to terminate the Agreement was based on § 12.1.  The letter provided no additional details and confirmed that Sky Angel's access to the Services would cease on April 22.  (*See* PTX 33).[15]

On April 22, Discovery ceased delivery of its programming to Sky Angel.  During 2009 and early 2010, Sky Angel argued at trial, the Services were among the most popular channels that it carried.  Relying on two experts, Sky Angel concluded that it has been damaged in the amount of nearly $11 million, which includes prejudgment interest.

## III. Applicable Legal Principals

Under Maryland law, "[t]o prevail in an action for breach of contract, a plaintiff must prove that the defendant owed the plaintiff a contractual obligation and that the defendant

---

[15] Seeking to avert termination under the Agreement, Sky Angel filed an emergency petition with the FCC.  (ECF Nos. 266, at 78-80, 96; 274, at 35); *see In the Matter of Sky Angel U.S., LLC*, 25 F.C.C. Rcd. 3879 (2010).  The FCC denied Sky Angel's request for a temporary injunction and found that it "failed to satisfy its burden of demonstrating that a standstill is warranted."  *In the Matter of Sky Angel U.S., LLC*, 25 F.C.C. Rcd. at 3882.

breached that obligation." *Taylor v. NationsBank, N.A.*, 365 Md. 166, 175 (2001) (citation omitted).[16] Here, Sky Angel "bears the burden of proving that the Agreement was wrongfully terminated, and as a part of this burden, it must show that its distribution of services was fully in compliance with the terms of the Agreement in order to establish that Discovery's termination was wrongful." (ECF No. 197, at 18).

## A. Introduction to Maryland Contract Law

Maryland relies on the objective theory of contract interpretation. Under the objective theory, "[t]he purpose of contract interpretation is to determine and effectuate the intent of the parties, and the primary source for identifying this intent is the language of the contract itself." *Gresham v. Lumbermen's Mut. Cas. Co.*, 404 F.3d 253, 260 (4th Cir. 2005) (citation omitted) (applying Maryland law). "[T]he cardinal rule of contract interpretation is to give effect to the parties' intentions." *Dumbarton Imp. Ass'n, Inc. v. Druid Ridge Cemetery Co.*, 434 Md. 37, 51 (2013) (quoting *Tomran, Inc. v. Passano*, 391 Md. 1, 14 (2006)). Courts "enforce the terms of [a] contract" according to their "plain and unambiguous"

---

[16] The Agreement provides that "the rights and obligations of the parties hereunder shall be governed by and construed in accordance with the laws of the State of Maryland applicable to contracts entered into and fully performed therein without regard to its conflict of laws principals." (PTX 1 § 13.8).

language.  *Connors v. Gov't Employees Ins. Co.*, 442 Md. 466, 480 (2015).  When the language of a contract is clear, "it must be presumed that the parties meant what they expressed: not what the parties intended the contract to mean, but what a reasonable person in the position of the parties would have thought it meant."  *Roged, Inc. v. Paglee*, 280 Md. 248, 254 (1977). Extrinsic evidence may be used to assist the court in resolving a particular ambiguity.  *See Wash. Metro. Area Transit Auth. v. Potomac Inv. Properties, Inc.*, 476 F.3d 231, 235 (4th Cir. 2007) (citing *Walker v. Dep't of Human Res.*, 379 Md. 407, 421 (2004)); *Calomiris v. Woods*, 353 Md. 425, 436-37 (1999).

## B. Identifying and Resolving Ambiguity

The initial determination of whether contract language is ambiguous is a question of law for the court.  *See Auction & Estate Representatives, Inc. v. Ashton*, 354 Md. 333, 341 (1999) (citing *Calomiris*, 353 Md. at 434).  Here, as previously determined, the Agreement is "ambiguous as to whether Sky Angel was permitted to use the public Internet as its second distribution path."  (ECF No. 197, at 28).

When a contract provision is found to be ambiguous, "the court may consider evidence of extrinsic factors, *i.e.*, negotiations of the parties, the circumstances surrounding execution of the contract, the parties' own construction of the contract and the conduct of the parties."  *Canaras v. Lift Truck*

*Servs., Inc.*, 272 Md. 337, 352 (1974).   The court may also consider trade custom or usage to explain the terms of a written contract.   *See Burch v. Prudential Ins. Co. of Am.*, 184 Md. 664, 670 (1945).   And, at times, ambiguous provisions must be construed against the drafter.   *See John L. Mattingly Const. Co. v. Hartford Underwriters Ins. Co.*, 415 Md. 313, 334 (2010); *Biggus v. Ford Motor Credit Co.*, 328 Md. 188, 223 (1992) ("[I]t is a canon of contract construction that ambiguities in the contract are to be construed against the drafter because that party had the better opportunity to understand and explain its meaning." (citing *King v. Bankerd*, 303 Md. 98, 106 (1985))). However, "[t]he rule that doubtful language is to be interpreted against the party who drafted the instrument is only a secondary rule of construction and perhaps should have but slight force in a situation where both parties are represented by counsel," as is the case here.   *Rossi v. Douglas*, 203 Md. 190, 198 (1953).

## C. Section 12.1 Termination Provision

The scope of Sky Angel's distribution rights implicates the Agreement as a whole.   *See Gresham*, 404 F.3d at 260 (explaining that "[c]ontracts are interpreted 'as a whole'"); *Walker*, 379 Md. at 421 ("We also attempt to construe contracts as a whole, to interpret their separate provisions harmoniously, so that, if possible, all of them may be given effect." (citations omitted)); *Laurel Race Course, Inc. v. Regal Const. Co.*, 274 Md.

27

142, 153 (1975) ("[T]he intention of the parties to an agreement must be garnered from the terms considered as a whole, and not from the clauses considered separately." (citations omitted)). Here, the Agreement contains no explicit and clear provision governing whether Sky Angel could use the public Internet in its distribution path. The parties did not include terms that dealt with that issue, and there was no meeting of the minds.

It is, however, Sky Angel's burden to prove that it *was* permitted to use the Internet in its distribution methodology, which it has failed to do. The Agreement simply does not say so. Discovery did, moreover, include § 12.1, which granted it the right to terminate if it "determine[d] that the Service signal integrity or the Service signal security measures or distribution methodology used by or on behalf of [Sky Angel] are not satisfactory."

### D. Validity of Satisfaction Clauses

Contracts subject to a party's satisfaction have been almost universally upheld because they generally require performance that must be satisfactory in the exercise of honest judgment. 13 Williston on Contracts § 38:21 (4th ed.) (explaining that "the restraint that the obligation to act in good faith places on the promisor's discretion furnishes good consideration for the parties' agreement"); Restatement (Second) Contracts § 228 cmt. a (1981) (noting that when a contractual

28

provision conditions continued performance on the satisfaction of a party, the "exercise of judgment [by the party to be satisfied] must be in accordance with the duty of good faith and fair dealing" to preclude the contract from being rendered illusory).

> It is an accepted rule that *where parties are competent to contract, neither party can be relieved from his promises merely because he did not use good business judgment or because the contract was not as profitable as expected*, in the absence of fraud, undue influence, or mistake in making the agreement. *Poe v. Ulrey*, 233 Ill. 56 (1908); *Lea v. Blokland*, 122 Or. 230 (1927). Generally the parties to a contract may provide that it may be rescinded at the option of either party, and may fix the rights and liabilities of each in the event of such rescission. . . . *Where the right to terminate a contract is reserved in the instrument itself, in the absence of fraud, undue influence, or mistake, such reservation is valid and will be enforced*, if not contrary to equity and good conscience. *Morrissey v. Broomal*, 37 Neb. 766 (1893); *Republic Coal Co. v. W.G. Block Co.*, 190 N.W. 530, 534 (Iowa 1922).

*Kahn v. Janowski*, 191 Md. 279, 285-286 (1948) (emphases added).

Distribution agreements frequently provide that a party may exercise discretion during the term of the contract, or that it may determine the manner in which it or the other party will perform certain duties.   2 W. Michael Garner, Franchise & Distribution Law & Practice § 8:28 (2015).

> [T]he implied duty of good faith and fair dealing should be invoked to curb abuses in

> the exercise of discretion by one party. .
> . . [A]n abuse occurs either when one
> party's conduct exceeds the other party's
> reasonable expectations or when a motive of
> the party exercising the discretion is
> strictly in bad faith — meaning, that it is
> exercised with malice or with a view solely
> toward injuring the other party.

*Id.* (emphasis added) (citing Steven J. Burton, *Breach of Contract and the Common Law Duty to Perform in Good Faith*, 94 Harv.L.Rev. 369, 369-70 (1980)); *see also Questar Builders, Inc. v. CB Flooring*, LLC, 410 Md. 241, 273 (2009) (explaining that, in Maryland, "a party with [contractual] discretion is limited to exercising that discretion in good faith and in accordance with fair dealing").

> The reservation of such a power to terminate
> does not invalidate the contract or render
> the consideration for a promise
> insufficient, so long as the party reserving
> the power to terminate is irrevocably bound
> for any appreciable period of time or has
> materially changed any of his legal
> relations or otherwise rendered some
> performance capable of operating as a
> consideration.

*Acme Markets, Inc. v. Dawson Enterprises, Inc.*, 253 Md. 76, 87 (1969) (citation and internal quotation marks omitted). "[I]f the provisions are quite clear as to one party's option a court cannot be expected to relieve the other party of the consequences thereof because the bargain as to him was improvident, rash, foolish or oppressive." *Id.* at 88-89; *see Ard Dr. Pepper Bottling Co. v. Dr. Pepper Co.*, 202 F.2d 372, 377

(5th Cir. 1953) ("[S]uch a provision for termination of a contract is valid, unless there is an absence of good faith in the exercise of the judgment. . . . Such a stipulation may be a harsh one, or an unwise one, but it is valid and binding if entered into." (quoting *Goltra v. Weeks*, 271 U.S. 536, 548 (1926))).

**1. The Objective Test of Good Faith and Fair Dealing**

Discovery's dissatisfaction, which ultimately formed the basis for the decision to terminate the Agreement, must be measured by an objective standard of good faith and fair dealing. (ECF No. 197, at 15). The objective standard of good faith and fair dealing examines whether the party to be satisfied has exercised its discretion "in accordance with the 'reasonable expectations of the other party.' What constitutes a 'reasonable expectation,' of course, depends on the language of the contract." *Questar Builders*, 410 Md. at 282 (citations omitted);[17] *see also First Nat. Realty Corp. v. Warren-Ehert Co.*,

---

[17] The *Questar Builders* court noted that:

> [A] discretion-exercising party may be called upon to justify its actions by giving its reasons. A court or jury must decide whether those reasons reasonably deserved significant weight and were among the reasons allowed by the contract. If they satisfy these criteria, then the discretion exercising party performed in good faith. At the same time, this standard requires

247 Md. 652, 655-62 (1967) (finding that the contractor's dissatisfaction with and subsequent termination of the subcontractor was not reasonable because the contractor's allegations that the subcontractor delayed the project were not supported by the record).

No party has a right to rescind or modify a contract merely because the party finds, in light of changed conditions, that it has made a bad deal.  5A Maryland Law Encyclopedia Contracts § 123 (citing cases).  Discovery's invocation of the satisfaction provision thus cannot be based on some ulterior motive.  *See Devoine Co. v. International Co.*, 151 Md. 690, 136 A. 37 (1927) (finding that the buyer who agreed to take cherries of "satisfactory quality" was not excused when his business slacked off and he decided to use his own supply because he conceded quality of the seller's cherries was indeed satisfactory).[18]  If

---

deference to the discretion exercising party, not judge or jury.  Accordingly, a reasonableness standard allows meaningful legal review of discretion without overreaching — *a deferential standard that bites*.

410 Md. at 282 (emphasis added) (quoting Steven J. Burton & Eric G. Anderson, Contractual Good Faith: Formation, Performance, Breach, Enforcement § 3.3.4 (1995)).

[18] In *Questar Builders*, too, "the obligation to act in good faith and deal fairly prohibits a party from terminating its contract (or otherwise exercising its discretion) to 'recapture' an opportunity that it lost upon entering the contract.  . . .

determined "on some question of interest or advantage not made the basis of rights or obligations by the contract, the decision is outside of the contract and is given no effect by it." *Id.* at 38.  The court's previous ruling on summary judgment noted:

> If prior to receiving the letter from DISH, Discovery knew that Sky Angel was using the Internet as part of its distribution method, then its termination of the Agreement could have been based on extra-contractual reasons . . . rather than honest dissatisfaction with Sky Angel's distribution methodology. If Discovery did not become aware of Sky Angel's use of the Internet until it received the letter from DISH and verified such use on Sky Angel's website, then its dissatisfaction may have in fact been honest.

(ECF No. 197, at 33-34).  Arbitrary and capricious behavior could vitiate the quality of reasonableness under the objective standard.  *First Nat'l Realty*, 247 Md. at 660; *see Questar Builders*, 410 Md. at 274 (concluding that, although the termination for convenience clause could be exercised absent a performance default by the subcontractor, it did not establish a "right to terminate based on a whim").

## 2. Discerning the Parties' Reasonable Expectations

When the party to be satisfied is limited in the exercise of discretion, courts are guided by applicable contract language

---

Upon entering a binding contract for a specified duration, the parties thereto 'give up their opportunity to shop around for a better price.'"  410 Md. at 281-82 (citations omitted).

and extrinsic evidence. *See Questar Builders*, 410 Md. at 282; *Calomiris*, 353 Md. at 447. "While courts will look to contractual agreements and the conduct of the parties to gauge good faith, reasonableness is the foundation for the parties' expectations." 2 Franchise & Distribution Law & Practice § 8:28. The objective sources that courts examine to discern the parties' expectations include the agreement itself; the course of dealing between the parties, industry standards, or other extrinsic evidence concerning the parties' relationship; and general notions of reasonableness that ultimately turn the issue of good faith into a question of fact. *See id.*

"Dependent upon the subject matter of the contract and all of the circumstances surrounding the parties and particularly when a definite objective test of satisfaction is available, courts tend to adopt an interpretation of the contract, wherever possible, requiring performance to the satisfaction of a reasonable man." *Ard*, 202 F.2d at 377. "[H]owever, the question is one of construction or interpretation, and the contract, if not illegal or against public policy, must be enforced according to the actual or legally presumed intention of the parties." *Id.* In *Ard*, the district court had directed the jury to return a verdict in favor of the defendant:

> The Dr. Pepper Company, when it lets these contracts out, naturally is looking to the future. It puts at least a fair part of

> its business in the hands of its dealers and
> it, therefore, has the right to reserve unto
> itself the determination of whether or not
> the contract is being carried out to its
> satisfaction.  The company, in good faith,
> and I think after a full and thorough
> investigation, and after an ample
> opportunity to Ard Dr. Pepper Bottling
> Company to take up the matter with it,
> determined that the contract was not being
> carried out to its satisfaction and,
> therefore, it had the right to cancel the
> contract.

*Id.* at 373.  There, the district court determined that "so long

as Dr. Pepper's dissatisfaction was genuine and it acted in good

faith, under the terms of the license agreement, Dr. Pepper's

judgment was conclusive and, further, that there was no evidence

of bad faith on the part of Dr. Pepper." *Id.* at 376.  The

United States Court of Appeals for the Fifth Circuit agreed,

noting that the plaintiff had the burden of proving that Dr.

Pepper wrongfully terminated the contract:

> The terms of the present contract in the
> light of its subject matter and of the
> circumstances of the parties leave little or
> no room for construction of interpretation.
> The impact upon Dr. Pepper's business of
> improper performance of a license agreement
> by a bottler could well be serious.  Dr.
> Pepper was the party to be satisfied, not
> some imaginary reasonable person.  It was
> not unreasonable for Dr. Pepper to reserve
> to its own business judgment the question of
> whether the agreement had been properly and
> faithfully performed.  There was no evidence
> of actual ill will, nor of financial
> advantage to Dr. Pepper.  The cancellation
> of the license agreement left Dr. Pepper
> without a distributor in the territory, and

35

>the place had not been filled.  If Ard would
>make out his case by proof of performance,
>such proof must extend to such perfect
>performance as would negative Dr. Pepper's
>good faith.  The proof in this case fails by
>a wide margin to meet that exacting
>standard.  On the contrary, we, like the
>district court, are impressed that Dr.
>Pepper acted in the utmost good faith and
>indeed with patience and forbearance.

*Id.* at 377-78.  The Fifth Circuit thus charged the plaintiff

with the burden to prove "such perfect performance as would

negative [the defendant's] good faith."  *Id.* at 377.

The United States Court of Appeals for the Eighth Circuit

determined that, under Missouri law, the defendant

manufacturer's alleged plan to terminate its contract with a

distributor even without ever placing it on an internal list of

substandard distributors did not breach the distributorship

agreement.  *Rolscreen Co. v. Pella Products of St. Louis, Inc.*,

64 F.3d 1202 (8th Cir. 1995).  Rather, the court found that the

manufacturer met its contractual obligations by relying on

market penetration statistics to show that the distributor's

substandard performance justified termination.  According to the

plaintiff in *Rolscreen*:

>[I]ts performance was not 'unsatisfactory'
>as required by the distribution agreement
>for conditional termination and that other
>distributors had poorer records.  The
>performance of others was irrelevant because
>the agreement required only that [the
>plaintiff's] performance be unsatisfactory,
>and the negative income and falling

36

> penetration statistics were a reasonable
> indicator of unsatisfactory performance.
> *See Hickham v. Chronister*, 792 S.W.2d 631,
> 633 (Mo.Ct.App. 1989) (assessment of
> unsatisfactory performance must be made both
> reasonably and in good faith).

*Id.* at 1212 (footnote omitted).  And under *Hickman*, "[w]here performance of a contract is to be to the satisfaction of the promisor, he must exercise that judgment in good faith and as a reasonable man, not arbitrarily without a bona fide reason for his dissatisfaction."  792 S.W.2d at 633 (citation omitted).  The *Rolscreen* court determined that because the defendant used "a reasonable indicator of unsatisfactory performance," the plaintiff's allegations of bad faith were "inconsistent with the undisputed facts." *Rolscreen*, 64 F.3d at 1212.

On the other hand, in a case involving construction repair and remodeling, the parties' agreement called for the contractor to furnish first-class workmanship and materials that were satisfactory to the owner.  *Hood v. Meininger*, 377 Pa. 342, 344 (1954).  The owner expressed dissatisfaction as the work progressed and dismissed the contractors without further payment.  Affirming judgment in favor of the plaintiff contractor for breach of contract, the court quoted the trial judge:

> It is highly improbable that [the owner]
> would make regular payments as the work
> progressed on a building contract if the
> work completed was not in fact substantially

37

> satisfactory to her.   Such a suggestion
> verges on the ridiculous in a case where the
> same woman had just allegedly been the
> victim of another contractor whom she had
> claimed had done defective work.

*Id.* at 349-50.

The Supreme Court of New Jersey also determined that "where a promisor agrees to pay for work or goods *provided he is satisfied with them*, he must act honestly and in good faith.   To escape liability his dissatisfaction must be actual, and not feigned; real, and not merely pretended." *Williams v. Hirshorn*, 91 N.J.L. 419, 420 (1918) (emphasis added).   The court explained that the promisor "must, if a test is necessary to determine fitness, give that test or permit it to be made.   Where good faith is in issue, and the evidence is conflicting, a jury question is presented."  *Id.  Hirshorn* involved a construction contract, but it bears on the issue whether Discovery sufficiently assessed the fitness of Sky Angel's distribution methodology.

## IV.  Findings of Fact and Conclusions of Law

The parties, many years after the fact, strain to put a spin on the events that they think favors their respective legal positions.   What comes through is that, despite the rapidly evolving technology – and the all-too-obvious imprecision in terminology – neither side took the time and effort to ascertain precisely what Sky Angel's IPTV system entailed, or what the

specific terms and phrases in the Agreement meant, or were intended to mean. (*See* ECF Nos. 269, at 21-24, 85-88; 259, at 13-15, 34-39). Nonetheless, the right to terminate the Agreement for dissatisfaction "is a risk-allocating tool, which allowed [Discovery] to terminate . . . if, in its discretion, it determined that" Sky Angel's distribution methodology was not satisfactory. *Questar Builders*, 410 Md. at 283. By the close of trial, Sky Angel failed to demonstrate that the Agreement permitted use of the public Internet in its distribution path. Nor did Sky Angel prove that Discovery breached the Agreement by exercising its "right to terminate in bad faith, or, stated otherwise, by not exercising its discretion to terminate in accordance with the implied obligation of good faith and fair dealing." *Id.* As provided in the Agreement, Discovery was entitled to decide whether to terminate the relationship based on honest dissatisfaction with Sky Angel's distribution methodology. Critically, "[i]t is not the court's role to make that decision for [Discovery]; the court's role is to determine only whether [Discovery's] determination was consistent with the reasonable expectations of [Sky Angel], in light of the terms of the [Agreement]." *Id.* Here, Sky Angel has not met its burden of proof.

## A. Distribution Via the Public Internet Under the Agreement

Sky Angel failed to demonstrate that it was permitted to distribute Discovery programming over the public Internet via its IPTV system.  At summary judgment, the court noted, "Sky Angel bears the burden of proving that the Agreement was wrongfully terminated, and as part of that burden, it must show that its distribution of [the] [S]ervices was fully in compliance with the terms of the Agreement in order to establish that Discovery's termination was wrongful."  (ECF No. 197, at 18).  Irrespective of Discovery's purported extra-contractual rationales for termination, Sky Angel has not demonstrated "such perfect performance as would negative [Discovery's] good faith." *Ard*, 202 F.2d at 377.  The evidence adduced at trial simply does not satisfy such an exacting standard.

The Agreement did not unambiguously either permit or prohibit Sky Angel from using the public Internet in transmitting the Services.  The prohibition was in the method of viewing the programs by the subscriber.  Rather, as the court determined at summary judgment:

> [T]he Agreement is ambiguous as to whether Sky Angel was permitted to use the public Internet as its second distribution path. Moreover, based on the plain language of the Definitions section, it is not possible to distill the parties' intent as to whether the Internet constitutes "proprietary-encoding over a high[-]speed data connection" and therefore, whether it would

40

> have been permissible for Sky Angel to use
> the Internet as part of its [IPTV system].
> Because the Agreement lacks specificity as
> to this issue, and both parties'
> interpretations are plausible based on the
> plain language of the Agreement, extrinsic
> evidence must be examined.

(ECF No. 197, at 28). Given the ambiguity of "high-speed data connection" as used in § 1.1.2 of the Agreement, extrinsic evidence was offered at trial to resolve the dispute. That evidence, however, does not show that Sky Angel was permitted to use the public Internet to distribute Discovery's programming. In light of the entire Agreement and extrinsic evidence – including contract negotiations and evidence of the parties' intentions - Sky Angel failed to demonstrate that its use of the Internet to distribute Discovery's linear programming *did not* violate the Agreement.

The court finds credible testimony and evidence adduced at trial that Discovery, at the time of the Agreement, did not intend to permit distribution of the Services via the public Internet. Mr. Goodwyn described the Agreement thusly:

> I wouldn't call it a[n] experiment
> because it was a multi-year agreement. It
> was an agreement that we entered into with
> Sky Angel under the assurances I was . . .
> given that [it] [was] not using the public
> Internet. And since I didn't know exactly
> how the technology worked or the impact,
> because I think it was a . . . long[-]term
> deal and I didn't know how [its] technology
> may or may not change. . . .

41

> So I would not have called it an
> experiment. I would have called it an
> agreement that we entered into with Sky
> Angel knowing that they were not using the
> public Internet, but I did have the right to
> get out for any reason if I was not
> satisfied with the distribution methodology
> [it] [was] using.

(ECF No. 276, at 73). In 2007, at the time the Agreement was executed, Discovery maintained a company policy prohibiting distribution of linear programming content over the public Internet by affiliates. Such a policy was in place until late 2013. (*See id.* at 64-65). According to Mr. Goodwyn, Sky Angel's use of the public Internet "would have been against [Discovery's] policy to allow carriage for linear networks." (*Id.* at 74). Ms. Freeman and Mr. Cross also understood Discovery's position regarding Internet distribution. (*See* ECF Nos. 259, at 30; 277, at 14, 24-25). Furthermore, the evidence shows that, before the Agreement was executed, Discovery's negotiators conveyed their concerns regarding Internet distribution to Sky Angel representatives. (*See* ECF No. 259, at 11-12). The parties, however, were not vigilant in detailing Sky Angel's IPTV system in the Agreement or uncovering precisely how it functioned.

Affiliation agreements between Discovery and other third-party distributors constitute additional evidence for the existence and significance of the company policy, as articulated

42

by Mr. Goodwyn.   These contracts contained language restricting the use of the Internet, thereby lending credibility to Mr. Goodwyn's testimony.   (*See* DTX 164; DTX 165; DTX 166; DTX 182; DTX 183; DTX 184; DTX 185; DTX 189; ECF No. 277, at 9-13, 32-39).   Mr. Goodwyn acknowledged that the language in Discovery's various third-party affiliation agreements prohibiting use of the public Internet differed somewhat, and he conceded that different language does have different meaning.   (ECF No. 276, at 66).   Ms. Freeman also noted differences in the language of Discovery's other contracts, but testified, "[It] means the same thing.   That [affiliates are] not to deliver over the Internet. The only difference was that . . . we have iterations of the contract, [the legal department] wished to change the language a bit.   But it meant the exact same thing."   (ECF No. 259, at 27). Moreover, Discovery's agreements with other large distributors included MFN clauses.   The MFN clauses are relevant because granting Internet carriage rights to smaller distributors automatically grants those same rights to larger distributors with MFN protections.   (ECF No. 276, at 56, 67, 89).   At that time, DISH did not have the rights to distribute Discovery's linear channels over the public Internet.   (*Id.* at 60). Granting those rights to Sky Angel would have also given them to DISH, which Discovery was not prepared to do.   The existence of MFN clauses in its third-party affiliation agreements bolsters

43

Discovery's contention that it did not intend to grant such distribution rights to Sky Angel.

There was no meeting of the minds by the parties in 2007 that authorized Sky Angel to distribute the Services over the public Internet.  The evidence shows that Discovery did not intend to permit use of the Internet by any distributors, with the exception of closed, private networks like Internet tunnels or private fiber-optic pathways.  Discovery simply did not contemplate allowing content distribution in the manner by which Sky Angel and NeuLion made programming available via the IPTV system.  Furthermore, the court is not persuaded that "high-speed data connection" – the term in § 1.1.2 held to be ambiguous at summary judgment – embraced the use of the public Internet so as to allow distribution via Sky Angel's IPTV system.  Sky Angel has not met its burden to prove that its IPTV system complied with the terms of the Agreement such that its performance negates Discovery's good faith termination and shows Discovery to have breached.  *See Ard*, 202 F.2d at 377.

### B. Discovery's Good Faith Termination

### 1. Evaluating Discovery's Honest Dissatisfaction

Sky Angel asserts that Discovery breached the Agreement by invoking the termination provision without valid justification, and for reasons unrelated to Sky Angel's performance and inconsistent with its reasonable expectations.  Under § 12.1,

"[n]otwithstanding anything to the contrary herein, in the event [Discovery] determines that the Service signal integrity or the Service signal security measures or distribution methodology used by or on behalf of [Sky Angel] are not satisfactory, [Discovery] shall have the right to terminate this Agreement." (PTX 1 § 12.1).  At summary judgment, the court acknowledged:

> [T]he Agreement's termination provision, specifically the portion permitting Discovery to terminate based on its dissatisfaction with Sky Angel's distribution methodology, did not permit Discovery to terminate based on any reason whatsoever; rather, [§§] 1.1.2, 2, and 7 of the Agreement provide specific guidelines for Sky Angel regarding its distribution of [the] Services.    Accordingly, these guidelines provide objective criteria by which to measure Discovery's satisfaction with Sky Angel's distribution methodology.

(ECF No. 197, at 16-17).

Ms. Freeman, Discovery's lead negotiator, testified that § 12.1 afforded "a termination right in the event that [Discovery] [was] dissatisfied with the signal integrity, signal security measures or distribution methodology." (ECF No. 259, at 19; *see* ECF No. 277, at 43-44; PTX 412, at 67-68).  For Discovery, dissatisfaction with distribution methodology encompasses concern about both distribution technology and the manner by which Sky Angel distributed the Services to its subscribers, including distribution over the Internet.  Sky Angel, however, argues that the Agreement limits Discovery's determination of

dissatisfaction to an assessment of the distribution requirements established in § 7.1. In other words, Sky Angel interprets § 7.1 to constitute exhaustive criteria available to Discovery in determining dissatisfaction. Because Discovery did not base its decision to terminate on an examination of § 7.1, Sky Angel contends, it breached the Agreement. (*See* ECF No. 273, at 16-19). Section 7.1 sets forth requirements regarding the distribution of the Services:

> [Sky Angel] shall distribute each Service in its entirety, without delay, interruption, alteration, addition, deletion, or editing of any portion thereof and in a manner which will permit highest quality reception by Service Subscribers of each Service's audio and visual materials. [Sky Angel] shall maintain suitable facilities for the pick-up and retransmission of the Service signal(s) throughout [Sky Angel's] Systems and shall comply with all applicable local, state, and federal laws, rules regulations, licensing requirements, and franchises. [Sky Angel] represents and warrants that each satellite-delivered, advertiser-supported programming service, including each Service, that it distributes to Subscribers shall be distributed in digital rather than analog format. [Sky Angel] acknowledges and agrees that throughout the Term, each of the programming services provided by [Sky Angel] to Subscribers of its [] Systems shall be delivered in the same manner, and using the same technology, as the Services.

(PTX 1 § 7.1). Mr. Johnson and Mr. Jones each testified that Sky Angel consistently distributed the unedited Services in their entirety; without delay, interruption, or retransmission;

46

in digital format; and in a manner to ensure that only Sky Angel
subscribers received the signal.   (ECF Nos. 266, at 84; 257, at
84-87).   Mr. Goodwyn acknowledged that, in deciding to terminate
the Agreement, he did not consider Sky Angel's signal integrity,
signal security, or signal quality.   (ECF No. 276, at 86-89).
Accordingly, Sky Angel argues, Discovery's failure to do so
demonstrates that it breached the Agreement by terminating
without regard to appropriate objective standards of
satisfaction.

        The court finds that, under the Agreement, Discovery's
determination of dissatisfaction need not be limited to
consideration of signal integrity, signal security, or signal
quality.   Sky Angel's argument wrongly reads out Discovery's
contractual right to determine that the "distribution
methodology used by or on behalf of [Sky Angel] [is] not
satisfactory."   (PTX 1 § 12.1).   Indeed, the Agreement permits
Discovery honestly to become dissatisfied with Sky Angel's
distribution methodology – as well as signal integrity and
signal security – and invoke § 12.1's right to terminate.
Although § 7.1 appears to add context and objective standards
against which to assess signal integrity and signal security, it
does not similarly elaborate on distribution methodology.

        Sky Angel seeks to subsume "distribution methodology"
within signal integrity and signal security, but the Agreement's

plain, unambiguous language cannot be ignored. Courts interpreting language "give every word effect, avoiding constructions that render any portion of the language superfluous or redundant." *Blondell v. Baltimore City Police Dep't*, 341 Md. 680, 691 (1996) (citations omitted); *see Calomiris*, 353 Md. at 441 ("Where possible, courts should avoid interpreting contracts so as to nullify their express terms."). Moreover, the interpretive canons do not permit Sky Angel to restrict the meaning of distribution methodology. *See Russell Motor Car Co. v. United States*, 261 U.S. 514, 519 (1923) ("That a word may be known by the company it keeps is, however, not an invariable rule, for the word may have a character of its own not to be submerged by its association."). In the related context of statutory interpretation, "[u]nder the doctrine of *noscitur a sociis*, the meaning of questionable words or phrases in a statute may be ascertained by reference to the meaning of words or phrases associated with it." *Dist. 1199E, Nat. Union of Hosp. & Health Care Emp., Div. of R.W.D.S.U., AFL–CIO v. Johns Hopkins Hosp.*, 293 Md. 343, 351 n.4 (1982) (citation and internal quotation marks omitted). However, the mere circumstance that Discovery's permissible bases for determining dissatisfaction were listed together in one sentence does not by itself call for the application of interpretive canons to restrict the meaning of the terms. Rather, "[r]ules of

48

statutory construction are to be invoked as aids to the ascertainment of the meaning or application of words otherwise obscure or doubtful. They have no place . . . except in the domain of ambiguity." *Russell Motor*, 261 U.S. at 519. The court does not find ambiguity present in § 12.1's termination provision, and the application of *noscitur a sociis* – or other interpretive canons - is misplaced.

Discovery's honest assessment of satisfaction regarding distribution methodology need not be constrained by the requirements set forth in § 7.1. The interpretation proposed by Sky Angel would render unnecessary and superfluous the phrase "distribution methodology," and the court cannot accept such a reading. Given the novelty of IPTV technology and the uncertainties surrounding Sky Angel's specific system, Discovery sought the protection afforded by § 12.1. The parties signed the final version of the Agreement even after Ms. Freeman explicitly highlighted the insertion of § 12.1 in communications with Mr. Scott. Accordingly, under the terms of the Agreement, Discovery permissibly considered Sky Angel's distribution methodology.

### 2. Extra-Contractual Reasons for Termination

Sky Angel also argues that extra-contractual considerations infected Discovery's assessment of dissatisfaction (*see* ECF No. 273, at 17-19, 93-94) and that Discovery's termination was

contrary to Sky Angel's reasonable expectations under the Agreement (*id.* at 20). These arguments are unavailing, however, as Sky Angel has failed to meet its burden to prove that Discovery acted in bad faith.

Sky Angel contends that Discovery viewed Sky Angel as a disposable, "*de minimis*" partner and in effect pursued a strategy of efficient breach. (*See id.* at 34). Discovery, Sky Angel argues, was motivated by the desire to capture a deal with DISH that was concluded in early 2010, shortly after terminating the Agreement. (*See* PTX 28; PTX 183; PTX 184). If Sky Angel's distribution methodology was unsatisfactory only in the sense that Discovery was concerned with how that methodology might be perceived by third parties – a reason that would be outside the contract – then that reason cannot be given effect. *See Devoine*, 151 Md. at 38. Discovery's contracts with DISH executed on January 29, 2010, however, were amendments to the parties' 2007 affiliation agreement. The amendments concerned subscriber fee packages and a trademark dispute. (PTX 183; PTX 184; *see* ECF Nos. 276, at 84-85; 277, at 32-35). Plaintiff has not proven that Discovery invoked § 12.1 in an attempt to salvage more lucrative external business relationships. There is no evidence connecting the termination of the Agreement to Discovery's January 2010 amendments with DISH. Moreover, there is no evidence that the decision to terminate was based on

50

anything other than dissatisfaction with Sky Angel's IPTV distribution methodology, which used the public Internet in a manner prohibited by Discovery. The court finds Discovery's dissatisfaction was honest, particularly in light of its company policy.

The determination of dissatisfaction is evaluated against standards of good faith and honest judgment; reasonableness is injected into the inquiry because Discovery's good faith assessment must comport with Sky Angel's reasonable expectations. *Questar Builders*, 410 Md. at 282. There is no support in the case law, however, for the proposition that Sky Angel can simply dictate Discovery's honest assessment of satisfaction under the terms of the Agreement. Sky Angel cannot reasonably expect that Discovery would not, when prompted by external parties and supplied with new information, reexamine Sky Angel's distribution methodology and become dissatisfied. Furthermore, Discovery's good faith determination of dissatisfaction must be analyzed in such a way that allows Discovery to harmonize its obligations to Sky Angel and other distributors with which it contracted. The court thus finds that Discovery, in good faith, became dissatisfied with Sky Angel's distribution methodology at least in part due to the potential effect on Internet distribution rights and MFN clauses in third-party contracts. (*See* ECF Nos. 276, at 54-56; 277, at

14, 24-25; PTX 414, at 293-99).   It is these considerations that led Discovery to adopt a company policy precluding distribution of its linear programming via the Internet, except through closed, private networks or Internet tunnels.   Discovery's dissatisfaction with, *inter alia*, how Sky Angel's use of the Internet would affect its other business relationships is legitimate in light of its intentions at the time of the Agreement.

At bottom, the court must weigh the evidence adduced at trial, make credibility determinations, and consider the governing burden of proof.   Under Maryland law, Sky Angel bears the initial burden of production to adduce a *prima facie* showing that Discovery invoked § 12.1 in bad faith.   If the court is satisfied that Sky Angel met its burden, the burden shifts to Discovery, "on a preponderance of evidence standard, to prove the good faith exercise of its termination power."   *Questar Builders*, 410 Md. at 281 (citations omitted).   The evidence presented at trial does not support a *prima facie* finding of bad faith on the part of Discovery.   Here, Discovery's asserted basis for termination – the revelation that Sky Angel was using the public Internet to distribute linear programming, including the Services, to subscribers – was commercially reasonable under circumstances, and should have been consistent with Sky Angel's reasonable expectations under the Agreement.   Discovery did not

exercise its right to terminate under § 12.1 on a whim.  *See Questar Builders*, 410 Md. at 274.  Though not terribly vigilant in monitoring Sky Angel's IPTV system during the contractual relationship, Discovery nonetheless is not liable for breach of contract.[19]  Judgment will be entered in favor of Discovery.

## V.   The Parties' Motions *in Limine*

Shortly before trial, the parties filed motions *in limine*, many of which were resolved at a pretrial conference held on October 19, 2015.  The court's rulings were "no more than [] preliminary or advisory opinion[s] that [fell] entirely within the discretion of the district court.  The primary purpose of an *in limine* ruling is to streamline the case for trial and to provide guidance to counsel regarding evidentiary issues."  *Adams v. NVR Homes, Inc.*, 141 F.Supp.2d 554, 558 (D.Md. 2001).  Some motions constituted objections to proposed evidence and

---

[19]   The court need not determine whether Sky Angel first breached § 7.1 by failing to divulge that other networks ceased providing signals, as Discovery contends.  Mr. Scott did admit that Sky Angel breached § 7.1 (ECF No. 269, at 45-48, 95-96), but the parties dispute the materiality of the contract provision and whether it afforded Discovery the option to terminate.  Maryland law requires that a party must perform in order to recover under a contract.  *See Weichert Co. of Maryland v. Faust*, 419 Md. 306, 342 (2011) (citing 23 Williston on Contracts § 63:8 (4th ed. 2002)).

Nor will the court's decision rely on Discovery's argument that Sky Angel did not own 51% of the IPTV system, as required by § 1.1 of the Agreement.  The Agreement's other provisions – including the grant of rights and reservation of rights - are not dispositive in this case.

were reserved for further discussion at trial.  Many of those
and other objections were raised during trial and resolved.
Other objections were not made or renewed at trial and are
waived.  A few evidentiary objections remained at the conclusion
of trial.  Those, however, pertain to evidence that is not
germane to the rulings announced in this opinion, relating
primarily to damages and other issues that are no longer
relevant.  Accordingly, to the extent any pending motions or
objections remain, they are denied as moot.

## VI.  Discovery's Motion to Redact and Seal Trial Testimony

On January 28, 2016, Discovery moved to redact the
transcript of the trial proceedings during the afternoon session
of November 20, 2015 (the "Transcript") and to file the
unredacted version under seal.  (ECF No. 279).  Sky Angel
responded (ECF No. 281), and Discovery replied (ECF No. 282).
Discovery argues that excerpts on five pages of the Transcript
should be redacted.  Discovery requests the proposed redactions
because, it contends, "certain specific portions of the
Transcript reflect commercially sensitive information, the
public disclosure of which would be detrimental to Discovery's
business." (ECF No. 279, at 2).  Sky Angel challenges the
proposed redactions, asserting that Discovery's "generic
assertions are insufficient to trump the overriding public

interest in access to these judicial records." (ECF No. 281, at 1).

## A. Standard of Review

At issue in any request to redact or seal are the principles of common-law access and the more rigorous First Amendment analysis that applies to judicial records. "[D]ocuments filed with the court are 'judicial records' if they play a role in the adjudicative process, or adjudicate substantive rights." *In re United States for an Order Pursuant to 18 U.S.C. Section 2703[(D)]*, 707 F.3d 283, 290 (4th Cir. 2013). The United States Court of Appeals for the Fourth Circuit recently reminded us that:

> It is well settled that the public and press have a qualified right of access to judicial documents and records filed in civil and criminal proceedings. *See Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 580 n.17 (1980); *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 597 (1978); *Media Gen. Operations, Inc. v. Buchanan*, 417 F.3d 424, 428 (4th Cir. 2005). The right of public access springs from the First Amendment and the common-law tradition that court proceedings are presumptively open to public scrutiny. *Va. Dep't of State Police v. Wash. Post*, 386 F.3d 567, 575 (4th Cir. 2004). "The distinction between the rights of access afforded by the common law and the First Amendment is significant, because the common law does not afford as much substantive protection to the interests of the press and the public as does the First Amendment." [*In re United States for an Order*, 707 F.3d at 290] (quoting *Va. Dep't of State Police*, 386 F.3d at 575)

55

> (internal quotation marks omitted). The
> common-law presumptive right of access
> extends to all judicial documents and
> records, and the presumption can be rebutted
> only by showing that "countervailing
> interests heavily outweigh the public
> interests in access." *Rushford v. New
> Yorker Magazine, Inc.*, 846 F.2d 249, 253 (4th
> Cir. 1988). By contrast, the First
> Amendment secures a right of access "only to
> particular judicial records and documents,"
> *Stone v. Univ. of Md. Med. Sys. Corp.*, 855
> F.2d 178, 180 (4th Cir. 1988), and, when it
> applies, access may be restricted only if
> closure is "necessitated by a compelling
> government interest" and the denial of
> access is "narrowly tailored to serve that
> interest." *In re Wash. Post Co.*, 807 F.2d
> 383, 390 (4th Cir. 1986) (quoting *Press-
> Enter. Co. v. Superior Court*, 464 U.S. 501,
> 510 (1984) (internal quotation marks
> omitted)).

*Doe v. Pub. Citizen*, 749 F.3d 246, 265-66 (4th Cir. 2014). The

First Amendment right of access applies to judicial records made

part of a dispositive motion or entered into evidence at trial.

*See Minter v. Wells Fargo Bank, N.A.*, 258 F.R.D. 118, 121 (D.Md.

2009) (citing *Va. Dep't of State Police*, 386 F.3d at 576;

*Rushford*, 846 F.2d at 253); *Level 3 Commc'ns, LLC v. Limelight

Networks, Inc.*, 611 F.Supp.2d 572, 576, 589 (E.D.Va. 2009).

Furthermore, "[t]he burden to overcome a First Amendment right

of access rests on the party seeking to restrict access, and

that party must present specific reasons in support of its

position." *Va. Dep't of State Police*, 386 F.3d at 575 (citing

*Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 15 (1986)).

Before sealing any documents, the court should consider less drastic alternatives to sealing, such as filing redacted versions of the documents. If the court decides that sealing is appropriate, it should also provide reasons, supported by specific factual findings, for its decision to seal and for rejecting alternatives. *In re Knight Publ'g Co.*, 743 F.2d 231, 235 (4th Cir. 1984); *see Ashcraft v. Conoco, Inc.*, 218 F.3d 288, 302 (4th Cir. 2000). "Adherence to this procedure serves to ensure that the decision to seal materials will not be made lightly and that it will be subject to meaningful appellate review." *Va. Dep't of State Police*, 386 F.3d at 576.

**B. Analysis**

**1. Testimony Regarding the Third-Party Licensor**

Describing Discovery's 2007 affiliation agreement with DISH (*see* PTX 25) during his trial testimony on November 20, Mr. Cross revealed the identity of a third-party to the contract. Discovery seeks to redact seven lines of the Transcript identifying the third-party. (*See* ECF No. 279-1, at 28). Sky Angel contends that "Discovery's contractual relationship with [DISH] is a central issue in this case," and that "Discovery itself solicited testimony from Mr. Cross regarding the contract in its case-in-chief." (ECF No. 281, at 6).

This court previously held that "[w]hile the DISH Contract generally is relevant to this dispute, in that Sky Angel has

argued that the MFN provision and specifically Internet distribution rights were the true reason for Discovery's termination of the [] Agreement, not every provision of the DISH Contract is germane to adjudicating the current dispute." (ECF No. 197, at 46-47 (permitting the unredacted version of Discovery's affiliation agreement with DISH to remain under seal)). As it did at the summary judgment stage, Discovery relies on declarations previously submitted to the court by Mr. Cross and executives of the third-party. (*See* ECF No. 282, at 8-9). The declarants attested to why the redacted information is commercially sensitive and, should it be disclosed, would negatively impact Discovery and these non-party entities. (*See* ECF Nos. 189-6, at 13; 190-1; 190-2). At summary judgment, the court determined that redacting third-parties' identities was reasonable considering that the identities were not relevant or necessary to the adjudication of this dispute. (ECF No. 197, at 52). Similarly here, because the information contained in the proposed redactions is not necessary to the adjudication of this case, Discovery's proposed redactions remain reasonable and narrowly tailored to address the concerns raised by Mr. Cross and executives of the third-party. Accordingly, as before, the third-party's interest in anonymity and preventing commercially sensitive information from reaching competitors overrides the public's interest in access to irrelevant information.

Discovery's motion to redact seven lines on page 28 of the November 20 trial transcript will be granted.

### 2. Testimony Regarding Discovery's Third-Party Contracts

On cross examination on November 20, Mr. Cross testified about PTX 186, one of Discovery's third-party licensing agreements. Discovery seeks to redact ten lines on page 39 of the Transcript that identify the third-party licensor and the nature of its relationship with Discovery. (*See* ECF No. 279-1, at 39). According to Discovery, "[t]his information is both immaterial to any issue adjudicated in the case, and confidential and business sensitive to Discovery and that third-party." (ECF No. 282, at 10). Sky Angel argues that the identity of the third-party licensor was disclosed on its list of exhibits (*see* ECF No. 263), that Discovery introduced the exhibit during its case-in-chief, and that the proposed redactions Mr. Cross's testimony contain significant information about the legal relationship between Discovery and the third-party. (ECF No. 281, at 10).

During its case-in-chief, Discovery solicited testimony from Mr. Cross using a redacted version of the third-party licensing agreement. (*See* DTX 185). The identity of the third-party licensor, however, was not revealed during Mr. Cross's direct examination. (*See* ECF No. 279-1, at 13). More important, neither the identity of the third-party licensor nor

its legal relationship with Discovery "play[ed] a role in the adjudicative process, or adjudicate[d] substantive rights" in this dispute. *In re United States for an Order*, 707 F.3d at 290. The redacted information is not necessary to the adjudication this case, and Discovery and the third-party licensors' interests in keeping this commercially sensitive information confidential outweigh any public interest in access. Accordingly, Discovery's motion to redact ten lines on page 39 of the Transcript will be granted.

### 3. Testimony Regarding the Discovery-DISH Contract

Discovery also seeks to redact a portion of Mr. Cross's testimony concerning terms and conditions of the January 2010 amendments to Discovery's 2007 affiliation agreement with DISH. (*See* ECF No. 279-1, at 33-35). Arguing that public access to this testimony would prejudice Discovery and cause significant harm to its negotiations with other distributors, Discovery again relies on Mr. Cross's declaration previously submitted to the court. (ECF No. 279, at 2; *see* ECF No. 189-6, at 3, 10-15). Sky Angel contends that the exhibits and Mr. Cross's testimony "shed light on what was actually going on between Discovery and [DISH]" at the time Discovery terminated the Agreement with Sky Angel. (ECF No. 281, at 5).

At trial, Sky Angel argued that Discovery improperly terminated the Agreement in bad faith as a result of extra-

contractual considerations, namely in order to preserve its relationship with DISH. Discovery's communications with DISH and the parties' January 2010 contract amendments are relevant to this dispute. (*See* PTX 183; PTX 184). Discovery's motion and its reliance on Mr. Cross's declaration are insufficient to meet its burden to demonstrate that the proposed redactions concerning the DISH contract amendments would, if made public, "expose Discovery's strategies and allow Discovery's competitors to use that knowledge to try and make their networks more attractive to distributors as against Discovery's networks." (ECF No. 282, at 9; *see* ECF No. 189-6, at 13-14). As the court's opinion makes clear, Discovery's affiliation agreement with DISH is relevant to this case, and public access to Mr. Cross's testimony about the January 2010 amendments is necessary "so that the public can judge the product of the courts in a given case." *Va. Dep't of State Police*, 386 F.3d at 575 (quoting *Columbus–America Discovery Group v. Atlantic Mut. Ins. Co.*, 203 F.3d 291, 303 (4th Cir. 2000)). Discovery's negotiations with DISH, culminating with the contract amendments, were identified by Sky Angel at trial as the true motivation behind Discovery's decision to terminate the Agreement. The court relied on PTX 183 and PTX 184, as well as Mr. Cross's testimony, in the decisional process.

Considered during the adjudication of a civil trial, the portion of the Transcript constitutes a judicial record subject to the First Amendment right of access. *See In re U.S. for an Order*, 707 F.3d at 290; *Level 3 Commc'ns*, 611 F.Supp.2d at 590. Consequently, the court must weigh the appropriate competing interests to determine whether the redactions are "justified by 'an overriding interest based on findings that closure is essential to preserve higher values.'" *Level 3 Commc'ns*, 611 F.Supp.2d at 590 (quoting *Press-Enter. Co. v. Superior Court of California, Riverside Cty.*, 464 U.S. 501, 510 (1984)). "In concrete terms, the [c]ourt would need to determine if such sealing is either necessitated by a compelling governmental interest or, perhaps, justified by a non-governmental interest that also implicates such higher values." *Id.* (citations and internal quotation marks omitted). Here, no such interest is implicated. Discovery does not claim that the Transcript or related exhibits contain trade secrets, "which at least some courts apparently consider a possible exception even to the stronger First Amendment right of access." *Id.* at 591 (citations omitted). Discovery's private confidentiality interests, however legitimate, are not sufficiently compelling to overcome the right of access guaranteed by the First Amendment. Furthermore, even under the common law analysis, Discovery's asserted countervailing interests – the potential

for the testimony at issue to expose Discovery's strategies – do not heavily outweigh the public's interest in access in this case.   Accordingly, Discovery's motion to redact selected testimony on pages 33-35 of the Transcript will be denied.

## VII. Conclusion

For the foregoing reasons, judgment will be entered in favor of Defendants Discovery Communications, LLC and Animal Planet, LLC on all counts in the complaint.   A separate order will follow.

```
                              /s/
                         _____
                         DEBORAH K. CHASANOW
                         United States District Judge
```